UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

_____

|  |  |
|---|---|
| JOHN GALLUS, D. ELAINE GALLUS, INA BLOOM, ALEXANDRIA IONE FALLER (A/K/A ALEXANDRIA IONE GRIFFIN), for use and benefit of AXP NEW DIMENSIONS FUND, AXP MUTUAL FUND, AXP PRECIOUS METALS FUND, AXP EQUITY SELECT FUND, AXP SMALL CAP ADVANTAGE FUND, AXP PARTNERS SMALL CAP VALUE FUND, AXP MID CAP VALUE FUND, AXP SMALL COMPANY INDEX FUND, AXP HIGH YIELD BOND FUND, AXP MANAGED ALLOCATION FUND, and AXP BLUE CHIP ADVANTAGE FUND | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AMERICAN EXPRESS FINANCIAL CORPORATION, and AMERICAN EXPRESS FINANCIAL ADVISORS INC. | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 0:04-cv-4498

Honorable Donovan W. Frank
Magistrate Judge Janie S. Mayeron

_____

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Robert L. Schnell, Jr. #97329
FAEGRE & BENSON LLP
90 South Seventh Street
Minneapolis, MN  55402
612-766-7225

John D. Donovan, Jr.
Robert A. Skinner
Chanel R. Dalal
ROPES & GRAY LLP
One International Place
Boston, MA  02110
617-951-7000

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................................ii

PRELIMINARY STATEMENT .........................................................................1

BACKGROUND ...............................................................................................3

ARGUMENT.....................................................................................................6

I.     COUNT I FAILS BECAUSE THE COMPLAINT DOES NOT ALLEGE FACTS
       SPECIFIC TO THE DEFENDANTS AND THE AMERICAN EXPRESS FUNDS
       THAT MEET THE PLEADING STANDARD FOR A CLAIM OF EXCESSIVE FEES
       UNDER SECTION 36(b) OF THE ICA. .........................................................6

       A.  The Pleading Standard For Section 36(b) Actions .......................................6

       B.  Allegations Regarding The Industry As A Whole Are Insufficient to Establish
           Disproportionality Between Fees Charged and Services Rendered by *This* Adviser....9

       C.  The Complaint's Few Allegations Specific To AEFC Are Insufficient To Raise an
           Inference of "Disproportionality".............................................................11

       D.  Pleading Legal Conclusions Or Legal Standards Is Insufficient.................................13

       E.  These Pleading Tactics Have Been Used Before, and Failed ....................................17

II.    COUNTS III AND IV FAIL BECAUSE THE COMPLAINT ALSO DOES NOT
       ALLEGE FACTS SPECIFIC TO DEFENDANTS AND THE FUNDS TO MEET THE
       PLEADING STANDARD FOR A CLAIM OF EXCESSIVE DISTRIBUTION FEES
       UNDER SECTIONS 12(b) AND 36(b) OF THE ICA....................................................18

III.   COUNT IV FAILS BECAUSE THERE IS NO PRIVATE RIGHT OF ACTION UNDER
       SECTION 12(b) OF THE ICA.......................................................................22

IV.    COUNTS II AND III OF THE COMPLAINT ASSERT AN "EXCESS PROFITS"
       THEORY OF LIABILITY NOT PROVIDED BY THE STATUTE. ............................25

V.     PLAINTIFFS' REQUEST TO DECLARE THE ADVISORY AND DISTRIBUTION
       AGREEMENTS "VOID AB INITIO" SHOULD BE STRICKEN BECAUSE IT IS NOT
       PROVIDED FOR IN THE STATUTE. ...........................................................26

CONCLUSION...................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Amron v. Morgan Stanley Investment Advisers*, No. 03-5896 (S.D.N.Y.) .......................17

*Bildstein v. Dreyfus/Laurel Funds, Inc.*, 1999 WL 177349 (S.D.N.Y. Mar. 30, 1999) ...........................................................................................................................23

*Burks v. Lasker*, 441 U.S. 471 (1979) ...........................................................................1

*Disabled American Veterans v. Gober*, 234 F.3d 682 (Fed. Cir. 2000) ..........................20

*Florida State Board of Administration v. Green Tree Financial Corporation*, 270 F.3d 645 (8th Cir. 2001) ..............................................................................................4

*Frison v. Zebro*, 339 F.3d 994 (8th Cir. 2003)................................................................23

*Gartenberg v. Fund Asset Management, Inc.*, 528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd* 694 F.2d 923 (2d Cir. 1982) ...............................................................................23

*Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) .................................................................................................. 1, 6, 7, 18

*Green v. Fund Asset Management, L.P.*, 286 F. 682 (3d Cir. 2002)................................26

*I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*, 936 F.2d 759 (2d Cir. 1991) .............................................................................................................................4

*International Broadcasting Corporation v. Turner*, 734 F. Supp. 383 (D. Minn. 1990) ...........................................................................................................................25

*Jones v. Harris Associates*, No. 04-4184-CV-C-NKL (W.D. Mo.)............................14, 17

*Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991) ...............................23, 24

*Krantz v. Prudential Investments Fund Management LLC*, 305 F.3d 140 (3rd Cir. 2002) .................................................................................................. 8, 13, 17

*Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404 (2d Cir. 1989).....................23, 24

*Krinsk v. Fund Asset Management, Inc.*, 654 F. Supp. 1227 (S.D.N.Y. 1987), *aff'd* 875 F.2d 404 (2d Cir. 1989)..........................................................................23, 24

*Krinsk v. Fund Asset Management, Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988) .................21

*Mattes v. ABC Plastics, Inc.*, 323 F.3d 695 (8th Cir. 2003) .............................................8

*Merine v. Prudential-Bache Utility Fund, Inc.*, 859 F. Supp. 715 (S.D.N.Y. 1994) ........24

*meVC Draper Fisher Jurvetson Fund I, Inc. v. Millenium Partners L.P.*, 260 F.
   Supp. 2d 616 (S.D.N.Y. 2003) ...................................................................................23

*Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861 (2d Cir. 1990) ................18-19

*Migdal v. Rowe Price-Fleming International, Inc.*, 248 F.3d 321 (4th Cir.
   2001) ................................................................................... 8, 10, 13, 17

*Migdal v. Rowe Price-Fleming International, Inc.*, 2000 WL 350400 (D. Md.
   2000) .......................................................................................................19

*Millenco L.P. v. Mevc Draper Fisher Jurvetson Fund I, Inc.*, No. CIV. 02-142-
   JJF, 2002 WL 31051604 (D. Del. Aug. 21, 2002)...........................................7, 8, 14

*Morton v. Becker*, 793 F.2d 185 (8th Cir. 1986) .............................................................4

*Nelson v. AIM Advisors, Inc.*, 2002 WL 442189, Civ. No. 01-282-MJR (S.D. Ill.
   2002) ............................................................................................... 5, 6, 17

*Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002)....................................22, 23

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997) ..........................................4

*Penn v. Iowa State Board of Regents*, 999 F.2d 305 (8th Cir. 1993) ..............................13

*Reimel v. MacFarlane*, 9 F. Supp. 2d 1062 (D. Minn. 1998) ..........................................25

*Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982)................................................................21

*Strougo v. BEA Associates*, 188 F. Supp. 2d. 273 (S.D.N.Y. 2002) ................................13

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002) ........................................................8

*Tarlov v. Paine Webber Cashfund, Inc.*, 559 F. Supp 429 (D. Conn. 1983) ...................24

*Todd & Co. v. SEC*, 557 F.2d 1008 (3d Cir. 1977) ........................................................21

*Thompson v. Thompson*, 484 U.S. 174 (1988)...............................................................23

*Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979)............................22

*Westcott v. City of Omaha*, 901 F.2d 1486 (8th Cir. 1990) .............................................13

*Wexler v. Equitable Capital Management Corp.*, 1994 WL 48807 (S.D.N.Y. Feb. 17, 1994) ...............................................................................................19

*Wiles v. Capital Indemnity Corp.*, 280 F.3d 868 (8th Cir. 2002)..............................13, 19

*Winter v. Farmers Educational & Co-op Union*, 259 Minn. 257, 107 N.W.2d 226, 233-34 (1961) .............................................................................................25

*Yampolsky v. Morgan Stanley Investment Advisers, Inc.*, 2004 WL 1065533 (S.D.N.Y. May 12, 2004) .....................................7, 8, 9, 10, 13, 14, 17, 18

## STATUTES

15 U.S.C. § 78o-3 ..............................................................................................21

15 U.S.C. § 78s(b)-(c) ......................................................................................21

15 U.S.C. § 78bb(e) ..........................................................................................15

15 U.S.C. § 80a-10(a)-(b) ..................................................................................1

15 U.S.C. § 80a-12(b) ...................................................1, 5, 18, 22 & *passim*

15 U.S.C. § 80a-15(a)-(c) ..................................................................................1

15 U.S.C. § 80a-22(b) ......................................................................................21

15 U.S.C. § 80a-35(b).........................................1, 5, 6, 21, 24, 26 & *passim*

ICA, ch. 686, § 12, 54 Stat. 789, 809 (1940) .................................................23

ICA, Pub. L. No. 91-547, § 20, 84 Stat. 1413, 1429 (1970).............................23

## RULES & REGULATIONS

17 C.F.R. § 270.12b-1 ................................................................................18, 21

Fed. R. Civ. P. 8(a) .....................................................................................2, 7, 8

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 7

Fed. R. Civ. P. 23.1 ..........................................................................................25

Final Rule, SEC Release No. IC-26591, 2004 WL 1969665 (Sept. 2, 2004)...................20

Payment Of Asset-Based Sales Loads By Registered Open-End Management Investment Companies, SEC Release No. IC-16431, 1988 WL 1000015 (June 13, 1988) ...................................................................................19

Self-Regulatory Organizations; National Association of Securities Dealers, Inc.; Order Approving Proposed Rule Change Relating to the Limitation of Asset-Based Sales Charges As Imposed By Investment Companies, SEC Release No. 30897, 1992 WL 165343 (July 7, 1992) ..........................................................22

NASD Conduct Rule 2830(d)(2)(E)(i) ..........................................................21

## **MISCELLANEOUS**

Amy Goodman, Investment Company Regulation Deskbook § 7.4(2) (1998) ................21

Thomas P. Lemke & Gerald T. Lins, *Soft Dollars & Other Brokerage Arrangements* at v (2003) ........................................................................15

Restatement (3d) of Torts: Liability for Physical Harm § 16, Tentative Draft No. 1 (2001).............................................................................................22

5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (2d ed. 1990) ...........................................................................................8

Pursuant to Fed. R. Civ. P. 12(b)(6), the American Express Defendants[1] submit this memorandum in support of their motion to dismiss the claims against them.

## PRELIMINARY STATEMENT

This is an action under Sections 12(b) and 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. §§ 80a-12(b), 80a-35(b), to recover allegedly "excessive" fees paid to a mutual fund investment adviser and distributor.[2]  Plaintiffs, shareholders in eleven American Express mutual funds (the "American Express Funds"), contend that the fees those funds paid to AEFC and AEFA, their adviser and distributor, respectively, are too high, the "excess" portion should be returned to the funds, and the advisory and distribution contracts should be rescinded.

The well-developed jurisprudence under Section 36(b) establishes a rubric for examining "excess" investment advisory and distribution fee claims.  The seminal case of *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982), erects six "factors" to aid analysis of the ultimate issue a Section 36(b) case poses:  whether facts specific to the funds in question show that a defendant's fees are so disproportionately large that they bear no reasonable relationship to the services rendered such that they could not have been the product of arm's-length bargaining.  But *Gartenberg's analytical* rubric is not a *pleading* standard.  It is not enough simply to invoke the framework's "factors" and assert they are not met.  Factually empty *conclusions* about *Gartenberg's* "factors" do not substitute for fund-specific *facts* upon which to

---

[1] The "American Express Defendants" are American Express Financial Corporation ("AEFC") and American Express Financial Advisors Inc. ("AEFA").

[2] As a matter of industry practice and as recognized as a matter of law, the management and operations of a mutual fund are externalized and contractually delegated to its investment "adviser."  Since the enactment of the ICA and the Investment Advisers Act of 1940, the Supreme Court and lower courts have appreciated the legal separation of a mutual fund and its adviser, and have acknowledged this distinction as a principal purpose of the 1940 Acts, which protect fund investors by maintaining a fund's independence from its adviser.  *See Burks v. Lasker*, 441 U.S. 471, 480-87 (1979); ICA, 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c).  The contractual "distributor" of a fund's shares – its primary underwriter – solicits retail securities brokers to sell shares to individual investors or

draw the required inference of disproportionality between fees and services, or the essential conclusion that the contracts could not have been fairly bargained.

But that is all the plaintiffs' Complaint supplies.  The pleading summons up the *Gartenberg* "factors" and advances the conclusion that they are not met.  But it conspicuously omits any factual allegation upon which to measure disproportionality, whether under the *Gartenberg* "factors" or otherwise.  The Complaint is silent about the value of the services that the American Express Defendants provide to the American Express Funds, and it never mentions the relationship between those services and the fees the funds pay to the defendants for them.

Instead, the Complaint grounds its conclusion of "excessive" fees on a critique of the size of fees charged generally in the mutual fund industry.  But broad assertions about *competitors* of the American Express Defendants and the American Express Funds say nothing about the relationship between defendants and the funds, just as they say nothing about the value of the services rendered for these specific funds by this specific adviser and distributor.  These bare allegations do not satisfy Section 36(b)'s pleading standards.  *See* Fed. R. Civ. P. 8(a) (complaint must make "showing that the pleader is entitled to relief").

Plaintiffs' last count – which asserts a claim about the distribution fees under Section 12(b) of the ICA – fails as well.  The claim is redundant.  It merely repeats the allegation that the distribution fees are too high, and invokes Section 12(b) rather than Section 36(b).  But there is no private right of action under Section 12 of the ICA.  Any "excess" portion of the distribution fees is recoverable – if at all – only under the statutory provision that specifically authorizes shareholders to pursue fee claims against a distributor on behalf of a fund.

Accordingly, the Complaint should be dismissed in its entirety.

---

sells them directly to investors itself.  Thus, a mutual fund – owned by public investors – conducts all its operations through external agents; here, those agents are under common corporate ownership.

# BACKGROUND

## The Parties and the Funds

Plaintiffs John and Elaine Gallus of Tomball, Texas, Ina Bloom, of Sun City, Arizona, and Alexandria Ione Faller of Phoenix, Arizona, allege that they own an unspecified number of shares of eleven mutual funds in a family of funds known as the American Express Funds. The Texas plaintiffs allege that they both are shareholders in eight funds: the AXP Precious Metals Fund, Equity Select Fund, New Dimensions Fund, Small Cap Advantage Fund, Partners Small Cap Value Fund, Mid Cap Value Fund, Small Company Index Fund, and High Yield Bond Fund. Elaine Gallus adds that she also owns shares of the AXP Managed Allocation Fund and Blue Chip Advantage Fund. The Arizona plaintiffs each claim to own a single fund: Ms. Bloom is an AXP New Dimensions Fund shareholder and Ms. Faller is an AXP Mutual Fund shareholder.

Defendants AEFC and AEFA serve as adviser and distributor, respectively, of the American Express Funds, and are based in Minneapolis, Minnesota. Defendants provide services to the funds pursuant to agreements approved by each fund's board of directors.

Under these agreements, the funds pay certain fees for the services the defendants provide. Each fund pays a management fee, based on a percentage of the fund's net assets, in respect of the advisory and administrative services performed by the investment manager.[3] Compl. ¶ 6. The percentage management fee declines as the fund size increases. *See* Funds' Statements of Additional Information ("SAIs"), Exs. C (SAI at 33); D (SAI at 32); E (SAI at 32); F (SAI at 33); G (SAI at 34); H (SAI at 33); I (SAI at 41); J (SAI at 33); K (SAI at 32); L (SAI at 32); M (SAI at 33).[4] The fee compensates AEFC for its services as investment adviser to the

---

[3] The term "management fees" is used to represent "advisory fees" throughout this memorandum.

[4] In addition to the facts alleged in the Complaint, defendants rely on the Growth Trust Investment Management Services Agreement (on behalf of, *inter alia*, the AXP New Dimensions Fund) (Dec. 1, 2002), the

funds, including all of its services in researching and executing transactions in the funds' portfolios.  In addition, the fee covers expenses beyond "pure" investment advisory expenses, including taxes, brokerage commissions and non-advisory expenses, such as custodian fees; audit and certain legal fees; fidelity bond premiums; share registration fees; office expenses; consultants' fees; board member compensation; corporate filing fees; organizational expenses; expenses related to lending securities; and other expenses approved by the fund's board.  *See* Exs. A, Part III; C (SAI at 33); D (SAI at 32); E (SAI at 32); F (SAI at 33); G (SAI at 34); H (SAI at 33); I (SAI at 43); J (SAI at 33); K (SAI at 32); L (SAI at 32); M (SAI at 33).  According to the Complaint, the funds' management fees range from 0.36% to 0.91%.  *See* Compl. ¶ 9.

Each fund also pays a distribution fee, based on a percentage of the fund's net assets, in respect of the costs of marketing and distributing fund shares.  *See* Compl. ¶¶ 20, 24.  The distribution fee covers sales commissions; business, employee and financial advisor expenses charged to distribution; overhead allocated to the sale of shares; and costs of providing personal services to shareholders.  *See* Exs. C (SAI at 35); D (SAI at 34); E (SAI at 33); F (SAI at 35); G

---

AXP New Dimensions Fund Distribution Agreement (Mar. 9, 2000), and the funds' 2004 SAIs and recent Prospectuses or Annual Reports filed with the SEC (AXP New Dimensions SAI & Prospectus (Sept. 29, 2004); AXP Managed Allocation Fund SAI & Prospectus (Nov. 28, 2003, updated Aug. 2, 2004); AXP Small Company Index Fund SAI & Prospectus (Mar. 31, 2004, updated Aug. 2, 2004); AXP High Yield Bond Fund SAI & Prospectus (Jul. 30, 2004, updated Aug. 2, 2004); AXP Precious Metals Fund SAI & Prospectus (May 28, 2004, updated Aug. 2, 2004); AXP Small Cap Advantage Fund SAI & Prospectus (May 28, 2004, updated Aug. 2, 2004); AXP Partners Small Cap Value Fund SAI & Prospectus (Jul. 30, 2004, updated Aug. 2, 2004); AXP Equity Select Fund SAI & Prospectus (Jan. 29, 2004, updated  Aug. 2, 2004); AXP Mutual Fund SAI & Prospectus (Nov. 28, 2003, updated Aug. 2, 2004); AXP Mid Cap Value Fund SAI & Prospectus (Nov. 28, 2003, updated Aug. 2, 2004); AXP Blue Chip Advantage Fund SAI (Mar. 31, 2004) & 2004 Annual Report), which are attached to the Declaration of Robert A. Skinner, dated December 21, 2004 ("Skinner Decl."), as Exhibits A, B, C, D, E, F, G, H, I, J, K, L, and M, respectively.   In considering a motion to dismiss for failure to state a claim, the initial pleading is deemed to include any exhibits attached to it.  *See Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986).  The district court is also entitled to consider documents central to the plaintiffs' claims, even if the documents are not themselves attached to the initial pleading.  *See Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 n.9 (8th Cir. 1997).  This is especially true when the central documents – like those here – are publicly filed.  *See Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 663 (8th Cir. 2001) (considering executives' stock transactions on a motion to dismiss since they appear in required public filings with the SEC); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir. 1991) (declining "to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference").

(SAI at 36); H (SAI at 35); I (SAI at 52); J (SAI at 35); K (SAI at 34); L (SAI at 34); M (SAI at 35).  Recent SAIs for the funds disclose that each fund pays a distribution fee of 0.25% for its Class A shares.  *See* Exs. C (SAI at 35); D (SAI at 34); E (SAI at 33); F (SAI at 34); G (SAI at 36); H (SAI at 35); I (SAI at 52); J (SAI at 35); K (SAI at 34); L (SAI at 34); M (SAI at 35).[5]

According to the Complaint, the assets of the American Express family of funds have grown dramatically since its founding in 1940.  *See* Compl. ¶ 15.  But the Complaint is silent on the reasons for that growth – be it due to new sales, additional funds, new products, or fund performance.  It also is silent on the types of management services provided over this period.

### The Derivative Claims

Plaintiffs purport to bring claims on behalf of the funds pursuant to Sections 12(b) and 36(b) of the ICA (15 U.S.C. §§ 80a-12(b) and 80a-35(b)), alleging that the fees charged under the funds' advisory and distribution agreements are excessive.  Counts I and II challenge the advisory fee under Section 36(b), respectively alleging that the fee is "excessive" and that AEFC earned "excess profits" from economies of scale.  Counts III and IV challenge the distribution fee, respectively under Section 36(b) as "excessive," and under Section 12(b) as "unlawful."[6]  Beyond those legal theories, however, the pleading's factual allegations to support the conclusions of "excessiveness" are thin.  While it alleges that fees in the industry as a whole are too high, it contains no facts specific to the funds at issue that show that the fees the *American Express Defendants* charge the *American Express Funds* are excessive or unlawful.

---

[5] The Complaint alleges that the New Dimensions Fund pays a distribution fee of 0.36%, but the source of this figure is unclear.  The figure above refers to the distribution fees listed in the 2004 SAIs (Exs. C-M) for Class A shares – the class of shares referenced elsewhere in the Complaint, *see* Compl. ¶ 52.  For consistency's sake, and since Class A is uniformly the largest class of shares, this Memorandum focuses on fees for this class in each fund.

[6] These claims were previously asserted in *Nelson v. AIM Advisors, Inc.*, Civ. No. 01-282-MJR (S.D. Ill.) (attached as Ex. N to Skinner Decl.), by the same plaintiffs' counsel against the same defendants, among others.  After the *Nelson* court ordered the claims against the American Express Defendants transferred to the District of Minnesota, the *Nelson* plaintiffs voluntarily dismissed their case.  Two years later, plaintiffs filed this suit.

*The Procedural History*

Plaintiffs initially filed this lawsuit in the District of Arizona, but the parties stipulated to a transfer of the case to this District, where defendants are headquartered and where they manage the mutual funds at issue.  As the court held in *Nelson v. AIM Advisors, Inc.*, it is "clearly more convenient" for claims against the American Express Defendants to be heard here.  2002 WL 442189, at \*5 (S.D. Ill. Mar. 8, 2002).  The case was filed in this Court on October 14, 2004.

## ARGUMENT

I.    **COUNT I FAILS BECAUSE THE COMPLAINT DOES NOT ALLEGE FACTS SPECIFIC TO THE DEFENDANTS AND THE AMERICAN EXPRESS FUNDS THAT MEET THE PLEADING STANDARD FOR A CLAIM OF EXCESSIVE FEES UNDER SECTION 36(b) OF THE ICA.**

   A.    **The Pleading Standard For Section 36(b) Actions**

Section 36(b) of the ICA imposes a statutory fiduciary duty on mutual fund investment advisers in connection with their receipt of fees from the funds they manage:  "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services . . . paid by such registered investment company."  15 U.S.C. § 80a-35(b).  The statute further provides the funds' shareholders a right to bring a derivative action against the adviser, on behalf of the funds, for alleged breaches of that fiduciary duty in connection with the receipt of compensation.  *See id.*[7]

Section 36(b)'s jurisprudence is well developed.  As the Complaint identifies, the seminal case on Section 36(b) is *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982).  *See* Compl. ¶ 39.  *Gartenberg* and its progeny apply this test to assess liability under

---

[7] In pertinent part, Section 36(b) provides:

> An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment adviser . . . for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company . . . to such investment adviser or person.

the ICA: "To be guilty of a violation of § 36(b), . . . the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928.

While *Gartenberg* sets disproportionality between fees paid and the value of services rendered as the touchstone for liability under Section 36(b), it does not articulate a pleading standard for Section 36(b) complaints. Rather, *Gartenberg* supplies a rubric for analyzing ostensible disproportionality. The court described six "factors" that could be considered in determining whether a fee is so large that it bears no reasonable relationship to the services rendered, including: (i) the nature and quality of the services provided by the adviser to the shareholders; (ii) the profitability of the mutual fund to the adviser; (iii) fall-out benefits; (iv) economies of scale realized by the adviser; (v) comparative fee structures with similar funds; and (vi) the independence and conscientiousness of the independent trustees. *Gartenberg*, 694 F.2d at 928-931. But these *Gartenberg* factors are not a pleading standard for purposes of Fed. R. Civ. P. 8(a) and 12(b)(6); they are an analytical tool for examining and testing well-pled facts. *Millenco L.P. v. Mevc Draper Fisher Jurvetson Fund I, Inc.*, No. CIV. 02-142-JJF, 2002 WL 31051604, *3 n.3 (D. Del. Aug. 21, 2002) ("the *Gartenberg* decision does not set a pleading standard, but rather is helpful only after the complete evidentiary record has been established"). Thus, the mere invocation of the *Gartenberg* factors cannot substitute for the required factual allegations comparing specific fees for specific services, because the mere invocation of *Gartenberg* omits the factual predicate supporting the required inference of disproportionality and the evidence essential to infer an absence of good faith bargaining. *Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*, 2004 WL 1065533, *1-2 (S.D.N.Y. May 12, 2004) (dismissing Section 36(b) claims where plaintiffs "crafted their complaints" to track the *Gartenberg* factors).

Simply put, the decisional law recognizes that, when it comes to pleading under Rule 8(a), disproportionality or the absence of arm's-length bargaining cannot exist in a vacuum. To make out a cognizable claim under Section 36(b), then, a plaintiff must allege facts *specific* to AEFC and the American Express Funds that establish that the advisory fees are so large that the link between AEFC's fees and its services to the funds is broken.[8] Indeed, the disproportionality between fees and services must be so great that it compels the inference that the contractual arrangement *"could not"* have been the product of arm's-length bargaining. That inference also depends upon fund- or adviser-specific facts. *See Millenco,* 2002 WL 31051604 *at* \*3; *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) ("[A] plaintiff must allege facts that, if true, would support a claim that the fees at issue are excessive."); *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3rd Cir. 2002) (dismissing under Rule 12(b)(6) where plaintiff "failed to allege any facts indicating that the fees received were disproportionate to the services rendered"); *Yampolsky,* 2004 WL 1065533 at \*2 (dismissing two similar complaints based on Section 36(b) that lack "any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants").[9]

---

[8] Plaintiffs allege "excessive fee" claims against both AEFC – for the management fees – and AEFA – for the distribution fees. Part I of this Memorandum addresses the claim regarding management fees; Parts II and III, building on Part I, address the claim regarding distribution fees.

[9] That the ICA jurisprudence requires plaintiffs to allege facts "indicating that the fees received were disproportionate to services rendered," *Krantz*, 305 F.3d at 143, in no way runs afoul of the Supreme Court's recent notice-pleading case, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002). *Swierkiewicz* merely held that in an employment discrimination case, Fed. R. Civ. P. 8(a)'s "notice pleading" standard did not oblige a plaintiff to plead the *proof* that would establish each element of a prima facie case under the *McDonnell Douglas* burden-shifting regime. But that case does not change the requirement of the pleading rules – i.e., Rule 8(a)'s "short and plain statement" amounting to a "*showing* that the pleader is *entitled to relief*." Fed. R. Civ. P. 8(a) (emphases added). ICA cases well recognize the parameters of Rule 8(a), and simply reiterate the well-settled principle that – even under Rule 8(a) – more detail is required than a "bald statement by plaintiff that he has a valid claim of some type against defendant." *See, e.g.*, *Migdal*, 248 F.3d at 326, quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Practice & Proc. § 1357 at 318 (2d ed. 1990). This continues to be the standard under which pleadings are measured. *See Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003) ("well-pleaded facts, not legal theories or conclusions, determine adequacy of complaint") (quotation omitted).

**B.    Allegations Regarding The Industry As A Whole Are Insufficient to Establish Disproportionality Between Fees Charged and Services Rendered by *This* Adviser**

The Complaint in this action cannot satisfy this pleading standard, as it alleges virtually nothing about either (i) the services that AEFC provided to the American Express Funds or (ii) the relationship between the value of services and the fees paid to AEFC for them.  Without such facts, the plaintiffs cannot hope to establish the disproportionality between fees and services that is the touchstone of a Section 36(b) claim.

Indeed, most of the Complaint's factual allegations do not relate specifically to AEFC and the American Express Funds at all.  Instead, the pleading advances a broad critique of fees charged in the mutual fund industry as a whole.  *See* Compl. ¶¶ 18, 26, 48, 49, 50, 51, 54, 55, 66, & *passim*.  But generalized allegations about the mutual fund industry's practices – untied as they are to any alleged conduct of *this* adviser defendant – cannot form the foundation for a claim against AEFC.  *See Yampolsky*, 2004 WL 1065533 at *2 (dismissing Section 36(b) complaints that "rely heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders").

*First*, while the Complaint contains broad critiques of the industry and its fees, it is *silent* as to how AEFC's fees compare with the industry's.  Without these specific allegations about AEFC, there is no basis to conclude that, whatever infirmities ostensibly plague the mutual fund industry as a whole, those same problems actually infect AEFC and the American Express Funds.  If *some* investment advisers have generated economies of scale they have not passed on to their funds, or have derived "fall-out" benefits from advising multiple funds, that does not tend to establish that anything similar has occurred at AEFC.  Mere *participation* in the industry proves nothing about AEFC's *conduct* as an industry participant.  Therefore, the Complaint's references to the industry's fees are meaningless to this case.

*Second*, even if the Complaint's repeated references to industry practices is meant to suggest that AEFC's fees behaved *consistently* with industry norms, such an assumed conclusion does not advance plaintiffs' excessiveness claim under Section 36(b).  It does just the opposite.  If in fact AEFC charges fees for services rendered that are the same as what other investment advisers charge for similar services, that compels the conclusion that its fees are proportionate to what the funds could otherwise obtain from an AEFC competitor.  By definition, fees that are the same as industry norms are not "disproportionately" large compared to the value of services rendered.  *See Yampolsky*, 2004 WL 1065533 at *2; *Migdal*, 248 F.3d at 327 (dismissing a 36(b) claim that compared the funds' performance to three other funds but failed to "address the particular services offered by the defendants in this case").

*Third*, despite the Complaint's attempt to *imply* that AEFC's fees match the industry's, it is telling that the Complaint contains no outright allegations to this effect.  The absence of these allegations suggests that plaintiffs *chose* not to make any specific fee comparisons, and further suggests the lack of substance to their claims.  And in fact, had plaintiffs alleged facts about how AEFC's fees compare with the industry's, they would have had to reveal that defendants' fees are typically *less* than the average fees charged by the industry.  For example, the Complaint alleges that the AXP Equity Select Fund pays a management fee of 0.60%.  *See* Compl. ¶ 9.  According to Lipper – widely regarded as the preeminent expert in fund analysis – the average management fee for similarly sized Mid-Cap Growth Funds – Equity Select's type of fund – is 0.87%, which is well above AEFC's rate.  *See* www.lipperweb.com.  Similarly, the Complaint alleges that the expense ratio – which represents the total fees paid by a fund, including management *and* distribution fees – for the AXP New Dimensions Fund's Class A shares is 1.08%.  Compl. ¶ 52.  However, one of plaintiffs' own exhibits actually reports that the

industry's average expense ratio in 1998 was 1.57%. *See* Compl. Ex. 1 n.48. The industry average is thus higher than all of the American Express Funds' recent Class A expense ratios, which range from 0.91% to 1.55%. *See* Exs. C (Prospectus at 7); D (Prospectus at 10); E (Prospectus at 7); F (Prospectus at 7); G (Prospectus at 9); H (Prospectus at 7); I (Prospectus at 9); J (Prospectus at 7); K (Prospectus at 9); L (Prospectus at 5); M (Annual Report at 21).

At root, the Complaint's allegations about industry-wide behavior betray a subjective view about investment advisers and their fees. It is evident that plaintiffs view the industry's fees as too large. But such subjective opinions self-evidently are not based upon the objective facts essential to a claim about AEFC and the American Express Funds. And it is objective information – warranting an inference of disproportionality or bad faith bargaining in connection with AEFC's fees to the funds – that is the essential ingredient of a Section 36(b) claim.

### C.   The Complaint's Few Allegations Specific To AEFC Are Insufficient To Raise an Inference of "Disproportionality"

The few facts alleged in the Complaint that do relate directly to AEFC and the American Express Funds do not come close to satisfying the pleading standard for a 36(b) action, as they allege nothing about the services provided or the relationship between the value of those services and the fees paid by the funds. The sum total of the Complaint's factual allegations specific to the fees charged by AEFC is the following: the allegation that the amount of the fee for the AXP New Dimensions Fund as a percentage of assets was slightly higher in 2003 (0.61%) than in 1999 (0.52%), even though the fund's asset base had increased. *See* Compl. ¶ 23.

But an alleged increase over time in the *absolute* size of the fee as a percentage of the fund assets under management tells us nothing about whether those fees were out of proportion to the services being compensated. There is nothing in the Complaint about how the fees grew during 1999-2003 *relative* to the quantity and nature of the services being provided during that

period.  Disproportion between fees and services can only be established with factual allegations regarding both sides of the equation, and the Complaint is notably silent about how the services provided in 2003 compared to those provided in 1999 (*e.g.*, what types of securities were being managed, the resources and expertise required to manage them, and the ancillary trading and execution services provided to the funds).  Even plaintiffs' exhibit reveals the possibility that industry services have changed.  *See* Compl. Ex. 3 at 6 (GAO research showing that "[i]ndustry officials reported that some costs of operating mutual funds have been increasing, in part, because funds have been expanding the level of services they provide to investors").

Plaintiffs assert that an increase in fee size as a percentage of assets by itself shows that AEFC is not passing along supposed economies of scale that arise as funds grow.  Plaintiffs ignore, however, the fee schedules AEFC actually charges the American Express Funds.  Among other things, the schedules recognize the possibility of economies of scale by including "break points" at which the percentage fee *decreases* as fund assets *increase*.[10]  The Complaint neither acknowledges this fact nor alleges why these diminishing schedules do not adequately account for the alleged economies of scale when viewed in relation to the services provided.  Even plaintiffs' exhibits describe the use of break points as "[o]ne piece of evidence for the existence of economies in portfolio management."  Compl. Ex. 1 n.59; Compl. Ex. 2 at 22 & n.107.

---

[10] *See* Ex. A, Part II.  As the 2004 SAIs show, the management fee for: (1) the AXP New Dimensions fund is set at reducing percentages from 0.6% to 0.48% annually; (2) the AXP Management Allocation Fund is set at reducing percentages from 0.53% to 0.4% annually; (3) the AXP Small Company Index Fund is set at reducing percentages from 0.38% to 0.34% annually; (4) the AXP High Yield Bond Fund is set at reducing percentages from 0.59% to 0.465% annually; (5) the AXP Precious Metals Fund is set at reducing percentages from 0.8% to 0.675% annually; (6) the AXP Small Cap Advantage Fund is set at reducing percentages from 0.74% to 0.615% annually; (7) the AXP Partners Small Cap Value Fund is set at reducing percentages from 0.97% to 0.87% annually; (8) the AXP Equity Select Fund is set at reducing percentages from 0.60% to 0.48% annually; (9) the AXP Mutual Fund is set at reducing percentages from 0.53% to 0.43% annually; (10) the AXP Mid Cap Value Fund is set at reducing percentages from 0.70% to 0.58% annually; and (11) the AXP Blue Chip Advantage Fund is set at reducing percentages from 0.54% to 0.35% annually.  *See* Exs. C (SAI at 33); D (SAI at 32); E (SAI at 32); F (SAI at 33); G (SAI at 34); H (SAI at 33); I (SAI at 41); J (SAI at 33); K (SAI at 32); L (SAI at 32); M (SAI at 33).

The allegation that AEFC charges institutional clients less for services is also irrelevant. *See* Compl. ¶ 43.  Plaintiffs do not allege that the services AEFC provides to institutional clients are the same services AEFC provides as an investment adviser to the American Express Funds, nor can they.  Indeed, fund documents show that AEFC's adviser role involves general business management services extending beyond pure investment management.  *See, e.g.*, Ex. A.  With no basis to allege that services to institutional clients match the breadth of services provided to the funds, the proffered comparison of advisory fees is an apples-to-oranges comparison and legally irrelevant.  *See Strougo v. BEA Assocs.*, 188 F. Supp. 2d. 273, 384 (S.D.N.Y. 2002) ("relevant comparison must be to other mutual funds, not to non-mutual fund institutional clients").

### D.    Pleading Legal Conclusions Or Legal Standards Is Insufficient

Short on facts about AEFC, plaintiffs fill the Complaint with legal conclusions posing as facts.  It is well settled that in analyzing the sufficiency of a complaint, the Court should ignore "legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."  *Wiles v. Capital Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002); *Penn v. Iowa State Bd. of Regents*, 999 F.2d 305, 307 (8th Cir. 1993) ("the Court must dissect the Complaint, eliminate mere rhetoric, legal conclusions and unsupported factual conclusions"); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) ("we do not . . . blindly accept the legal conclusions drawn by the pleader from the facts").

### 1.    Conclusory Allegations of Excessiveness or Disproportionality Are Insufficient

The Section 36(b) case law is clear that the conclusory "facts" stated by the plaintiffs are inadequate to support a claim for liability.  *See, e.g.*, *Migdal*, 248 F.3d at 327; *Krantz*, 305 F.3d at 143 (finding Rule 12(b)(6) proper where plaintiff "failed to allege any facts indicating that the fees received were disproportionate to the services rendered"); *Yampolsky*, 2004 WL 1065533 at

*2 (dismissing two similar Section 36(b) complaints that lack "any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants."). Accordingly, plaintiffs' general averments of excessive fees are insufficient.

### 2.    Recitation Of The *Gartenberg* "Factors" Is Insufficient

Much of the Complaint is devoted to a recitation of six "factors" that *Gartenberg* said could be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered.  But the mere invocation of the *Gartenberg* factors is legally insufficient to state a claim under Section 36(b).  *See Yampolsky*, 2004 WL 165533 at *1-2 (dismissing Section 36(b) claim where the plaintiffs "crafted their complaints" to track the *Gartenberg* factors).  The *Gartenberg* factors are not a pleading standard; they are an analytical framework for analyzing well-pled facts.  *See Millenco*, 2002 WL 31051604, at *3 n.3.

Here, the Complaint's architecture is predicated upon *Gartenberg*.  The pleading recites the *Gartenberg* factors and advances a series of assumptions, all asserted upon "information and belief," regarding how AEFC *must* have acted if the document's pre-ordained conclusion of disproportionality is to be accepted.  For example, under the heading "The Nature and Quality of the Services Provided to the Funds," the plaintiffs allege "[o]n information and belief . . . the nature of the services Defendants rendered to the Funds has remained unchanged despite dramatic growth in the assets of the Funds."  Compl. ¶ 42.[11]  The plaintiffs do not identify any basis – much less the required reasonable basis – for their "information and belief."  Rather, they *assume* the services have remained unchanged because that assumption is consistent with the pleading's pre-ordained conclusion.  But that logic is suspiciously circular.

---

[11]  Allegations made "[o]n information and belief" tracking the *Gartenberg* factors are popular Section 36(b) pleading tactics.  In fact, each "information and belief" allegation above appears verbatim in the complaint in *Jones v. Harris Assocs.*, No. 04-4184-CV-C-NKL (W.D. Mo.) (attached as Ex. O to Skinner Decl.).  *Compare* Compl. ¶ 42 *with Jones* Compl. ¶ 25; Compl. ¶ 46 *with Jones* Compl. ¶ 28; Compl. ¶ 67 *with Jones* Compl. ¶ 49.

Similarly, under the heading "The Profitability of the Fund to the Adviser/Manager" the Complaint states "upon information and belief, Defendants' reporting of their revenues and costs is intended to, and does obfuscate Defendants' true profitability.  For instance, upon information and belief, Defendants employ inaccurate accounting practices in their financial reporting, including arbitrary and unreasonable cost allocations."  Compl. ¶ 46.  But that is the meretricious posing as the meritorious.  The Complaint does not say how or why revenues and costs are misreported; it supplies no basis for the defamatory allegation of "intention[al] . . . obfuscat[ion]."  It does not deign to describe any "inaccura[cy]" in AEFC's accounting practices, and it does not set forth the details of any cost allocations that would deem them unreasonable, much less arbitrary.  Nor does it allege any facts regarding how AEFC allegedly misstated its profits.  The absence of factual underpinning to these unsubstantiated charges unmasks them as hollow attempts to shoehorn a conclusion into a *Gartenberg* factor, rather than *facts* upon which to use *Gartenberg's* "factors" to test the reasonableness of the funds' compensation to AEFC.

The plaintiffs repeat the same ploy with other *Gartenberg* "factors."  Regarding the "Fallout Benefits" factor, plaintiffs allege "on information and belief" that AEFC has received "fall-out" benefits and then describe four categories of common "fall out" benefits, which they conclusorily allege AEFC received: "soft dollars,"[12] "kickbacks," benefits from securities lending arrangements, and the ability to sell investment advisory services paid by the American Express Funds at virtually no additional cost.  Compl. ¶¶ 58-61.  But the pleading conspicuously omits any details about "soft dollar" arrangements between AEFC and any third party, much less

---

[12] The term "soft dollars" "refers to the practice whereby a discretionary money manager uses brokerage commissions from client transactions to pay for research or brokerage services, in addition to basic execution services."  Thomas P. Lemke & Gerald T. Lins, *Soft Dollars & Other Brokerage Arrangements* at v (2003).  The use of soft dollars is widespread.  *Id.* at § 1-14.  The research obtained by such "soft dollar" arrangements is often used to benefit the mutual fund and is protected under the 1934 Act by a statutory "safe harbor."  15 U.S.C. § 78bb(e).

the background or circumstances of any "kickbacks."  As with "intention[al] . . . obfuscat[ion]" of reported revenues and costs, one would imagine that if the plaintiffs truly had a good faith basis to accuse AEFC of "kickbacks" or "improper accounting," the plaintiffs would not merely advance the conclusion under the veil of "information and belief," but would paint the factual bases for these allegations in neon colors.  Their failure even to hint at the "information" that supports their "belief" speaks volumes about the Complaint's effort to invoke the *Gartenberg* factors, and suggests instead that these allegations are hip-shooting of the worst sort.  The Complaint fails miserably to do anything other than invoke the "factors" emptily – without facts that would justify using them as analytical tools to scrutinize AEFC's fees to the funds.

Plaintiffs' allegations about the American Express Funds' trustees who negotiated the advisory agreement with AEFC are equally devoid of factual underpinning.  Notwithstanding the statutory definition of "disinterested" and the ICA's presumption that disinterested directors are in fact disinterested, plaintiffs broadly allege "on information and belief" that "[a]s part of their scheme to receive excessive fees, Defendants did not keep the directors fully informed regarding all material facts and aspects of their fees and other compensation, and the directors failed to insist upon adequate information."  Compl. ¶ 67.  Plaintiffs do not plead any basis for the assertions that AEFC misled the board and that the board was not conscientious in its duties.  The Complaint does not say what the directors did not know or failed to ask.  The "aspects" of the fees about which the directors remained ignorant are not illuminated.  In short, the pleading's "facts" are the other end of plaintiffs' circular hypothesis that the fees were disproportionate.

For each *Gartenberg* factor, the analysis is identical.  Plaintiffs begin with the allegation that the fees are disproportional and then allege "on information and belief" a conclusory claim consistent with their assumption.  That kind of bootstrapping is insufficient as a matter of law.

**E.**   **These Pleading Tactics Have Been Used Before, and Failed**

Numerous complaints almost identical to plaintiffs have been filed in the recent past. Several have already been dismissed by the courts.[13]  Others have been voluntarily dismissed.[14] And others are currently at the motion to dismiss stage of pleading.[15]

*Yampolsky* is particularly instructive.  In that case, the court consolidated two cases – *Yampolsky* and *Amron* – filed against Morgan Stanley.  On consideration of a motion to dismiss, the court noted that both complaints "rel[ied] heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders."  2004 WL 1065533, at *2.  Just as in the instant complaint, the *Yampolsky* plaintiffs quoted Jack Bogle, founder of the Vanguard Group, on his critique of fund directors.  Compl. ¶ 66; *Yampolsky* Compl. ¶ 33 (attached as Ex. P to Skinner Decl.); *Amron* Compl. ¶ 32 (attached as Ex. Q to Skinner Decl.). Both plaintiffs' and the *Yampolsky* complaints similarly quoted Arthur Levitt, former Chairman of the SEC, on his concerns over fund fees.  Compl. ¶ 18; *Yampolsky* Compl. ¶ 21; *Amron* Compl. ¶ 20.  And both plaintiffs' and the *Amron* complaints quoted investor Warren Buffet's questioning of fund directors' independence.  Compl. ¶ 66; *Amron* Compl. ¶ 35.

In addition, the *Yampolsky* complaints' factual allegations were conclusory – "rel[ying] principally on the assertions that the fund underperformed as compared to the S&P 500 Index, had an unfavorable expense ratio, and that the trustees were poor 'watchdogs.' " 2004 WL 1065533, at *2.  But *Yampolsky*'s factual allegations were actually more fulsome and specific to the relevant parties than the ones here.  While plaintiffs complain that the AXP New Dimensions

---

[13] *See, e.g., Krantz*, 305 F.3d at 140; *Migdal*, 248 F.3d at 321; *Yampolsky*, 2004 WL 1065533; *Amron v. Morgan Stanley Investment Advisers*, 2004 WL 1065533, No. 03-5896 (S.D.N.Y.) (consolidated with *Yampolsky*).

[14] *See, e.g., Nelson v. AIM Advisors, Inc.*, Civ. No. 01-282-MJR (S.D. Ill.) (Ex. N).

[15] *See, e.g., Jones v. Harris Assocs.*, No. 04-4184-CV-C-NKL (W.D. Mo) (Ex. O).

Fund's fees have recently grown, and that New Dimensions shareholders must have failed to benefit from economies of scale, *see* Compl. ¶ 52, *nowhere* does the Complaint allege how the funds' fees compare to those of comparable funds, nor how the funds have performed.

The *Yampolsky* court found the complaints' allegations to be insufficient. It held that the complaints merely "track[ed] the *Gartenberg* factors," and failed "in sum or substance, [to] indicate how or why the fees 'are so disproportionately large that [they] bear[ ] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." 2004 WL 1065533, at *2. The court continued:

> For example, conspicuously absent from either of the complaints are any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants. Instead, the complaints rely on speculation, inference and generalized observations about the securities industry from public figures such as Warren Buffet . . . .
>
> Thus, speculative, conclusory allegations of 36(b) violations [are] insufficient to survive a motion to dismiss under Rule 12(b)(6) . . . .

*Id*. (citations omitted). For these same reasons, plaintiffs' 36(b) claims should be dismissed here.

## II.  COUNTS III AND IV FAIL BECAUSE THE COMPLAINT ALSO DOES NOT ALLEGE FACTS SPECIFIC TO DEFENDANTS AND THE FUNDS TO MEET THE PLEADING STANDARD FOR A CLAIM OF EXCESSIVE DISTRIBUTION FEES UNDER SECTIONS 12(b) AND 36(b) OF THE ICA.

Assuming that a Section 12(b) right of action exists – which it does not, as shown below – plaintiffs' claims of excessive *distribution fees* under Sections 36(b) *and* 12(b) should fail.[16] As with their management fee claims, to prove that fund distribution fees are excessive, plaintiffs must plead facts showing that the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928. *See Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d

---

[16] Section 12(b) allows funds to pay distribution fees with fund assets, as long as such costs are borne pursuant to board-approved "distribution plans." 15 U.S.C. § 80a-12(b); 17 C.F.R. § 270.12b-1.

861, 866 (2d Cir. 1990) (applying *Gartenberg* to 12b-1 fees); Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, SEC Release No. IC-16431 (June 13, 1988) (same), *available at* 1988 WL 1000015, at *14 n.60.  They have not done so.

The allegations that defendants: (1) violated Section 36(b) by "failing to pass along economies-of-scale benefits from the distribution fees, and . . . continuing to assess distribution fees pursuant to plans of distribution despite the fact that no benefits inured to Plaintiffs," in violation of their fiduciary duty to the funds, Compl. ¶ 80; and (2) violated Section 12(b) and Rule 12b-1 by "accepting excessive or inappropriate compensation" in violation of their duty, Compl. ¶ 85, are "merely . . . conclusion[s] of fact.  [They do] not indicate in any way that the fees are disproportionately large, that they bear no relationship to the services rendered or that they could not have been the product of arm's-length bargaining." *Wexler v. Equitable Capital Mgmt. Corp.*, 1994 WL 48807, at *4 (S.D.N.Y. Feb. 17, 1994).  *See also Wiles*, 280 F.3d at 870 ("we are 'free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations' ").  Noticeably absent is a discussion of the core *Gartenberg* standard:  how the *actual* distribution services provided to the American Express Funds clash with the *actual* distribution fees charged.  Thus, where "the level of generality remains too high and (more importantly) . . . the allegations do not remotely touch on the issue of what, if any, relation exists between the disputed fees on the one hand, and the services provided in consideration for their payment, on the other hand," the allegations fail to state a claim. *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 2000 WL 350400, at *3 (D. Md. 2000).

The allegations regarding excessive distribution fees – like those pertaining to excessive management fees – are not only insufficient because they fail to provide any specific facts about the relationship between the defendants and the funds.  Just as with the challenge to management

fees, plaintiffs' assertion of the *Gartenberg* factors as factual allegations are ineffective to plead a viable cause of action about the distribution fees.[17]  Plaintiffs' allegations that industry critics have questioned whether fund shareholders as a whole benefit from the imposition of distribution fees, *see* Compl. ¶ 26, say nothing about how the American Express Funds' shareholders have been affected by *these* funds' distribution plans.

Other deficiencies in plaintiffs' distribution fee allegations deserve attention.  *First*, plaintiffs allege that defendants have engaged in illegal "directed brokerage" arrangements.  *See* Compl. ¶¶ 45, 86.  Plaintiffs' assertion – again containing no specific facts showing that the American Express Funds have engaged in such a practice – is apparently based on a recent SEC analysis of industry-wide directed brokerage arrangements.  *See* Final Rule, SEC Release No. IC-26591, 2004 WL 1969665 (Sept. 2, 2004).  But the SEC rule prohibiting such arrangements did not take effect until December 13, 2004, *see id.*, signifying that plaintiffs' allegations about earlier periods are irrelevant.  *See, e.g.*, *Disabled Am. Veterans v. Gober*, 234 F.3d 682, 690 (Fed. Cir. 2000) ("A petitioner cannot be affected by a rule or regulation until, at the very least, that rule or regulation has gone into effect.").  But more important, the Complaint does not illustrate how a directed brokerage arrangement could logically influence the reasonableness of the distribution fee.  Absent facts about a directed brokerage agreement that affected the value of distribution services AEFA rendered to the funds, the existence *vel non* of arrangements between AEFA and any broker is simply irrelevant to the "excessiveness" calculus under Section 36(b).

*Second*, plaintiffs assert that Rule 12b-1 requires that economies of scale be reached, *see* Compl. ¶ 53, but neither the statute nor the rules contain that requirement.  *See* 15 U.S.C. § 80a-

---

[17]  Without any factual bases, plaintiffs assert that: (1) services have not changed, Compl. ¶ 42; (2) the funds are "enormous[ly]" profitable, while admitting they know nothing about profit, *id.* ¶¶ 46-47; (3) economies of scale have not been passed on to plaintiffs, *id.* ¶ 53; (4) fall-out benefits – reading like a generic glossary – possibly are being gained by defendants, *id.* ¶¶ 57-62; and (5) directors had no data to assess distribution plans, *id.* ¶ 67.

35; 17 C.F.R. § 270.12b-1. And despite plaintiffs' claim that the institution of distribution fees

necessarily should have reduced management fees, *see* Compl. ¶ 84, no direct relationship exists

between the two. In fact, Rule 12b-1 plans are beneficial to shareholders for many other reasons,

like "help[ing] management maintain a significant degree of portfolio diversification, obtain[ing]

better and lower cost portfolio execution services, and attract[ing] reports and recommendations

about securities transactions from Wall Street professionals." Amy Goodman, Investment

Company Regulation Deskbook § 7.4(2) (1998). *See Krinsk v. Fund Asset Mgmt.*, 715 F. Supp.

472, 501 (S.D.N.Y. 1988) ("Plaintiff . . . asserts that use of 12b-1 payments to encourage better

shareholder service and to maintain Fund size violates Rule 12b-1. The Court disagrees.").

*Third*, while plaintiffs disparage an increase in the New Dimensions Fund's distribution

fees, *see* Compl. ¶ 23, none of the funds' distribution fees are excessive relative to industry

standards. Pursuant to statutory authority, the National Association of Securities Dealers

("NASD") has established maximum fees for its members to charge investors. *See* 15 U.S.C. §

80a-22(b). The NASD's Conduct Rule 2830 prohibits "excessive" distribution fees (or "asset-

based sales charges") – defined as fees that exceed 0.75% per year of a fund's net assets. NASD

Conduct Rule 2830(d)(2)(E)(i). The SEC has approved the NASD's distribution fee limit,

agreeing that the Rule has "carrie[d] out the NASD's congressional mandate to prevent excessive

sales charges on mutual funds shares." *See* SEC Release No. 30897, at *7 (July 7, 1992).[18]

In every fund named here, the distribution fee for Class A shares is 0.25% of the fund's

assets, *see* Exs. C (SAI at 35); D (SAI at 34); E (SAI at 33); F (SAI at 34); G (SAI at 36); H (SAI

---

[18] The SEC is required to review and approve the NASD's rules, *see* 15 U.S.C. §§ 78o-3, 78s(b)-(c); accordingly, courts have regularly affirmed the NASD's legitimacy. *See Sorrell v. SEC*, 679 F.2d 1323, 1325 (9th Cir. 1982); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012-13 (3d Cir. 1977). In fact, when the SEC approved Conduct Rule 2830, it noted that "[t]he ability of the NASD, through its rules, to regulate comprehensively mutual fund fees received by members" and "to adopt rules that ensure overall reasonableness of sales fees received by its members" is fully consistent with its statutory mandate under the ICA. SEC Release No. 30897, at *7 (July 7, 1992).

at 35); I (SAI at 52); J (SAI at 35); K (SAI at 34); L (SAI at 34); M (SAI at 35) – much less than the maximum 0.75% distribution fee permitted by the NASD and the SEC. Accordingly, these fees cannot be deemed excessive – especially given plaintiffs' paucity of allegations articulating excessiveness. *Cf.* Rest. (3d) of Torts: Liability for Physical Harm § 16, Tentative Draft No. 1 (2001) (in negligence action, compliance with the law is "evidence of non-negligence").

In short, plaintiffs' lack of factual allegations fails to state a claim for excessive distribution fees under Sections 36(b) or 12(b).

## III.   COUNT IV FAILS BECAUSE THERE IS NO PRIVATE RIGHT OF ACTION UNDER SECTION 12(b) OF THE ICA

Plaintiffs' Section 12(b) claim fails for an independent reason: no express or implied private right of action exists under that section of the ICA. While it is undisputed that Section 36(b) expressly grants a shareholder a private right to sue an adviser that breaches his fiduciary duty, Section 12(b), by contrast, makes *no* mention of a private right to enforce its terms.[19]

As the Supreme Court has held, where Congress has expressly created a private right of action in other sections of the same statute, "it is highly improbable that Congress absentmindedly forgot to mention an intended private action." *Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979). This especially holds true for the ICA, in which "Congress expressly authorized private suits for damages in prescribed circumstances . . . . Obviously, then, when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Id.* at 20-21. And while private rights of action may be *implied*, plaintiffs cannot

---

[19] Rather, the section begins with the phrase "[i]t shall be unlawful . . . ." 15 U.S.C. § 80a-12(b). As the court observed in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), analyzing an identical statutory phrase to determine whether Sections 26(f) and 27(i) of the ICA contain private rights of action, this language "only describes actions . . . that are prohibited; it does not mention investors such as plaintiffs." *Id.* at 433. The court continued: " 'Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.' " *Id.* (quotations and internal punctuation omitted).

point to any evidence of congressional intent to create such a right.[20]  *Frison v. Zebro*, 339 F.3d 994, 999 (8th Cir. 2003) (if congressional intent to establish a remedy cannot be inferred from statutory text, structure, or other source, "the essential predicate for implication of a private remedy simply does not exist") (quoting *Thompson v. Thompson,* 484 U.S. 174, 179 (1988)).

It is no surprise then that in the ICA's sixty-four-year existence, no court has found an implied right of action in Section 12(b).  Rather, Section 36(b) has been deemed the *sole* private remedy in the ICA for plaintiffs recovering fees received in breach of an adviser's or distributor's fiduciary duty.  *See Gartenberg v. Fund Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1067 (S.D.N.Y. 1981), *aff'd* 694 F.2d 923 (2d Cir. 1982) ("no private remedies other than Section 36(b) seeking restitution of advisory fees shall be [maintained because] Section 36(b) affords the complete remedy indicated by Congress"); *Krinsk v. Fund Asset Mgmt., Inc.*, 654 F. Supp. 1227, 1234 (S.D.N.Y. 1987), *aff'd* 875 F.2d 404 (2d Cir. 1989) (Section 12(b) claims must be brought under 36(b) since "§ 36(b)'s fiduciary duty standard is explicitly referenced in Rule 12b-1").[21]

Accordingly, even if the Court were to imply a right of action under Section 12(b), plaintiffs' claim – which simply reasserts their Section 36(b) claim as a 12(b) one – should be dismissed.  The Complaint's Section 12(b) count alleges that the funds' distribution plans violate

---

[20] In fact, all evidence suggests the contrary.  In the original 1940 Act – the version in which Section 12(b) was enacted – the statute contained no express private rights of action.  *See* ICA, ch. 686, § 12, 54 Stat. 789, 809 (1940).  Instead, it provided for enforcement of all ICA provisions, including Section 12, *by the SEC* through investigations and civil injunctive suits.  *See id*. § 42, 54 Stat. at 842; *see also Olmsted*, 283 F.3d at 433; *meVC Draper Fisher Jurvetson Fund I, Inc. v. Millenium Partners L.P.*, 260 F. Supp. 2d at 616, 622 (S.D.N.Y. 2003) (applying Section 42 to Section 12).  This "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Olmsted*, 283 F.3d at 433 (quotation omitted).  Moreover, when Congress later amended the Act to add a private right of action for certain breaches of fiduciary duty, it did so in Section 36(b) – not 12(b).  *See* ICA, Pub. L. No. 91-547, § 20, 84 Stat. 1413, 1429 (1970).

[21] *See also Krinsk v. Fund Asset Mgmt.*, 875 F.2d 404, 413 n.5 (2d Cir. 1989) (leaving issue of whether "there exists generally a private right of action under section 12(b) . . . to another day"); *Bildstein v. Dreyfus/Laurel Funds, Inc.*, 1999 WL 177349, *3 n.1 (S.D.N.Y. Mar. 30, 1999) (same).  The Supreme Court has never even found an implied right of action anywhere in the Act.  *See Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 97 n.4 (1991).

the statute because management fees were not – but should have been – reduced following the implementation of the distribution fees, and alleged "economies of scale" were therefore not passed on to the funds. *See* Compl. ¶ 84. This claim is just complaining that fees are too high, confirming that plaintiffs' Section 12(b) claim "is a reincarnation of [plaintiffs'] 'excessive fee' argument, and thus is indistinguishable from the section 36(b) claim." *Krinsk*, 875 F.2d at 413. In fact, even plaintiffs recognize the interchangeability of their 12(b) and 36(b) counts by including the distribution fee claim as part of their 36(b) action. *See* Compl. ¶ 80. What is more, plaintiffs actually concede that defendants' exaction of a portion of the allegedly excessive fees – the purported "directed brokerage payments" – "violates Rule 12b-1 and §§ 12 *and 36(b)* of the ICA." Compl. ¶ 36 (emphasis added). So although plaintiffs label their claim an "unlawful distribution plan," the only issue raised is that fees are excessive. Compl. ¶¶ 82-87.

Where, as here, "the question is excessiveness of fees," the sole remedy within the ICA is Section 36(b). *Krinsk*, 654 F. Supp. at 1234; *Merine v. Prudential-Bache Util. Fund, Inc.*, 859 F. Supp. 715, 722 (S.D.N.Y. 1994). Indeed, were plaintiffs' 12(b) claim allowed, the procedural limitations of Section 36(b) – that damages, limited to the amount of the compensation, are recoverable only against the recipient of the compensation, and only for the one-year period before the action – would be circumvented. *Krinsk*, 875 F.2d at 413 (citing 15 U.S.C. § 80a-35(b)(3)); *see also Tarlov v. Paine Webber Cashfund, Inc.*, 559 F. Supp 429, 436-37 (D. Conn. 1983) (dismissing excessive fee claims brought under Sections 15 and 36(a) as an attempt to "avoid the express limits of Section 36(b)(3)"). Since "a plaintiff may not circumvent the procedural limitations of § 36(b), by dressing an identical claim for relief in the language of § 12(b)," *Krinsk*, 654 F. Supp. at 1234, plaintiffs' Section 12(b) claim should be dismissed.[22]

---

[22] Plaintiffs' Section 12(b) count fails for yet another reason. Under applicable Minnesota law, *see Kamen*, 500 U.S. at 97-99 (applying the state law under which the fund was organized), a claim is derivative where, as here,

## IV. COUNTS II AND III OF THE COMPLAINT ASSERT AN "EXCESS PROFITS" THEORY OF LIABILITY NOT PROVIDED BY THE STATUTE.

In addition to the Complaint's shortcomings set forth above, Count II and part of Count III of the Complaint should be dismissed for the independent reason that they seek recovery on a theory of liability that does not exist under Section 36(b) of the ICA. While Count I asserts that AEFC violated the statute by charging excessive fees "disproportionate to the services rendered," Counts II and III aver that the defendants "have received and continue to receive *excess profits* attributable to extraordinary economies of scale." Compl. ¶ 75 (emphasis added); Compl. ¶ 80.

Section 36(b) provides a cause of action for excessive fees, but not for "excess profits." As discussed above, the statute is violated only where fees are so disproportionate to services rendered that they could not have been bargained at arm's length. Nowhere does the ICA allow an action based on the impact of such payments on the adviser's bottom line. Indeed, as a matter of common sense and economic reality, no necessary connection exists between "excessive fees" under the Act – *i.e.*, fees disproportionate to services rendered – and the adviser's or distributor's profits. Their profits will be determined by numerous variables, many of which will not involve whether the fees charged were proportionate to the services rendered in connection with those fees. The American Express Defendants respectfully request that the Court dismiss Count II and part of Count III because there is no "excess profits" cause of action under Section 36(b).

---

the conduct alleged does not inflict an injury on the plaintiffs "separate and distinct from all shareholders." *International Broad. Corp. v. Turner*, 734 F. Supp. 383, 392 (D. Minn. 1990). In a derivative action, plaintiffs must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and, if necessary, from the shareholders or members," unless the complaint instead alleges "the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1. A derivative action complaint also must satisfy the demand requirements of Minnesota law, where demand is "a condition precedent to a shareholder's derivative suit [that is] not lightly to be dispensed with." *Winter v. Farmers Educ. & Co-op Union*, 259 Minn. 257, 107 N.W.2d 226, 233-34 (1961). *See also Reimel v. MacFarlane*, 9 F. Supp. 2d 1062, 1065 (D. Minn. 1998). Because plaintiffs do not allege any attempt to satisfy the demand requirements of Rule 23.1 or Minnesota law, the count should be dismissed.

**V.  PLAINTIFFS' REQUEST TO DECLARE THE ADVISORY AND DISTRIBUTION AGREEMENTS "VOID AB INITIO" SHOULD BE STRICKEN BECAUSE IT IS NOT PROVIDED FOR IN THE STATUTE.**

Finally, plaintiffs purport to seek an order declaring the agreements between the funds and the defendants "void ab initio."  *See* Compl. ¶ 87.  This prayer for relief should be stricken. Section 36(b) expressly delimits the form of relief available to shareholder plaintiffs – "the actual damages resulting from the breach of fiduciary duty," recoverable only against the recipient of the compensation, for a one-year period preceding the filing of an action.  15 U.S.C. § 80a-35(b)(3).  Nowhere does the statute provide for the much broader relief of rescission of the agreements or a declaration that the agreements were "void ab initio."  By including this request, plaintiffs apparently seek to extend the reach of the money damages they might recover beyond the statutory one-year period.  Because there is no legal basis for such a maneuver, this prayer for relief should be stricken.  *See Green v. Fund Asset Mgmt., L.P.*, 286 F. 682, 685 (3d Cir. 2002) ("§ 36(b) was intended to provide a very specific, narrow federal remedy").

## CONCLUSION

For all the foregoing reasons, the American Express Defendants respectfully request that this Court dismiss with prejudice all claims against them in the Complaint.

Dated:  December 21, 2004

Respectfully submitted,

s/Robert L. Schnell, Jr.
Robert L. Schnell, Jr. #97329
FAEGRE & BENSON LLP
90 South Seventh Street
Minneapolis, MN  55402
612-766-7225

John D. Donovan, Jr.
Robert A. Skinner
Chanel R. Dalal
ROPES & GRAY, LLP
One International Place
Boston, MA  02110
617-951-7000

M2:20680056.01

-26-