**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

_____

| | |
|---|---|
| JOHN GALLUS, D. ELAINE GALLUS, INA BLOOM, ALEXANDRIA IONE FALLER (A/K/A ALEXANDRIA IONE GRIFFIN), for use and benefit of AXP NEW DIMENSIONS FUND, AXP MUTUAL FUND, AXP PRECIOUS METALS FUND, AXP EQUITY SELECT FUND, AXP SMALL CAP ADVANTAGE FUND, AXP PARTNERS SMALL CAP VALUE FUND, AXP MID CAP VALUE FUND, AXP SMALL COMPANY INDEX FUND, AXP HIGH YIELD BOND FUND, AXP MANAGED ALLOCATION FUND, and AXP BLUE CHIP ADVANTAGE FUND, | Civil Action No. 0:04-cv-4498 |

) Civil Action No. 0:04-cv-4498

Plaintiffs,

v.

AMERICAN EXPRESS FINANCIAL
CORPORATION, and AMERICAN EXPRESS
FINANCIAL ADVISORS INC.,

Defendants.

Honorable Donovan W. Frank
Magistrate Judge Janie S. Mayeron

_____

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS'**
**MOTION TO DISMISS**

# TABLE OF CONTENTS

I.    INTRODUCTION ……………………………………………….…………..1

II.   ARGUMENT………..………………………………………..………………….2

      A.    The claims in the Complaint are governed by a notice pleading standard………2

      B.    Defendants have improperly cited documents not referenced in the
            Complaint, effectively turning this motion to dismiss into a summary
            judgment motion..........................................................................................................4

      C.    Plaintiffs have pled facts sufficient to demonstrate they are entitled to
            relief under the ICA……………………………………….…………………………...5

            1.    Plaintiffs have alleged facts pertinent to the relationship between
                  the fees and the services rendered by American Express……………..……7

            2.    In attacking Plaintiffs' Complaint, Defendants distort Plaintiffs'
                  allegations (or ignore them completely) and raise numerous questions
                  of fact which cannot be resolved in a motion to dismiss...…………………8

            3.    The other § 36(b) cases cited by Defendants provide no support
                  for dismissing the Complaint……………………………………………12

      D.    In Counts III and IV, Plaintiffs have pled sufficient facts to state claims
            that the distribution fees are excessive and the Distribution Plans,
            pursuant to which the fees are paid, are unlawful……………………...………..16

            1.    Plaintiffs have pled facts sufficient to allege Defendants'
                  distribution fees are excessive and enable Defendants to extract
                  additional advisory compensation………….…………………….……...16

            2.    Count IV challenges the lawfulness of the Distribution Plans,
                  not merely the excessiveness of the fees collected pursuant
                  to them……………………………………………………….…...…..20

            3.    An implied private right of action exists under § 12(b)……………….....23

            4.    Plaintiffs' § 12(b) claim is a direct cause of action……………..……….27

      E.    Neither the dismissal of Counts II and III of the complaint nor the
            striking of Plaintiffs' prayer for declaratory relief is proper……………….…....29

III.  CONCLUSION……………………………………………………………….……31

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bancroft Convertible Fund, Inc. v. Zico Investment Holding, Inc.*
  825 F.2d 731 (3d Cir. 1987)…………………………………………….…26
*BJC Health System v. Columbia Casualty Co.*
  348 F.3d 685 (8th Cir. 2003)……………………………………………………4
*Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
  916 F.Supp. 1343 (D.N.J. 1996)…………………………...………...26
*Carr v. Equistar Offshore, Ltd.*
  No. 94 CIV 5567, 1995 WL 562178 (S.D.N.Y. Sept. 21, 1995)…………...……...…26
*Christensen Hatch Farms, Inc. V. Peavey Co.*
  505 F.Supp. 903 (D. Minn. 1981)……………………………………………...23
*Clemente Global Growth Fund, Inc. v .Pickens*
  705 F.Supp. 958 (S.D.N.Y. 1989)……………………………………………26
*Conley v. Gibson*
  355 U.S. 41 (1957)……………………………………...………...……...3, 4
*Daily Income Fund, Inc. v. Fox.*
  464 U.S. 523 (1984)………………………………………….………………31
*Dowling v. Narragansett Capital Corp.*
  735 F.Supp. 1105 (D.R.I. 1990)……………………………...……26, 29
*In re Fidelity/Micron Securities Litigation*
  964 F. Supp. 539 (D. Mass. 1997)……………………………………………27, 28
*First Pacific Bancorp, Inc. v. Helfer*
  224 F.3d 1117 (9th Cir. 2000)……………………………………….………23, 24
*Fogel v. Chestnutt*
  668 F.2d 100 (2d Cir. 1981)…………………………...………………26
*Ford v. Hamilton Investments, Inc.*
  29 F.3d 255 (6th Cir. 1994)…………………………………………………20
*Frey v. City of Herculaneum*
  44 F.3d 667 (8th Cir. 1995)………………………………………….……4
*Fusco v. Xerox Corp.*
  676 F.2d 332 (8th Cir. 1982)……………………………………………4, 5
*Galfand v. Chestnutt Corp.*
  545 F.2d 807 (2d Cir. 1976)………………………………………………27
*Gardner v. First American Title Ins. Co.*
  294 F.3d 991 (8th Cir. 2002)……………………………………………………3
*Gartenberg v. Merrill Lynch Asset Mgt., Inc.*
  694 F.2d 923 (2d Cir. 1982)……………………………...…....passim
*Kamen v. Kemper Fin. Servs. Inc.*
  500 U.S. 90 (1991)…………………………………….……………......27
*Richard Krantz v. Fidelity Management & Research Co.*
  98 F.Supp.2d 150 (D. Mass. 2000)……………………………..……..………3, 7

ii

# TABLE OF AUTHORITIES

**(continued)**

**Page**

*Sheldon Krantz v. Prudential Inv. Fund Mgmt. LLC*
   305 F.3d 140 (3d Cir. 2002)……………………………………............…….7, 13
   77 F.Supp.2d 559 (D.N.J. 1999)……………………………………………...6, 14

*Krinsk v. Fund Asset Mgmt, Inc.*
   875 F.2d 404 (2d Cir. 1989)……………………………………....……..5, 22, 23

*Krome v. Merrill Lynch & Co.*
   637 F.Supp. 910 (S.D.N.Y. 1986)……………………………..…………26

*Langer v. Brown*
   913 F.Supp. 260 (S.D.N.Y. 1996)……………………………………………...26

*Layton v. United States*
   919 F.2d 1333 (8th Cir. 1990)……………………………………………5

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*
   507 U.S. 163 (1993)……………………………………………………….……………3

*Lessler v. Little*
   857 F.2d 866 (1st Cir. 1988)…………………………………….…...……26

*Lewis v. Byrnes*
   538 F.Supp. 1221 (S.D.N.Y. 1982)…………………………………………30

*Mann v. Kemper Financial Companies, Inc.*
   618 N.E.2d 317 (Ill. App. 1st Dist. 1992)……………………………....…29

*Maurice Sunderland Architecture, Inc. v. Simon*
   Civ. No. 3-92-493, 1993 WL 750859 (D.Minn. Dec. 30, 1993)…………….……...……2

*McLachlan v. Simon*
   31 F.Supp.2d 731 (N.D. Cal. 1998)…………………………….…...…..………...23, 26

*Merine v. Prudential-Bache Utility Fund, Inc.,*
   859 F.Supp. 715 (S.D.N.Y. 1994)……………………………………………22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*
   456 U.S. 353 (1982)……………………………………………...……………25

*MEVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*
   260 F.Supp.2d 616 (S.D.N.Y. 2003)……………………………………...…25

*Meyer v. Oppenheimer Mgmt. Corp.*
   895 F.2d 861 (2d Cir. 1990)…………………………………………….……5

*Meyer v. Oppenheimer Mgmt. Corp.*
   764 F.2d 76 (2d Cir. 1985)……………………………………………26, 29

*Migdal v. Rowe Price-Fleming Int'l, Inc.*
   248 F.3d 321 (4th Cir. 2001)……………………………………………7, 13, 30

*Millenco L.P. v. meVC Advisors, Inc.*
   No. Civ. 02-142-JJF, 2002 WL 31051604 (D. Del. 2002)……………………...…13

*In re ML-Lee Securities Litig.*
   848 F.Supp. 527 (D. Del. 1994)………………………………………………26

*In re Nuveen Fund Litig.*
   No. 94 C 360, 1996 WL 328006 (N.D. Ill. Jun. 11, 1996)……….………………26

# TABLE OF AUTHORITIES

**(continued)**

**Page**

*Olmstead v. Pruco Life Insurance Co.*
    283 F.3d 429 (2d Cir. 2002)……………………………………..……..25, 26

*Panfil v. Scudder Global Fund, Inc.*
    No. 93 C 7430, 1993 WL 532537 (N.D. Ill. Dec. 20, 1993)…………….….……….29

*Pfeiffer v. Bjurman, Barry & Associates*
    2004 WL 19093074 (S.D.N.Y. Aug. 26, 2004)………………..……...2, 7, 13, 18, 20, 29

*In re Prudential Securities, Inc.*
    795 F.Supp. 657 (S.D.N.Y.1992)……………………………………………….……..20

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*
    622 F.Supp. 169 (S.D.N.Y. 1985)……………………………….……………….………23

*Stone Motor Co. v. General Motors Corp.*
    293 F.3d 456 (8th Cir. 2002)…………………………………….……………………….4

*Strougo v. BEA Associates*
    188 F.Supp.2d 373 (S.D.N.Y. 2002)………………………………………………..12

*Swierkiewicz v. Sorema N.A.*
    534 U.S. 506 (2002)……………………………………………………...……..2, 3

*Tallarico v. Trans world Airlines, Inc.*
    881 F.2d 566 (8th Cir. 1989)………………………………………………….………23

*Tannenbaum v. Zeller*
    552 F.2d 402 (2d Cir. 1977)…………………………………..…….……....27

*Tarlov v. Paine Webber Cashfund, Inc.*
    559 F.Supp. 429 (D. Conn. 1983)………………………………..…………...22

*United States v. Cartwright*
    411 U.S. 546 (1973)……………………………….…...………….……...…..27, 28

*Wenzel v. Mathies*
    542 N.W.2d 634 (Minn. Ct. App. 1996)…………………………..……..…..27

*Wisdom v. First Midwest Bank*
    167 F.3d 402 (8th Cir. 1999)……………………………………………….……….23

*Yampolsky v. Morgan Stanley Investment Advisers Inc.*
    No. 03 Civ. 5710, No. 03 Civ. 5896, 2004 WL 1065533
    (S.D.N.Y. May 12, 2004)…………………………………………..…….7, 13, 14, 15

*Young v. Nationwide Life Insurance Co.*
    2 F.Supp.2d 914 (S.D. Tex. 1998)…………………………………………….……26

# STATUTES

Investment Company Act
15 U.S.C.
    § 80a-1……………………….…………………………………...………..…………….24
    § 80a-12 (§ 12(b)) ……………………………………………….*passim*
    §80a-15(a-c)…………………….……….........………...........................................30
    § 80a-35(b) (§ 36(b))……………………………………………………...*passim*

# STATUTES

**(continued)**

**Page**

Investment Company Act
15 U.S.C.
§ 80a-43…………………………………………………………………..………..24

Regulations
17 C.F.R. § 270.12b-1 (Rule 12b-1) …………………………….……………*passim*
17 C.F.R. § 270.12b-1(d)……………………………………………....……....…21
17 C.F.R. § 270.12b-1(e)……………………………………………....…19, 21, 24, 28

Approval of Investment Advisory Contracts by Directors of Investment Companies
69 Fed. Reg. 39798, 2004 WL 1452698 (SEC 2004)………….…..……….3, 11, 15

Federal Rules
Fed. R. Civ. P. 8(a)……………………………………………..…………………2
Fed. R. Civ. P. 12(b)(6)……………………………………………..……....……..2

# LEGISLATIVE HISTORY

S. Rep. No. 91-184 (1970), *reprinted* in 1970 U.S.C.C.A.N. 4897, 4911…………..…..……..25

S. Rep. No. 101-337, 1990 WL 263550(1990)..……………………..…….…...…..…..…28

H.R. Rep. No. 1341 (1980), *reprinted* in 1980 U.S.C.C.A.N. 4800, 4810-11……………25, 26

# MISCELLANEOUS

12B Fletcher Cyclopedia of Private Corp. § 5911…………………………………………….27

5 Charles Alan Wright & Arthur R. Miller, Federal  Practice & Procedure §1224 (3d ed.)..…..6

61A Am. Jur. 2d *Pleading* § 50………………………………………….…………………..6

General Accounting Office, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000) ……………………......28

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS'
MOTION TO DISMISS**

## I.  INTRODUCTION

American Express's motion to dismiss is plagued with blatant mischaracterizations of Plaintiffs' Complaint ("Compl."), subtle attempts to hold Plaintiffs to a heightened fact-pleading standard where none is required, and frequent references to materials outside the Complaint, turning this motion into one for summary judgment even though discovery is not yet underway.  None of Defendants' arguments in support of their motion passes muster against the notice pleading standard applicable to Plaintiffs' Complaint.   Indeed, at most, Defendants raise a number of factual issues thereby demonstrating the fundamental fallacy of their bringing a dispositive motion.

Plaintiffs are shareholders of 11 mutual funds (the "Funds") that are created, sold, advised, and managed by Defendant American Express Financial Advisors, Inc. and Defendant American Express Financial Corporation (collectively referred to as "American Express" or "Defendants"). American Express charges the Funds advisory and distribution fees based on a percentage of each Fund's net asset value.   Since their inception, the Funds' assets have increased dramatically, resulting in fees that are disproportionately large in relationship to the services rendered to Plaintiffs and the Funds.   In 2003 alone, the 11 Funds (and ultimately their shareholders) paid Defendants close to $300 million dollars in advisory and distribution fees. *See* Compl. ¶¶ 10, 27.

Plaintiffs have brought claims against Defendants pursuant to §§ 36(b) and 12(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. §§ 80a-35(b) and 80a-12(b). Plaintiffs allege that Defendants charged excessive fees and retained economies of scale in violation of their fiduciary duty owed to Plaintiffs and the Funds, and that they accepted excessive and inappropriate compensation pursuant to unlawful distribution plans.

## II. **ARGUMENT**

### A.  **The claims in the Complaint are governed by a notice pleading standard.**

At the outset, Plaintiffs agree with Defendants that *Gartenberg v. Merrill Lynch Asset Mgt., Inc.*, 694 F. 2d 923, 928 (2d Cir. 1982) ("*Gartenberg*"), the seminal § 36(b) case, does not establish a pleading standard but, rather, provides a framework for analyzing whether an advisory fee violates § 36(b).  However, Plaintiffs disagree with Defendants' implicit attempt to hold Plaintiffs to a heightened fact pleading standard.

Apparently recognizing that their frequent reference to "facts" supposedly missing from the Complaint resembles an argument in support of a fact pleading standard, Defendants make a transparent attempt at explaining why their position does not run afoul of the Supreme Court's recent pronouncement in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  Despite their statements to the contrary, the practical effect of Defendants' interpretation of the ICA jurisprudence would require Plaintiffs to prove their claims in the Complaint.  The burden that American Express seeks to impose on Plaintiffs in this case is not only unrealistic, it is in direct contravention to the applicable standard under Federal Rules of Civil Procedure Rules 8(a) and 12(b)(6) and has been recently rejected:

> The defendants have pointed to several decisions in which courts dismissed a Section 36(b) claim for failure to state a claim.  While recognizing that Rule 8's pleading standard is very liberal, these cases held that the complaints at issue were too conclusory to survive a motion to dismiss.  Almost all of these cases preceded the Supreme Court's reminder in *Swierkiewicz* that a plaintiff need only give a plain statement of its claim and fair notice of the ground on which it rests.

*Pfeiffer v. Bjurman, Barry & Associates*, 2004 WL 19093075, *4 (S.D.N.Y. Aug. 26, 2004) (denying motion to dismiss § 36(b) claim). [1]

---

[1]  This Court has rejected similar attempts to hold plaintiffs to a higher pleading standard where none is required.  *See Maurice Sunderland Architecture, Inc. v. Simon*, 1993 WL 750859, *4 (D.Minn. Dec. 30, 1993) ("We think, in practical

A plaintiff must only plead facts sufficient to place defendants on notice of the claims against them, not prove her case in the complaint. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (holding that heightened pleading contained in Federal Rule 9(b) does not extend to other claims). Notice pleading is the proper standard in *all* civil cases, save for a few exceptions not present here. *Swierkiewicz*, 534 U.S. at 513. Claims under the ICA are *not* one of the limited circumstances where a heightened pleading standard should be imposed. *See Richard Krantz[2] v. Fidelity Mgmt. & Research Co.,* 98 F.Supp.2d 150, 159 (D. Mass. 2000) (proceeding under "notice pleading standard" as to § 36(b) claim and refusing to dismiss).

Detailed facts, such as those that Defendants argue are lacking here, are not required.[3] *Conley v. Gibson*, 355 U.S. 41, 47 (1957) ("the Federal Rules … do not require a claimant to set out in detail the facts upon which he bases his claim") (citing Fed. R. Civ. P. 8(a)(2)). Rather, Plaintiffs need only provide "a short and plain statement" of their claim so as to "'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Swierkiewicz* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Gardner v. First American Title Ins. Co.*, 294 F.3d 991, 994 (8th Cir. 2002).

effect, that the argument of the Defendants has been soundly rejected by the holding of the Supreme Court in *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163 (1993). There, as here, the Defendant argued that the complexity of the underlying substantive law required a claim to be pled with a great degree of factual specificity …. The Court rejected that argument as incompatible with the requisites of 'notice pleading'…. Discovery is at its dawning, and we are unable to conclude that, as a matter of law, the course of that discovery will free the action of any genuine issues of material fact which would preclude … summary resolution.")

[2] Plaintiffs cite two unrelated cases in which the plaintiff's last name is "Krantz." To avoid confusion, Plaintiffs refer to the cases as "*Richard Krantz*" and "*Sheldon Krantz*."

[3] Many of the "facts" that Defendants argue are lacking are uniquely within their knowledge. As discussed below, recognizing that mutual shareholders have not had access to critical information about the investment advisory fees charged to them and the funds, the SEC has recently promulgated a rule requiring certain publicly filed documents to include a detail discussion of certain factors relevant to the approval of investment advisory fees. Disclosure Regarding Approval of Investment Advisory Contracts by Directors of Investment Companies, 69 Fed. Reg. 39798, 2004 WL 1452698 (SEC 2004) [Attached as Exhibit A].

In ruling on a motion to dismiss under Rule 12(b)(6), all allegations of material fact in the complaint are taken as true and viewed in the light most favorable to Plaintiffs. *Stone Motor Co. v. General Motors Corp.*, 293 F.3d 456, 464 (8th Cir. 2002). A claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46. Thus, "[a] motion to dismiss should be granted, as a practical matter, only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995) (citations omitted); *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir. 1982). "Moreover, … where the proof is largely in the control of the defendant, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Fusco v. Xerox Corp.*, 676 F.2d at 337 n. 7 (discussing dismissal in the context of antitrust cases) (citations omitted). As demonstrated below, Plaintiffs have exceeded the notice pleading standard and have alleged far more than what is sufficient to state legally cognizable claims against Defendants. Accordingly, Defendants' motion must be denied.

**B.  Defendants have improperly cited documents not referenced in the Complaint, effectively turning this motion to dismiss into a summary judgment motion.**

In support of their motion to dismiss, Defendants have filed a declaration to which 17 exhibits are attached. Many of these exhibits are neither central to, nor referenced in, Plaintiffs' Complaint. Despite their arguments to the contrary, consideration of these materials turns Defendants' motion to dismiss into a motion for summary judgment. *See BJC Health System v. Columbia Casualty Co.*, 348 F.3d 685 (8th Cir. 2003). As in *BJC Health System*, the only purpose for which Defendants have attached these documents is to refute specific allegations in the complaint. *See id.* at 688. Moreover, as discussed below, throughout their brief, Defendants'

arguments introduce a number of factual disputes, demonstrating that summary judgment is certainly not appropriate.

Plaintiffs have attempted to respond to Defendants' factual assertions.   Importantly, however, discovery in this case has not yet begun.   Thus, at the very least, Plaintiffs should be permitted to conduct discovery in order to refute the allegations in Defendants' motion.   *See Layton v. United States*, 919 F.2d 1333, 1335-36 (8th Cir. 1990) (electing not to turn motion into one for summary judgment and noting that record was deficient and not ripe for summary judgment where discovery process had not even begun and factual contours of the case were undefined).

### C.  Plaintiffs have pled facts sufficient to demonstrate they are entitled to relief under the ICA.

Indisputably, "[a]n advisory fee violates Section 36(b) if it 'is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'"   *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) (quoting *Gartenberg v. Merrill Lynch Asset Mgt., Inc.*, 694 F. 2d 923, 928 (2d Cir. 1982)). The *Gartenberg* court identified several factors relevant to this determination:  (1) the nature and quality of the services provided to the fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) economies of scale in operating the fund as it grows larger; (4) comparative fee structures; (5) fall-out benefits, i.e., indirect profits to the adviser attributable in some way to the existence of the fund; and (6) the independence and conscientiousness of the directors.  *Krinsk v. Fund Asset Mgmt, Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (citing *Gartenberg*, 694 F.2d at 929-30).

While nothing requires that all six factors be present in any given case, Plaintiffs' Complaint alleges a factual basis for each of the *Gartenberg* factors, thereby sufficiently alleging that the fees charged the Funds are so disproportionately large in comparison to the services rendered that they

were not the result of arm's length bargaining.[4]  *See, e.g.,* Compl. ¶¶ 15, 41-45 (alleging that

although the nature of the services Defendants provide to the Funds *have remained essentially*

*unchanged*, Defendants' costs in providing these services have *decreased* while Defendants' fees

have *risen* at dramatic rates); Compl. ¶¶ 46-47 (alleging the enormous profitability of the Funds to

Defendants is demonstrated by Defendants' full costs of providing advisory services and by the fact

that Defendants' incremental costs of providing services to Plaintiffs are nominal); Compl. ¶¶ 16,

48-53 (alleging that Defendants are wrongfully retaining the benefits of economies of scale[5] as

opposed to passing them on to Fund shareholders); Compl. ¶¶ 43, 54-56 (alleging that Defendants

charge the Funds substantially higher fees than what *Defendants themselves* charge institutional

clients (for identical advisory services); Compl. ¶¶ 57-62 (alleging that Defendants receive fall-out

(i.e, indirect profits) through various channels); and Compl. ¶¶ 17, 63-69 (alleging that the Funds'

directors failed to fulfill their duties to the Funds because Defendants have withheld (or the

directors have failed to request) necessary information).  Defendants censure Plaintiffs for crafting

their Complaint to follow these factors; however, courts have explicitly criticized other plaintiffs for

not alleging facts as to the *Gartenberg* factors.  *See, e.g., Sheldon Krantz v. Prudential Investments*

*Fund Mgmt. LLC*, 77 F.Supp.2d 559, 565 (D.N.J. 1999).

---

[4] Defendants disparage Plaintiffs for alleging some facts "on information and belief." *See* Def's Mem. in Supp. Mot. to Dismiss at 14.  However, pleading on information and belief is perfectly acceptable under the Federal Rules, particularly "when the matters alleged are peculiarly within the knowledge of the defendant." 61A Am. Jur. 2d *Pleading* § 50.  Indeed, commentators recognize that it is a practical necessity in certain instances.  *See* Charles Alan Wright, et al., 5 Federal Practice & Procedure 3d §1224 ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.").  Contrary to Defendants' insinuations, alleging the facts on which the pleader's belief is found "seem[s] to be unnecessary and inconsistent with the philosophy of the federal pleading rules, except when the stricter pleading requirements of Rule 9 … are involved or the matter pleaded in some way casts aspersions on the defendant's moral character." *Id.*

[5] In Count II, Plaintiffs have alleged that Defendants have realized and benefited from excess profits resulting from economies of scale created by market forces and Plaintiffs' payment of distribution fees.  *See* Compl. ¶¶ 16, 23-24, 74-77.

To be sure, courts have upheld complaints alleging § 36(b) violations where plaintiffs have made a much lesser showing than Plaintiffs in this case. *See, e.g., Richard Krantz v. Fidelity Mgmt. & Research Co.*, 98 F.Supp.2d 150 (D. Mass. 2000) (denying motion to dismiss § 36(b) claim where plaintiff alleged facts concerning only four of the six *Gartenberg* factors). In *Richard Krantz*, the court upheld plaintiff's § 36(b) claim based primarily on the factual allegation that "the defendants did not pass savings on to the funds' investors that [Defendants] realized from economies of scale (*Gartenberg* factor 3) due to the enormous growth in assets under management as well as efficiencies caused by computer advances." *Richard Krantz*, 98 F.Supp.2d at 159. The court found particularly significant the plaintiff's allegation that "between 1985 and 1995 the total revenues of defendants *increased* as a percentage of the mutual fund assets under management." *Id.* Plaintiffs have made virtually identical allegations here. *See* Compl. ¶¶ 23, 52.

Similarly, in *Pfeiffer v. Bjurman, Barry & Associates, supra*, in declining to dismiss a §36(b) claim, the court found that "[i]t is unnecessary for the plaintiff to set forth evidentiary details to support [the] allegation [that the defendant's increased 12b-1 fees were not reasonably related to the services it performed for the Fund], or to support those elements of the *Gartenberg* test that may apply to promotion, distribution, and service fees." 2004 WL 19093075, *4.

### 1. Plaintiffs have alleged facts pertinent to the relationship between the fees and the services rendered by American Express.

In the cases on which Defendants rely, the courts were concerned that plaintiffs had not alleged "facts pertinent to [the] relationship between fees and services." *Sheldon Krantz*, 305 F.3d at 143; *Migdal*, 248 F.3d at 327; *see also Yampolsky*, 2004 WL 1065533, * 2. In contrast, Plaintiffs herein have made specific factual allegations relevant to the relationship between the fees charged and the services rendered by Defendants, which demonstrate that the advisory fees are disproportionately large compared to the services rendered to Plaintiffs and the Funds, including:

(1) that the nature of the services have remained essentially unchanged; yet, Defendants' costs for providing these services have decreased while their revenues have increased dramatically, (Compl. ¶¶ 15, 42); (2) that the economies of scale generated as a result of a tremendous growth in Fund assets have not been shared with Funds or their shareholders and, instead, have allowed Defendants to reap additional profits on top of their already excessive fees, (Compl. ¶¶ 16, 23, 52); and (3) that the advisory fees charged by Defendants to the Funds vastly exceed the fees Defendants *themselves* charge to other clients, such as institutional clients, who buy *virtually identical services* on a free market, (Compl. ¶¶ 7, 43, 56).   These factual allegations alone provide an ample legal and factual basis for denying Defendants' motion.

### 2.   In attacking Plaintiffs' Complaint, Defendants distort Plaintiffs' allegations (or ignore them completely) and raise numerous questions of fact which cannot be resolved in a motion to dismiss.

In an apparent effort to avoid Plaintiffs' claims, Defendants either read Plaintiffs' allegations in an unnecessarily narrow fashion or ignore them altogether.  For example, Defendants contend that Plaintiffs have failed to allege the types of management services provided to the Funds.  *See* Defs.' Mem. in Support of Mot. to Dismiss at 11-12.  Yet the Complaint clearly alleges:  "The nature of the investment advisory services provided to the Funds is straightforward:  Defendants buy and sell, at their discretion, stocks, bonds, and other securities for the Funds."  Compl. ¶ 41.  "[T]he nature of the services Defendants rendered to the Funds has remained *unchanged* despite dramatic growth in the assets of the Funds and advisory revenues."  Compl. ¶ 42 (emphasis added).  Thus, Plaintiffs have made specific allegations regarding the type of services that Defendants provide and have alleged that these services have not changed throughout the relevant period.

Further, Defendants disparage Plaintiffs for not alleging the reason why the Funds have experienced a large growth in assets, but this criticism is misplaced as the reason is largely

irrelevant.  Regardless of why the assets have increased, as a result of that increase, Defendants are receiving significantly higher revenues in the form of fees though the nature of the services rendered in exchange for those fees has remained precisely the same.[6]  This fact alone demonstrates that Defendants' fees are disproportionately large to the services rendered and are, indeed, excessive.   Moreover, whether the assets have grown as a result of market forces or as a result of Defendants' distribution activity raises a factual issue that can be uncovered once discovery is underway.

Defendants also express their obvious disagreement with Plaintiffs' allegations regarding economies of scale, but this too presents a factual issue.   In their Complaint, Plaintiffs allege that despite a dramatic growth in Fund assets, Plaintiffs have not benefited from economies of scale.  As to the AXP New Dimensions Fund specifically, the assets have grown from $807 million to $14.9 *billion* dollars over the last 14 years, while the fees collected have actually increased at an even greater rate than the growth in assets. *See* Declaration of Stewart L. Brown ("Brown Decl.") [Attached as B].  While asset growth for the New Dimensions Fund was impressive, increasing by a factor of more than 18 times, fees charged annually grew even more, from less than $7.1 million in 1990, to $178 million in 2004, increasing by a factor of over 25 times. *See id.*

In an apparent attempt to refute the allegations that they have not passed on economies of scale, Defendants attach the Funds' Statements of Additional Information (documents neither referenced in, nor central to, Plaintiffs' Complaint) as evidence of the fee structure applicable to each Fund. *See* Defs.' Mem. in Support of Mot. to Dismiss at 12, fn. 10.  Defendants question why the Complaint does not state whether the fee break points applicable to the Funds adequately account for the alleged economies of scale. *See* Defs.' Mem. in Support of Mot. to Dismiss at 12.

---

[6]  To the extent that the assets grow due to market forces alone, Defendants can  provide advisory services with zero increased costs because the services remain identical.  Compl. ¶ 51.

First, however, the mere existence of a fee structure that employs break points at certain asset levels does not mean that economies of scale are adequately being passed on to Plaintiffs and the Funds. As described above, Plaintiffs allege fees have increased at a more rapid rate than assets; as such, regardless of the break point structure, Defendants are retaining economy of scale benefits for themselves rather than passing them on to shareholders in accordance with their fiduciary duties. At most, Defendants have created a question of fact as to whether these breakpoints adequately pass on the economies of scale generated as assets increase.

In addition, Defendants argue that if their fees are the same as (or less than) what other investment advisers charge for similar services "that compels the conclusion that [their] fees are proportionate to what the funds could otherwise obtain from an AEFC competitor" and are by definition "not disproportionately large." Defs.' Mem. in Support of Mot. to Dismiss at 10. This argument is completely illogical and out of touch with economic reality. Recognizing "the existence in most cases of an unseverable relationship between the adviser-manager and the fund it services", the court in *Gartenberg* stated:

> Competition between [funds] for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. ***Reliance on prevailing industry advisory fees will not satisfy § 36(b)***.

694 F.2d 923.

The most relevant comparison is not what other advisors charge other funds or even what American Express charges its other funds; rather, the most salient inquiry is what Defendants will charge their other clients, who bargain with Defendants and negotiate fees, for identical services – precisely the comparison Plaintiffs have set forth in their Complaint. Indeed, the Securities and Exchange Commission (the "SEC") recently confirmed the relevancy of this comparison when it

adopted a requirement that certain publicly available documents "will be required to indicate whether the board relied upon comparisons of the services to be rendered and the amounts to be paid under the contract with those under other investment advisory contracts, such as …other types of clients (e.g., pension funds and other institutional investors.)"  69 Fed. Reg. 39798, 39801-802 [Attached as Exhibit A].  Here, that comparison reveals the great disparity in what Defendants themselves are willing to charge on the open market versus what they charge the Funds, which for all practical purposes are captives of Defendants.[7]

Defendants attempt to downplay the importance of a comparison between the fees charged to the Funds and fees charged to Defendants' other clients.  First, Defendants mistakenly assert that Plaintiffs do not allege that the services Defendants provide to their institutional clients are the same as those provided to the Funds.  However, the Complaint plainly alleges that "[t]he pure investment advisory services Defendants provide to the Funds are identical to the investment advisory Defendants or their affiliates provide to other clients, such as institutional clients, and entail identical costs."  Compl. ¶ 7.  Second, relying on documents not referenced in the Complaint, Defendants argue that the advisory services provided to the Funds extend "beyond pure investment management," making the comparison irrelevant.  *See* Defs.' Mem. in Support of Mot. to Dismiss at 4.  Significantly, however, Defendants' own exhibits indicate that the expenses for the services they list are borne by the fund *in addition to* the management fee.  *See* Defs.' Ex. C-M[8] ("Under the agreement, the Fund *also* pays …."); Defs.' Ex. A at 5.  Accordingly, a comparison of the management fee charged to the Funds with the management fee Defendants charge their other

---

[7]  It is also illustrative of the quality of services provided to the Funds as it evinces Defendants' preference for their own financial interests at the expense of the Funds and their shareholders. *See* Compl. ¶ 43.
[8]  For purposes of this brief, Plaintiffs refer to the exhibits to the Declaration of Robert Skinner, filed in support of Defendants' motion, as "Defs.' Ex.".

clients is an apples-to-apples comparison.  *See* Compl. ¶ 54.[9]  In any event, at most, Defendants'

assertions raise another factual issue as to what services are performed in exchange for the fees

Defendants receive from Plaintiffs and the Funds.

Without the benefit of any discovery, Plaintiffs do not have ready access to data regarding

the fees Defendants charge to their other clients.  Nevertheless, with only a dearth of information

available to them, Plaintiffs allege that "Defendants and their affiliates routinely offer their services

to institutional and other clients for fees much lower than the investment advisory fees they charge

the Funds." Compl. ¶ 56.  For instance, for the first $1 billion in assets, Defendants charge the AXP

New Dimensions Fund, a large cap growth fund, a management fee of .60%. *See* Defs.' Ex. C at 33.

By way of comparison, Defendants charged the Louisiana State Employee's Retirement System a

fee equal to .23% annually to manage approximately $300 million in assets in the same large cap

growth style.  *See* Brown Decl.  Similarly, Defendants charged the State of Alaska only .17% to

manage approximately $ 500 million in assets in a large cap account.  *See id.*[10]  Thus, Defendants

are able to manage portfolios in the same investment style for their institutional clients at a fraction

of the price they charge Plaintiffs and the Funds, demonstrating that the fees charged to the Funds

are disproportionately large to the services rendered by Defendants.

### 3.  The other § 36(b) cases cited by Defendants provide no support for dismissing the Complaint.

---

[9]  Defendants cannot cite any authority requiring this Court to ignore the compelling evidence of what Defendants charge their other clients for the same services on the open market.   In the case upon which Defendants rely, *Strougo v. BEA Associates*, 188 F.Supp.2d 373, 384 (S.D.N.Y. 2002), there was no indication that the plaintiffs alleged, as Plaintiffs do here, that the services were the same.  Interestingly, the plaintiff appealed the dismissal of his complaint and the case was ultimately settled while the appeal was pending.  *See* Docket Report, Strougo v. BEA Associates, No. 1:98-cv-3725-RWS (S.D.N.Y.) [Attached as Exhibit C].
[10] Plaintiffs acknowledge that the cited data is a few years old; however, this fact underscores the need for discovery in this case.

In arguing that Plaintiffs have failed to plead facts proving they are entitled to relief under § 36(b), Defendants rely primarily on *Migdal*,[11] *Sheldon Krantz*, and *Yampolsky*.  None of those cases, however, provides support for Defendants' position that the § 36(b) claims should be dismissed[12] because none of those complaints contains the level of detailed factual allegations that appear in Plaintiffs' Complaint.  First, the *Migdal* court dismissed the complaint because it contained only conclusory allegations that amounted to nothing more than "the mere recitation of boilerplate statutory language." *Migdal*, 248 F.3d at 328.  The plaintiffs' claim of excessive fees regarding two mutual funds was based on four allegations: (1) the amount of fees, (2) the fact that two or three similar funds charged lower fees while outperforming the funds at issue, (3) the fact that the funds at issue failed to meet their performance benchmarks, and (4) the fact that despite the funds' underperformance, the defendant/advisor's earnings increased by more than 20%. *See Migdal*, 248 F.3d at 327.  The *Migdal* complaint did not identify, much less make a substantial factual showing, as to the *Gartenberg* factors.  There was no mention of economies of scale, no discussion of the advisers' profitability, no mention of fall-out benefits, and only a very limited comparison of the fees at issue to fees charged to other funds and of the nature of the services rendered in exchange for the fees charged. *See* Migdal, Second Am. Compl. [Attached as Exhibit D].  In fact, the *Migdal* court explicitly criticized plaintiffs for failing to make allegations about the defendants' receipt of excess profits from economies of scale. *Migdal*, 248 F.3d at 327. On the other hand, here there is no such deficiency as Plaintiffs make express factual allegations that Defendants have benefited from economies of scale as the Funds have grown larger while services have remained the same, and that

[11] As a practical matter, *Migdal*, applied a heightened, fact pleading standard.  To the extent that *Migdal* did stand for the proposition that fact pleading is required under § 36, the *Migdal* decision (2001) predates *Swierkiewicz*, which was decided in 2002, and has been effectively overruled as to that issue. *See Pfeiffer, supra*, at *4.
[12] Defendants also cite extensively the unreported opinion in *Millenco L.P. v. meVC Advisors, Inc.*, 2002 WL 31051604 (D. Del. 2002). However, in *Millenco*, the court denied the defendants' motion to dismiss the plaintiff's § 36(b) claim.

instead of passing these benefits on to the Funds, Defendants have retained them for themselves, extracting additional and excessive profits. *See, e.g.,* Compl. ¶¶ 15, 16, 74-77.

The complaint at issue in *Sheldon Krantz* was even more lacking in supporting factual allegations than the *Migdal* complaint. *See Sheldon Krantz*, First Am. Compl. ("*Sheldon Krantz* Compl.") [Attached as Exhibit E]. The *Sheldon Krantz* complaint focused almost exclusively on whether the "independent" directors' service on multiple boards renders them "interested" and whether, as a result, the contracts were unlawful under §§ 10(a) and 15(c) of the ICA. The entire § 36(b) excessive fee allegation essentially is stated in three sentences:

> Plaintiff alleges that none—much less 40%—of the members of the Fund's board are independent, as required by ICA Section 10(a). As a result, the Agreements were not properly negotiated at arm's-length and could not be properly approved as required by ICA Section 15(c). Consequently, the Fund has paid defendants' excessive fees pursuant to invalid, sweetheart contracts, thereby entitling plaintiff to seek recovery of those fees pursuant to ICA Section 36(b).

*Sheldon Krantz* Compl. ¶ 13. The complaint was utterly devoid of *any* facts demonstrating that the fees were disproportionate to the services rendered; instead, the excessive fee allegation was couched solely in terms of the directors' lack of independence. Indeed, the *Sheldon Krantz* complaint addressed only *one* of the six factors used to determine whether the fees charged were excessive. *Sheldon Krantz*, 77 F.Supp.2d at 565.

*Yampolsky*, upon which Defendants rely heavily, is similarly unhelpful to Defendants' position. In *Yampolsky*, the plaintiffs' claim of excessive fees was based simply on the underperformance of the funds at issue, the fees paid by the funds, and the independence of the directors. *See* 2004 WL 1065533 at *2. Importantly, as in *Migdal* and *Krantz*, the Yampolsky plaintiffs made no allegations regarding the retention of economies of scale, the relationship between the fees charged and services rendered, or what Defendants *themselves* charge for

providing identical services to their other clients.  *See* Defs.' Ex. P.  While Defendants go to great lengths to liken Plaintiffs' Complaint to the one in *Yampolsky*, the fact that the two complaints share in common some quotes from industry critics, of course, does not render them similar enough to warrant dismissal of Plaintiffs' Complaint.

A side-by-side comparison of the Complaint in this case and the *Yampolsky* complaint reveals that Plaintiffs have exceeded the allegations at issue in *Yampolsky*.  Nevertheless, it bears emphasizing that, without discovery, some of the missing facts that proved fatal to the *Yampolsky* complaint have been unavailable to shareholders.   Significantly, in *Yampolsky,* the court faulted Plaintiffs for not making allegations about the actual fee negotiations.  *See* 2004 WL 1065533 at *2. However, pleading such facts has been a practical impossibility because this type of information has not been publicly available.   Indeed, recognizing that "[i]ncreased transparency with respect to investment advisory contracts, and fees paid for advisory services, will assist investors in making informed choices among funds and encourage fund boards to engage in vigorous and independent oversight of advisory contracts," the SEC recently promulgated a new rule (the compliance date of which has not even become effective for some funds) adopting enhanced shareholder disclosure rules.  69 Fed. Reg. 39798, 39799 [Attached as Exhibit A].   The enhancements "are intended to address [the SEC's] concerns that some funds do not provide adequate specificity regarding the board's basis for its decision."  The rule requires a fund to include in certain publicly filed reports a discussion of "(1) The nature, extent, and quality of the services to be provided by the investment adviser; (2) the investment performance of the fund and the investment adviser; (3) the costs of the services to be provided and profits to be realized by the investment adviser and its affiliates from the relationship with the fund; (4) the extent to which economies of scale would be realized as the fund grows; and (5) whether fee levels reflect these economies of scale for the benefit of fund

investors." *Id.* at 39801.  As the SEC recognized, this sort of detailed factual information regarding the board's approval of advisory fees generally has not been available in materials to which shareholders have access.

At any rate, Plaintiffs here have far surpassed the allegations held insufficient by the courts in *Sheldon Krantz, Migdal,* and *Yampolsky,* allegations more than sufficient to defeat Defendants' motion to dismiss the § 36(b) claims.

### D.  In Counts III and IV, Plaintiffs have pled sufficient facts to state claims that the distribution fees are excessive and the Distribution Plans, pursuant to which the fees are paid, are unlawful.

Defendants misinterpret the nature of Counts III and IV of the Complaint, both of which relate to 12b-1 distribution fees.  The distribution fees pay for marketing programs used to attract new investors and sell fund shares in order to grow or stabilize Fund assets purportedly so that the Funds can benefit from economies of scale through reduced advisory fees.  Compl. ¶ 11.  In Count III, Plaintiffs allege that Defendants have breached their fiduciary duties under § 36(b) not only by receiving 12b-1 distribution fees that are themselves excessive, but also by using the distribution fees as a vehicle through which to extract additional compensation for their advisory services.  On the other hand, as discussed below, Count IV alleges that Defendants have failed to comply with the mechanical requirements of Rule 12b-1, rendering the Distribution Plans unlawful – such that *any* fee paid pursuant to them is improper.   Count IV is thus a "stand alone count," based on 12b-1 distribution fees separate from § 36(b). As discussed in more detail below, Counts III and IV are properly brought as separate and distinct counts and are not "redundant" as Defendants argue.

### 1.  Plaintiffs have pled facts sufficient to allege that Defendants' distribution fees are excessive and enable Defendants to extract additional advisory compensation.

Assuming *arguendo* that the test for *proving* that a distribution fee violates §36(b) is whether the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining" *Gartenberg v. Merrill Lynch Asset Mgt., Inc.*, 694 F. 2d 923, 928 (2d Cir. 1982),[13] Plaintiffs have stated a claim under §36(b) for excessive distribution fees.  The Complaint alleges that not only are the distribution fees themselves excessive and disproportionately large to the services rendered to the funds in exchange for those fees, but also that Defendants have used the distribution fees to "extract[] additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to acquire new shareholders so that these new shareholders could pay additional advisory fees to Defendants." Compl. ¶ 21.

Defendants turn a blind eye to Plaintiffs' allegations regarding the distribution fees charged to shareholders and the Funds, proclaiming (albeit wrongly) that Plaintiffs have not discussed how the actual distribution services "clash" with the actual distribution fees charged.  Defs.' Mem. in Support of Mot. to Dismiss at 19.  The Complaint reveals otherwise.  Specifically, Plaintiffs allege that in 2003, the shareholders of the Funds paid Defendants approximately $113 million in 12b-1 distribution fees (i.e., the actual fees).  Compl. ¶ 27.  Plaintiffs further allege that in exchange for $113 million, the shareholders and the Funds have received *no* benefit from Defendants' "marketing, selling, and distributing mutual fund shares to new shareholders" (i.e., the actual distribution services) (Compl. ¶ 11); instead, any rewards realized (i.e., economies of scale) have gone solely to Defendants (*See* Compl. ¶ 23, 25).  Thus, in reality, the services rendered in exchange for the distribution fees are really services that benefit Defendants, not Plaintiffs and the

---

[13] Defendants advance the position that a *Gartenberg* analysis applies to both Counts III and IV.  In no event could the *Gartenberg* framework apply to Count IV, which challenges the lawfulness of the Distribution Plans under which *any* fee is paid.  To the extent that a *Gartenberg* analysis is applicable to Count III, Plaintiffs have clearly pleaded sufficient facts.

Funds.  *See* Compl. ¶ 26 (discussing a recent report by a financial economist at the SEC, which found that 12b-1 plans provide "no apparent benefits" to shareholders of the fund).  A $113 million fee in exchange for services of zero value to the Funds and their shareholders is indisputably a fee that is disproportionately large to the services rendered by the Defendants.  To make matters worse, to the extent that Defendants' distribution activity has increased the assets in the Funds (a fact that may or may not be proven through discovery), Plaintiffs allege the distribution fees have actually increased Defendants' advisory fees as well because those fees are calculated as a percentage of the assets of the Funds.  *See* Compl. ¶ 21.  These allegations are more than sufficient to survive a motion to dismiss even under heightened standard that Defendants propose.  *See Pfeiffer, supra.*

Defendants launch a barrage of other attacks on Plaintiffs' allegations regarding distribution fees, none of which has any merit.  Defendants' first attack involves Plaintiffs' allegations about directed brokerage arrangements—a practice whereby Defendants direct the funds' brokerage business to firms and pay them above-market rates to promote Defendants' mutual funds over other funds. Compl. ¶ 45.  Apparently misunderstanding the nature of Plaintiffs' allegation, Defendants seek refuge behind the effective date of a new SEC rule prohibiting directed brokerage arrangements and argue that "[P]laintiffs' allegations about earlier periods are irrelevant." Defs.' Mem. in Support of Mot. to Dismiss at 20.  However, whether the SEC prohibits directed brokerage arrangements is not relevant to Plaintiffs' allegations.  Under § 36(b), the relevant inquiry is whether Defendants breached their fiduciary duties owed to Plaintiffs and the Funds; a breach of fiduciary duty is not dependent upon the violation of an SEC rule.  In any event, the primary import of Plaintiffs' allegation that Defendants participate in directed brokerage arrangements is related to the first *Gartenberg* factor (Nature and Quality of the Services), which Defendants criticize Plaintiffs for not addressing.  Compl. ¶ 45.  Plaintiffs' allegations regarding directed brokerage

payments bear directly on the quality of the services provided to the Funds because Defendants' participation in directed brokerage arrangements evinces their willingness to put their financial interests above the financial interests of Plaintiffs and the Funds. Simply because Defendants' activities prior to the Rule's effective date might not subject Defendants to any action by the SEC certainly does not make such practices irrelevant for purposes of evaluating the nature and quality of the services Defendants provide to the Funds.[14] Nor does the rule negate the fact that such arrangements are impermissible under the Distribution Plans that Defendants entered into with the Funds.

Defendants' next argument, which seems to relate to Count IV of the Complaint, pertains to whether the Distribution Plans benefit the shareholders in the form of economies of scale or otherwise. Specifically, Defendants argue that Rule 12b-1 does not require that economies of scale be produced and that distribution fees are beneficial to shareholders for reasons other than the reduction of fees. However, it is the mutual fund industry that has long since touted economies of scale as the justification for distribution fees, (*See* Compl. ¶ 20), and while Rule 12b-1 does not explicitly require that economies of scale be generated, it is indisputable that the Rule requires the fund boards to determine that the Distribution Plans are beneficial to the Funds and their shareholders. *See* 17 C.F.R. § 12b-1(e). Plaintiffs have expressly alleged that the 12b-1 plans have inured no benefits to the shareholders and the Funds. Compl. ¶¶ 23, 25. Although Defendants clearly disagree with Plaintiffs' allegations, whether the Distribution Plans actually benefit Plaintiffs and the Funds is a factual dispute to be resolved at trial and has no bearing on a motion to dismiss.

---

[14] To the contrary, the new rule demonstrates that directed brokerage arrangements are, in fact, relevant to the quality of Defendants' services.

Finally, Defendants argue that since their distribution fees do not exceed a cap set by the National Association of Securities Dealers (the "NASD") and is in line with what others in the mutual fund industry are charging, Defendants' fees cannot be deemed excessive. Industry averages cannot insulate Defendants from liability. The fact that Defendants' fees are similar to what other mutual fund distributors are charging does not make Defendants' fees reasonable. *See supra* Part II.C.2. Similarly, the fact that the fees do not exceed the maximum allowable fee set by an NASD rule does not compel the conclusion that the fees are not excessive or that they are not a mechanism by which Defendants wrongfully extract additional compensation for advisory services. Indeed, this argument recently has been rejected. *See Pfeiffer, supra,* at *5 (rejecting virtually identical argument as to NASD Conduct Rule 2830(d)(2) and noting that "should the plaintiff succeed in showing that the fees were excessive when measured against the services rendered, the defendant will not be able to defeat that showing by arguing that they could have charged even more.") Moreover, regardless of whether the SEC has the authority to review and approve the NASD's rules, "[t]he NASD is a private organization, not an arm of the government." Ford v. Hamilton Investments, Inc. 29 F.3d 255, 259 (6th Cir. 1994) (citations omitted); *see also In re Prudential Securities, Inc.,* 795 F.Supp. 657, 659 (S.D.N.Y.1992) ("NASD rules are established and enforced by a private association and do not give rise to federal question jurisdiction"). As a result, Defendants' compliance with the NASD rule proves nothing.

### 2. Count IV challenges the lawfulness of the Distribution Plans, not merely the excessiveness of the fees collected pursuant to them.

Plaintiffs allege in Count IV that the Distribution Plans, implemented pursuant to Rule 12b-1, are *unlawful* and should not have been adopted initially, much less continued annually. Rule 12b-1 obligates the directors to "request and evaluate … such information as may be reasonably

necessary to a determination of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d).  For the Distribution Plans to be implemented initially, and then continued, the directors must conclude that they will benefit the company *and its shareholders*. 17 C.F.R. § 270.12b-1(e).

Defendants try to muddle the distinction between Count IV and Count III by arguing that in Count IV Plaintiffs are merely "complaining that the fees are too high," a claim Defendants believe is interchangeable with Count III.  This demonstrates Defendants' misunderstanding of Count IV. In Count III, Plaintiffs allege that Defendants' receipt of 12b-1 fees violates their fiduciary duty with respect to receipt of compensation under § 36(b), not only because the 12b-1 fees are excessive but also because they serve as a means by which Defendants can extract additional compensation for advisory services.   In contrast, the crux of Plaintiffs' §12(b) claim is simple:  when re-approving the Funds' Distribution Plans year after year, the directors failed to obtain adequate information from which to determine whether any benefit would inure to the Funds and their shareholders as a result of the Plans.   Thus, Count IV goes beyond the issue of excessive fees and alleges that the Distribution Plans have failed to comply with the requirements of Rule 12b-1, thereby making it impossible to accomplish what they were designed to do,[15] namely grow fund assets such that economies of scale would be generated and passed on to shareholders.  In addition, Plaintiffs allege that the Distribution Plans do not comply with the mechanical requirements of Rule 12b-1, because the Funds' directors did not receive or request the information required to evaluate whether the Funds benefited from the Distribution Plans as required by Rule12b-1. Compl. ¶ 67 (c)-(d).  Nevertheless, the Fund boards have continued to approve, year after year, continuation of the Distribution Plans in violation of *both* Rule 12b-1 and § 36(b).  Compl. ¶ 25.

---

[15]  As a financial economist at the SEC recently observed, shareholders obtain "no apparent benefits" from 12b-1 plans and that the 12b-1 fee "is not an efficient use of shareholder assets."  Compl. ¶ 26.

Defendants reconstruct Plaintiffs' §12(b) claim in an attempt to reduce their exposure to damages.   However, the issue in Count IV is *not* the excessiveness of fees, but rather the uselessness of the Distribution Plans and Defendants' (and the directors') failure to comply with the rules applicable to the Plans' adoption and continuation.   In each of the cases cited by Defendants, the claims at issue were interpreted to be "excessive fee" claims.   Citing *Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404 (2d Cir. 1989), Defendants argue that Count IV is really just an excessive fee claim that cannot be brought under § 12(b).   However, *Krinsk* does not stand for the proposition that Plaintiffs cannot bring a separate § 12(b) claim; rather, *Krinsk* merely approved dismissal of a § 12(b) claim "*when the claim is indistinguishable from a § 36(b) claim.*"  *Id.* at 406 (emphasis added).   Here, Plaintiffs have not simply reincarnated their excessive fee claim under § 36(b), but have instead brought an entirely distinct claim under § 12(b) relating to the *unlawfulness* of the Distribution Plans. Importantly, *Krinsk* explicitly left open the possibility that a claim "that the plan fails to conform to the mechanical requirement of Rule 12b-1(b) … might give rise to a section 12(b) action independent of an action under section 36(b)." 875 F.2d at 413 n. 5.

Likewise, in *Merine v. Prudential-Bache Utility Fund, Inc.*, 859 F.Supp. 715, 723 (S.D.N.Y. 1994), the court found Plaintiffs' claim, brought under Sections 1(b)(2), 15, 17(h) and (i) of the ICA, "in essence, is that the fees he is charged are excessive because they are disproportionate to fees charged other shareholders" which the court deemed a "variation on a claim for 'excessive fees' under §36(b)."   Similarly, in *Tarlov v. Paine Webber Cashfund, Inc.*, 559 F.Supp. 429 (D. Conn. 1983), the Court clearly interpreted the claims at issue to be excessive fee claims.  *See* 559 F.Supp. 429 at 435 ("The task before this court, then, is to decide whether Congress intended to create private rights of action under Sections 1(b)(2), 15(a), 15(b), and 36(a) to correct the *payment of excessive fees* to an investment adviser.") (emphasis added).

Plaintiffs' claim that the Distribution Plans are unlawful advances a theory beyond one for the recovery of excessive fees and is properly brought under a section of the ICA other than § 36(b). *See Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 622 F.Supp. 169, 174 (S.D.N.Y. 1985) (finding complaint did "not allege solely that advisory fees paid by the Fund … were excessive. The § 20(a) claim raised … advances distinct factual allegations … and seeks legal and equitable relief beyond the mere recapture of excessive advisory fees"); *see also Krinsk, supra*, (leaving open the possibility that a claim for a technical violation of 12b-1 might give rise to an independent action under § 12).

### 3.   An implied private right of action exists under § 12(b).

In deciding whether a private right of action exists under a statute, "Congressional intent is the determining factor." *Wisdom v. First Midwest Bank*, 167 F.3d 402, 408 (8th Cir. 1999); *Christensen Hatch Farms, Inc. v. Peavey Co.*, 505 F.Supp. 903, 908 (D. Minn. 1981) ("The central inquiry is whether Congress intended to create, either expressly or by implication, a private cause of action."). "The Court first looks to the language of the statute itself, then to the legislative history." *McLachlan v. Simon*, 31 F.Supp.2d 731, 736 (N.D. Cal. 1998) (finding implied private right of action under § 36(a) of the ICA); *see Tallarico v. Trans world Airlines, Inc.*, 881 F.2d 566, 570 (8th Cir. 1989) (finding evidence in legislative history that Congress implicitly intended a private cause of action). "The absence of a statement of intent to create a remedy does not necessarily mean that no remedy is available." *First Pacific Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1121 (9th Cir. 2000).

Defendants' argument that no private right of action exists under § 12 is negated by the statutory language itself, Congress's own pronouncement as to the existence of private rights of action under the ICA, and the fact that, for decades, courts have routinely and consistently implied private rights of action under the ICA.  Moreover, the position that Defendants advance would

render worthless § 12(b) and Rule 12b-1 and the requirements imposed thereby, because there would be no way for injured shareholders to challenge a defendant's failure to comply with the mechanical requirements of § 12(b) or Rule 12b-1.

Congress has expressly and unambiguously said that investors, such as Plaintiffs, are among the class of intended beneficiaries of the ICA's protections:

> It is declared that the policy and purposes of this subchapter … are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and *the interest of investors*.

15 U.S.C. § 80a-1 (emphasis added).[16]   The plain language of § 12 similarly demonstrates that shareholders are the intended beneficiaries of that section's protections:

> It shall be unlawful for any registered open-end investment company … to act as distributor of securities of which it is the issuer … in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public investor *or for the protection of investors*.

15 U.S.C. § 80a-12. *See also* 17 C.F.R. § 270.12b-1(e) (directors must "conclude … that there is a reasonable likelihood that the [distribution plan] will benefit the company *and its shareholders)* (emphasis added).

Thus, § 12(b) and Rule 12b-1 focus on the individuals protected by the statute— shareholders—and hence support recognition of a private right of action. *See, e.g., Helfer*, 224 F.3d 1117, 1122-23 (9th Cir. 2000) (finding implied private right of action where "there is an explicit reference to the individuals for whose benefit the statute was enacted" and rejecting notion that placing shareholders on the same footing as the public in general eliminated the possibility that the statute was enacted for the benefit of the shareholders).  In contrast, the statutes at issue in *Olmstead*

---

[16] Second, the ICA provides courts with jurisdiction over "all suit in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of [the Act] or the rules, regulations, or orders thereunder." 15 U.S.C. § 80a-43.  Moreover, the phrase "suits in equity and actions at law" clearly anticipates suits and actions besides enforcement by the SEC, a fact implicit in the statute's statement that "[the SEC] may intervene as a party in any action or suit … at any stage of such action or suit prior to final judgment therein." *Id.*

*v. Pruco Life Insurance Co.*, 283 F.3d 429, 433 (2d Cir. 2002) did "not mention investors such as the plaintiffs" but rather "only describe[d] actions by insurance companies that are prohibited." Similarly, in *MEVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F.Supp.2d 616 (S.D.N.Y. 2003), the statute at issue, §12(d)(1)(a), the ICA's antipyramiding provision, does not mention investors, much less focus on them.

The legislative history of the ICA only reinforces the notion that Congress intended implied private rights of action under the Act. For example, when Congress amended the ICA in 1980, the House Committee reported:

> The rationale for implying private rights of action under the securities laws beyond those actions expressly provided for had been well articulated by the Supreme Court when it observed that implied rights of action allowing shareholders to sue to remedy their losses would significantly assist the congressional goal of promoting fair corporate suffrage. But in recent years, the Supreme Court has turned its focus toward a strict construction of statutory language and expressed intent.
>
> *The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation where the plaintiff falls within the class protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision ….*

H.R. Rep. No. 1341, at 28-29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4800, 4810-11 (emphasis added). This not legislative "inaction;" this is an affirmative expression of Congress's intent that courts would continue to imply rights of action under existing sections of the ICA. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378-79 (1982)") ("When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, … Congress need not have intended to create a new remedy, since one already existed; the question is whether to preserve the pre-existing remedy.")[17] Here, that answer is clearly answered by Congress's own words. *See H.R. Rep. No. 1341; see also* S. Rep. No. 91-184 (§36(b) "should

---

[17] The court in *Olmstead v. Pruco Life Insurance Co.*, 283 F.3d 429, 433 (2d Cir. 2002), upon which Defendants rely, was not persuaded by this legislative history; however, the provisions at issue in *Olmstead* were added to the ICA 16 years *after* the 1980 House Report.

not be read by implication to affect subsection (a)"). Indeed, courts have for decades implied private rights of action under various sections of the ICA.[18]

Defendants' argument that the creation of an explicit right under Section 36(b) confirms that Congress did not intend to authorize private suits under other sections of the Act cannot hold up. When Congress enacted § 36(b) in 1970, the Senate Report stated that the explicit creation of a private remedy under § 36(b) "should not be read by implication to affect subsection (a)," S. Rep. No. 91-184, at 16, *reprinted in* 1970 U.S.C.C.A.N. 4897, 4911, under which courts have been implying private rights of action for years. In addition, courts have specifically rejected arguments similar to the one advanced by Defendants. *See, e.g., Lessler*, 857 F.2d at 871 (amendments to the ICA did not negate previously recognized private rights of action); *Bancroft*, 825 F.2d at 735 (3d Cir. 1987) ("Inclusion of such an express private remedy has nothing to do with other sections of the Act, however, and in no way suggests a congressional intent to abolish established implied causes of action for their enforcement") (citing *Fogel*, 668 F.2d at 111); *Langer v. Brown*, 913 F.Supp. at 268 (presence of an express private right in one section (i.e., § 36(b)) does not negate an implied private right in another).

### 4.  Plaintiffs' § 12(b) claim is a direct cause of action.

Defendants' final argument as to Plaintiffs' § 12(b) claim – which they relegate to a footnote – is that a claim under § 12(b) is derivative and Plaintiffs have not met the demand requirements.

---

[18]   *See, e.g., Lessler v. Little*, 857 F.2d 866, 873 (1st Cir. 1988); *Bancroft Convertible Fund, Inc. v. Zico Investment Holding, Inc*, 825 F.2d 731, 733-36 (3d Cir. 1987); *Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76, 86-88 (2d Cir. 1985); *Fogel v. Chestnutt*, 668 F.2d 100, 109-12 (2d Cir. 1981); *McLachlan v. Simon*, 31 F.Supp.2d 731, 736-37 (N.D. Cal. 1998); *Young v. Nationwide Life Insurance Co.*, 2 F.Supp.2d 914, 925 (S.D. Tex. 1998); *Langer v. Brown*, 913 F.Supp. 260, 267-70 (S.D.N.Y. 1996); *Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F.Supp. 1343, 1349 (D.N.J. 1996); *In re Nuveen Fund Litig*., No. 94 C 360, 1996 WL 328006, at *4-6 (N.D. Ill. Jun. 11, 1996); *Carr v. Equistar Offshore, Ltd.*, No. 94 CIV 5567, 1995 WL 562178, at * 14-15 (S.D.N.Y. Sept. 21, 1995); *In re ML-Lee Securities Litig*., 848 F.Supp. 527, 538-40 (D. Del. 1994); *Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105, 1114-16 (D.R.I. 1990); *Clemente Global Growth Fund, Inc. v .Pickens*, 705 F.Supp. 958, 963 (S.D.N.Y. 1989); *Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910, 917-20 (S.D.N.Y. 1986).

Defendants, however, do not articulate why the claim is derivative.   As discussed below, because the injuries suffered by Plaintiffs as a result of the Distribution Plans are not common to all shareholders and are not injuries suffered by the Funds, Plaintiffs have properly brought their § 12(b) claim as a direct action.

Whether a claim is direct or derivative is determined by the law of the state under which the entity is incorporated or organized. *See Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90 (1991). Where there is no injury to the corporate entity, the claim is direct.   Under Minnesota law, "[a] derivative action is required when the shareholder has suffered a harm that is indistinct from the harm suffered by other shareholders or by the corporation itself." *Wenzel v. Mathies*, 542 N.W.2d 634, 640-41 (Minn. Ct. App. 1996) (citing *Arent v. Distribution Sciences, Inc.*, 975 F.2d 1370, 1374 (8th Cir. 1992)); 12B Fletcher Cyclopedia of Private Corp. § 5911 ("The action is derivative if the gravamen of the complaint is injury to the corporation.").

Unlike other entities, "[a] mutual fund is a 'mere shell,' a pool of assets consisting mostly of portfolio securities that belongs to the individual investors holding shares in the fund." *Tannenbaum v. Zeller,* 552 F.2d 402, 405 (2d Cir. 1977); *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 808 (2d Cir. 1976); *see also In re Fidelity/Micron Securities Litigation*, 964 F. Supp. 539, 543 (D. Mass. 1997). A mutual fund issues "redeemable securities," the redemption price for which is "approximately the fractional value per share of the fund's net assets at the time of redemption." *United States v. Cartwright*, 411 U.S. 546, 547 (1973). The net asset value per share is computed at least daily "by taking the market value at the time of all portfolio securities, adding the value of other assets and subtracting liabilities, and dividing the result by the number of shares outstanding." *Id.* at 548, n. 3.

Because mutual fund shares are priced daily, each dollar of expense (including distribution fees) borne by the Funds is passed immediately through to Fund shareholders in the form of a

deduction from the fund's net assets, and hence the net asset value per share.  As recognized by the Senate Committee overseeing the passage of the Securities Law Enforcement Remedies Act of 1990, "[g]enerally, an investment company is a managed portfolio of liquid assets, with all the expenses passed on to shareholders."  S.Rep. No. 337, at 17, 1990 WL 263550 (1990); *see In re Fidelity/Micron Securities Litigation*, 964 F.Supp. 539, 543-544 (1997).  Thus, unlawful fees (such as those paid through the Distribution Plans) immediately and permanently injure fund shareholders, rather than the Funds themselves, on a dollar-for-dollar basis.[19]  It follows then that shareholders possess the right to redress their injuries occasioned by the unlawful adoption and continuation of Distribution Plans.   This is particularly true because, under Rule 12b-1, Distribution Plans must benefit not only the Funds but also *the Funds' shareholders* in order to be adopted. 17 C.F.R. § 270.12b-1(e). [20]

However, these injuries suffered by Plaintiffs as a result of the Distribution Plans are not of the same character to each shareholder.   Unlike advisory fees, which are paid by each shareholder in proportion to the amount of shares he or she owns, 12b-1 fees are not paid by all investors of the Funds.  In fact, depending on which class of share a shareholder chooses to purchase, he or she may pay a greater or lesser 12b-1 fee, and the amount of the fee paid by each shareholder is dependent upon the value of the shareholders' mutual fund account.   For instance, while Class A, B and C

---

[19]  That fees are in actuality paid for by the individual investors has been recognized by the General Accounting Office, which recommended to the SEC that it "require that the quarterly account statements that mutual fund investors receive include information on the specific dollar amount of each investor's share of the operating expenses that were deducted from the value of the shares they own."  General Accounting Office, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000), Compl., Exhibit 3 at pages 1, 5.

[20]  Where, as here, shareholders are meant to be the direct beneficiaries of payments under Distribution Plans established under Rule 12b-1, surely they individually have a right to complain when the payments are calculated to injure them.

shares pay a fee of .25 of 1% of the Fund's average daily net assets, Class Y shares do not.[21]   *See, e.g.,* Defs.' Ex. C at 35.   As a result, the injuries suffered by Plaintiffs are distinct from injuries suffered by other shareholders.

Because Plaintiffs' § 12(b) claim can be brought as a direct claim,[22] there is no requirement that Plaintiffs make a demand on the Funds' directors or that they plead demand futility. Consequently, Defendants' argument must be rejected.

### E.  Neither the dismissal of Counts II and III of the Complaint nor the striking of Plaintiffs' prayer for declaratory relief is proper.

Defendants request that the Court dismiss Counts II and III of the Complaint for the independent reason that there is no statutory basis for the claims they assert.  At the outset, it should be noted that Count III is not an "excess profits" claim.   Rather, it asserts that Defendants' distribution fees are excessive and a mechanism by which Defendants obtain additional advisory compensation.   In *Meyer v. Oppenheimer Mgmt. Corp.,*  764 F.2d 76 (2d Cir. 1985), the court expressly found that "[a] claim that payments made under Rule 12b-1 are excessive when combined with advisory fees, where both payments are made to "affiliated persons" of an investment adviser, is cognizable under section 36(b)." *See also Pfeiffer, supra.*  Moreover, the fact that Defendants now deem Count III an "excess profits" claim is inconsistent with its earlier argument that the *Gartenberg* excessive fee test should apply to that claim.

Regardless of whether one or both of the Counts are "excess profits" claims, however, Defendants' argument that there is no statutory basis for those claims represents a fundamental

---

[21]  The Funds have institutional shares (i.e., Class Y shares), ownership of which does not require the payment of 12b-1 fees at all.

[22]  Other courts have held that claims pursuant to the ICA and common law are properly brought as direct actions. *See Dowling v. Narrangansett Capital Corp.*, 735 F.Supp. 1105, 1113-14 (D.R.I. 1990); *Panfil v. Scudder Global Fund, Inc.,* No. 93 C 7430, 1993 WL 532537, * 4 (N.D. Ill. Dec. 20, 1993); *Mann v. Kemper Financial Companies, Inc.*, 618 N.E.2d 317, 327 (Ill. App. 1st Dist. 1992).

misperception that § 36(b) only provides a remedy for excessive fees. In point of fact, § 36(b) is not limited to excessive fee claims; instead, that section provides a cause of action "for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or the security holders thereof to such investment adviser or person." 15 U.S.C. § 80a-35(b). In any event, *Migdal*, on which Defendants rely throughout their brief, provides an implicit basis for Count II of Plaintiffs' Complaint. *See Migdal*, 248 F.3d at 327 (noting the importance of an allegation regarding "excess profits from economies of scale" in context of § 36(b)). Indeed, it is hard to understand why an adviser would not be liable for charging excessive fees in breach of its fiduciary duty where a fund advisor experiences extraordinary economies of scale in providing investment advisory services to a phenomenally growing asset base but retains the benefits of those economies by not passing them on to the shareholders of the fund in any meaningful way. This is precisely what Plaintiffs have alleged. Compl. ¶¶ 16, 52-53, 75-77. And nothing in *Gartenberg*, or any of the other cases relied upon by Defendants, would indicate that such a claim does not exist.

Finally, Defendants urge the Court to strike Plaintiffs' prayer for declaratory relief. Defendants' argument that the Court should strike Plaintiffs' prayer for relief declaring the advisory and distribution agreements between Defendants and the Funds *void ab initio* should be rejected. Such a request prior to trial should only be granted in the rarest of circumstances, which are not present here. *See, e.g., Lewis v. Byrnes*, 538 F.Supp. 1221, 1226 (S.D.N.Y. 1982). In this case, declaratory relief would be consistent with § 15 of the ICA, which makes it unlawful for an investment adviser or principal underwriter to serve in that capacity unless the investment advisory and distribution agreements are approved annually by the independent directors who have requested and been furnished with all information necessary to evaluate the terms of the contracts. *See* 15 U.S.C. § 80a-15(a), (b), & (c). Plaintiffs have alleged that the directors did not receive such

information, which would indeed render the advisory agreements and the distribution agreements at issue in this case unlawful and, therefore, void.  Compl. ¶¶ 17, 67.  In addition such relief would be consistent with § 36(b)'s "broad remedial purpose."  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 541 (1984).

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the motion to dismiss be denied.

CHESTNUT & CAMBRONNE

Dated: January 18, 2005

By:  s\ Karl L. Cambronne_____
Karl L. Cambronne
MN Bar No.. 14321
3700 Campbell Mithun Tower
222 South Ninth Street
Minneapolis, MN  55402
Telephone:  (612) 339-7300
Fax:  (612) 336-2940

Lynn Lincoln Sarko, *pro hac vice*
Michael D. Woerner, *pro hac vice*
Gretchen F. Cappio, *pro hac vice*
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Fax: (206) 623-3384

Gary Gotto
Ron Kilgard
KELLER ROHRBACK P.L.C.
National Bank Plaza
3101 North Central Avenue, Ste. 900
Phoenix, AZ  85012
Telephone: (602) 248-0088
Fax: (602) 248-2822

Guy M. Burns, *pro hac vice*

Jonathan S. Coleman, *pro hac vice*
Becky Ferrell-Anton, *pro hac vice*
JOHNSON, POPE, BOKOR, RUPPEL & BURNS, L.L.P.
100 North Tampa Street, Ste. 1800
Tampa, FL  33602
Telephone: (813) 225-2500
Fax: (813) 223-7118

Michael J. Brickman, *pro hac vice*
James C. Bradley, *pro hac vice*
Nina H. Fields, *pro hac vice*
RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC
174 East Bay Street
Charleston, SC  29401
Telephone: (842) 727-6500
Fax: (842) 727-3103

**Counsel for Plaintiffs**