# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN E. GALLUS et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 0:04-cv-4498 |
| v. | ) |
| | ) Honorable Donovan W. Frank |
| AMERIPRISE FINANCIAL, INC. (F/K/A | ) Magistrate Judge Susan R. Nelson |
| AMERICAN EXPRESS FINANCIAL | ) |
| CORPORATION), RIVERSOURCE | ) |
| INVESTMENTS LLC, and AMERIPRISE | ) |
| FINANCIAL SERVICES, INC. (F/K/A | ) |
| AMERICAN EXPRESS FINANCIAL | ) |
| ADVISORS INC.), | ) |
| | ) |
| Defendants. | ) |
| | ) |

# MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................5

      1.    The Parties ...........................................................................5

      2.    The Investment Company Act's Regulatory Structure for Mutual Fund Governance ...........................................................................5

      3.    Ameriprise's Investment Management and 12b-1 Distribution Fees.....6

      4.    The Annual Negotiation and Approval of The Investment Management Contract and Fees ................................................................7

      5.    Ameriprise's Performance Record ......................................................11

ARGUMENT ..........................................................................12

I.    PLAINTIFFS MUST ADDUCE EVIDENCE THAT THE FEES CHARGED TO THE FUNDS WERE "SO DISPROPORTIONATELY LARGE" THAT THEY BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES RENDERED AND COULD NOT HAVE BEEN THE PRODUCT OF ARM'S-LENGTH BARGAINING." .................................12

    A.    Ameriprise Is Entitled To Summary Judgment If Plaintiffs Fail To Adduce Evidence Sufficient To Allow The Trier Of Fact – The Court In This Case – To Find For Plaintiffs Under Section 36(b) .....................................12

    B.    The Test Under Section 36(b) Is Not Whether A Challenged Fee Was "Reasonable," But Instead Whether It Was "So Disproportionately Large That It Bears No Reasonable Relationship To The Services Rendered And Could Not Have Been The Product Of Arm's-Length Bargaining."............13

II.    PLAINTIFFS HAVE FAILED TO ADDUCE EVIDENCE SUFFICIENT FOR THE COURT TO FIND THAT THE FUNDS PAID EXCESSIVE INVESTMENT MANAGEMENT FEES IN VIOLATION OF SECTION 36(b) ..........................................................................16

    A.    The Undisputed Record Of Ameriprise's Fees And The Negotiation Of Those Fees Defeats Plaintiffs' Claims Under Section 36(b)........................16

    B.    Comparison Of Mutual Fund Fees To Non-Mutual Fund Fees Is Irrelevant As A Matter Of Law, And Plaintiffs Have Shown No Factual Predicate Of Comparability..........................................................................18

C.   Plaintiffs' Evidence Relating To The So-Called "*Gartenberg* Factors" Raises No Genuine Issue Of Material Fact Under Section 36(b) As To The Fees Being The Product Of Arm's-Length Bargaining .........................................22

1.   In Attacking The Independent Directors' Diligence, Plaintiffs Ignore The Factual Record Of The Broad Array Of Information They Considered And The Fee Concessions They Negotiated On The Shareholders' Behalf ..............................................................................................23

2.   Plaintiffs Do Not Challenge The Voluminous Data Reviewed By The Independent Directors Regarding The "Nature And Quality Of Services" Ameriprise Provided To The Funds ....................................................25

3.   Plaintiffs' "Comparative Fee Structure" Analyses Focus On An Irrelevant Comparison Between Mutual Fund Fees And Non-Mutual Fund Fees, And They Ignore The Data Considered By The Directors Comparing The RiverSource Funds To Comparable Mutual Funds....26

4.   Plaintiffs' "Economies Of Scale" Experts Take No Account Of The Effect Of Ameriprise's Breakpoints, Which Concededly Pass Along Economies Of Scale To Shareholders ................................................26

5.   Any "Fall-Out Benefits" Were Fully Disclosed To The Directors ......27

6.   Plaintiffs' Challenge To The Directors' Profitability Report Does Not Describe Or Quantify The *Effect* Of Any Supposed Failings In The Report ..........................................................................................28

III.  PLAINTIFFS' CHALLENGE TO AMERIPRISE'S 12B-1 DISTRIBUTION FEES ARE NOT ACTIONABLE UNDER SECTION 36(b) ...................................................................................................................29

A.   Plaintiffs Do Not Attempt To Establish That Ameriprise's 12b-1 Distribution Fees Are Excessive Under Section 36(b) As Alleged In The Complaint, But Rather Challenge The Validity Of The Fees In Their Entirety ....................29

B.   Plaintiffs Provide No Analysis Of The 12b-1 Distribution Fees Under Relevant Section 36(b) Standards, As They Ignore The Record Evidence Of The         Different Services Actually Paid For By The 12b-1 Fees............30

CONCLUSION ..........................................................................................................31

# TABLE OF AUTHORITIES

## CASES

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
   No. 04 Civ. 4885, 2006 WL 1520222 (S.D.N.Y. May 31, 2006) .............................. 20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................12, 13, 18

*Batra v. Investors Research Corp.*,
   144 F.R.D. 97 (D. Mo. 1992) .................................................................. 20

*Benak v. Alliance Capital Mgmt. L.P.*,
   No. Civ. A. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004)................................ 14

*Bromson v. Lehman Mgmt. Co.*,
   No. 84-Civ.-7795 (JFK), 1986 WL 165 (S.D.N.Y. 1986) ........................................ 20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................ 12

*Fenny v. Dakota, Minn. & E. R.R.*,
   327 F.3d 707 (8th Cir. 2003) ................................................................... 13

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982)..............15, 19

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   694 F.2d 923 (2d Cir. 1982) .............................................................*passim*

*Green v. Fund Asset Mgmt., L.P.*,
   286 F.3d 682 (3d Cir. 2002) ................................................................... 14

*Green v. Fund Asset Mgmt., L.P.*,
   147 F. Supp. 2d 318 (D.N.J. 2001) ........................................................ 15

*Green v. Nuveen Advisory Corp.*,
   295 F.3d 738 (7th Cir. 2002) ..........................................................15, 26

*Green v. Nuveen Advisory Corp.*,
   No. 97-C-5255, 2001 WL 1035652 (N.D. Ill. Sept. 10, 2001) ................................. 14

*Herring v. Canada Life Assurance Co.*,
    207 F.3d 1026 (8th Cir. 2000) ................................................................. 13

*Jones v. Harris Assocs.*,
    No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007) ..............................*passim*

*Kalish v. Franklin Advisers, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990)......................................................... 20

*King v. Douglass*,
    973 F. Supp. 707 (S.D. Tex. 1996) .......................................................... 14

*Krinsk v. Fund Asset Mgmt., Inc.*,
    715 F. Supp. 472 (S.D.N.Y. 1988)......................................................... 21

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989) ................................................................. 14

*Levy v. Alliance Capital Mgmt. LP*,
    No. 97-Civ.-4672(DC), 1998 WL 744005 (S.D.N.Y. Oct. 26, 1998) ....................... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................... 13

*Meyer v. Oppenheimer Mgmt. Corp.*,
    895 F.2d 861 (2d Cir. 1990) ................................................................. 14

*Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*,
    387 F.3d 705 (8th Cir. 2004) ................................................................. 12

*Migdal v. Rowe Price-Fleming, Int'l, Inc.*,
    248 F.3d 321 (4th Cir. 2001) ................................................................. 14

*Miller v. Mitchell Hutchins Asset Mgmt., Inc.*,
    No. 01-CV-00192DRH, 2003 WL 24260305 (S.D. Ill. Mar. 6, 2003)....................... 14

*In re Nuveen Fund Litig.*,
    No. 94-C-360, 1996 WL 328006 (N.D. Ill. June 11, 1996)........................ 15

*Pfieffer v. Bjurman, Barry & Assocs.*,
    No. 03-Civ.-9741-DLC, 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) .................... 14

*Planned Parenthood of Minn./S.D. v. Rounds*,

372 F.3d 969 (8th Cir. 2004) ................................................................. 13

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    663 F. Supp. 962 (S.D.N.Y. 1987)........................................14, 16, 20, 21

*Strougo v. BEA Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002)..............................................14, 20

*Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*,
    No. 03-Civ.-5710(RO), 2004 WL 1065533 (S.D.N.Y. May 12, 2004)..................... 14

## STATUTES

15 U.S.C. § 80a-1 *et seq* ....................................................................... 5

15 U.S.C. § 80a-10 ................................................................................ 6

15 U.S.C. § 80a-15 ................................................................................ 6

15 U.S.C. § 80a-2(a) ........................................................................... 6, 7

15 U.S.C. § 80a-35(b) ........................................................................... 13

Fed. R. Civ. P. 56(c) ............................................................................ 12

H.R. Rep. No. 91-1382 (1970)............................................................ 14-15

## OTHER AUTHORITIES

SEC, Exemptive Rule Amendments of 2004: The Independent Chair Condition,
    http://www.sec.gov/news/studies/indchair.pdf (Apr. 2005) ........................................ 8

SEC Final Rule: Investment Company Governance, Release No. IC-26520,
    http://www.sec.gov/rules/final/ic-26520.htm (Sept. 7, 2004)..................................... 8

SEC, Mutual Fund Fees and Expenses, http://www.sec.gov/answers/mffees.htm
    (Mar. 1, 2006) ............................................................................ 29

Defendants Ameriprise Financial, Inc. (f/k/a American Express Financial Corp.), RiverSource Investments LLC, and Ameriprise Financial Services, Inc. (f/k/a American Express Financial Advisors Inc.) (collectively, "Ameriprise") respectfully submit this Memorandum in support of their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Section 36(b) of the Investment Company Act of 1940 (the "ICA") imposes a "fiduciary duty with respect to the receipt of compensation" on investment advisers to mutual funds, and authorizes individual shareholders to recover for their fund excessive fees charged in breach of that obligation. The standard against which "excessiveness" is measured is stringent: "the adviser-manager must charge a fee that is *so disproportionately large* that it bears *no reasonable relationship* to the services rendered," such that it "*could not have been* the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (emphasis added). As a matter of law, the question a Section 36(b) claim raises is *not* whether investment management fees were "reasonable." Rather, Section 36(b) addresses whether the fees were *so un*reasonable that they evince no hint of good faith negotiation. *See id.* That means an investment adviser cannot be liable for breach of its "fiduciary duty with respect to the receipt of compensation" if *either* its fees are not objectively unreasonable *or* the fees are objectively the result of bargaining at arms' length.

In this case, plaintiffs challenge the fees charged by Ameriprise to eleven current and former RiverSource mutual funds that plaintiffs allegedly owned as of the filing of the Complaint. In its prior Order granting in part and denying in part Ameriprise's motion to dismiss, the Court ruled that plaintiffs' excessive fee claims survived the motion "by only the narrowest of margins" and questioned "the basis and veracity" of certain assertions in the Complaint. *See* Mem. Opinion & Order (Mar. 7, 2005) ("Op.") at 7-8, 10. The Court granted plaintiffs an opportunity to take limited discovery, leaving Ameriprise the option of renewing its dispositive motion thereafter. *See id.* Now, following two years of extensive fact and expert discovery, Ameriprise respectfully seeks entry of summary judgment on all remaining claims.

No disputed, material fact permits the required inference that Ameriprise's fees were either grossly unreasonable or not fairly negotiated. The record adduced in discovery shows that Ameriprise and the RiverSource funds' independent directors engaged annually in a robust arms'-length negotiation of the fees charged to the funds based upon extensive information about the funds' operations and performance gathered by the independent directors and their legal counsel from Ameriprise and third-party industry consultants. The record shows what information the funds' independent directors collected, what they considered, and what they did – none of which supports the inference of a flawed process or bad faith essential to the conclusion that fees were not bargained for at arms' length. The arms'-length nature of this negotiation is demonstrated starkly by the results: the fees charged to the funds (i) are set to be at or below the median level charged to comparable funds in the industry, (ii) feature

"breakpoints" that concededly share economies of scale with shareholders as the funds grow, and (iii) are subject to performance incentive adjustments that further decrease the fees if fund performance does not exceed an agreed benchmark. Fees that compare so favorably to those charged by competitor funds are not objectively unreasonable.

Plaintiffs have adduced no evidence to undermine these core facts or their significance under the governing standard. Unable to prove the allegations about which the Court expressed concern in its prior Order, plaintiffs amended their Complaint to excise nearly all of them. Their experts say nothing about the value of Ameriprise's services relative to those provided by other fund managers, or why, in light of those services, Ameriprise's fees should be considered grossly out of proportion. Instead, plaintiffs raise matters that are legally and logically irrelevant to their excessive fee claims under Section 36(b).

At the heart of plaintiffs' case – indeed, the only basis upon which they quantify their allegation that Ameriprise's fees are "excessive" – is the assertion that the funds' investment management fees *must be* excessive because the fees paid to Ameriprise by non-mutual fund clients are lower. But that theory has failed in the courts as a matter of law because it is unsupported as a matter of fact by a predicate of comparability. Courts have repeatedly found that the clear differences between the services advisers provide to mutual funds and non-mutual fund clients rob this apples-to-oranges comparison of any probative value. Here, the same legal analysis applies. And the factual record includes the same gap in competent evidence to establish that the fees Ameriprise charges its different clients are for the same things. To the contrary, the record confirms that

Ameriprise provides its mutual funds with different and additional services that it does not perform for other clients, justifying the rate differential.  That simply is not a basis, then, upon which to contend that Ameriprise's investment management fees are excessive just because they are different.

At bottom, plaintiffs' claim of "excessiveness" is an assault on the industry – not Ameriprise or the fees it charges the RiverSource funds.  In fact, Judge Kocoras of the Northern District of Illinois has just granted summary judgment in a companion case brought by the same plaintiffs' counsel with nearly an identical complaint and theories of liability.  *See Jones v. Harris Assocs., L.P.*, No. 04-C-8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007).  There, as here, the plaintiffs failed to demonstrate that any supposed "flaws" they identified in the fee negotiation process made "a legally significant difference" under the law; instead, the plaintiffs told "an elaborate story of what they believe should have transpired between the Funds and [the adviser] in order to produce a deal that would ultimately be more advantageous to the Plaintiffs than the arrangement that was reached."  *Id*. at *9.  With such a showing – strikingly similar to plaintiffs' proffers in this case – the court determined that the plaintiffs had failed to "set forth an issue of fact that, if resolved in their favor, could lead to a finding that [the adviser] had breached its § 36(b) duty."  *Id*.  The same conclusion should be reached here.

## STATEMENT OF FACTS

### 1.    The Parties

Plaintiffs bring this action derivatively on behalf of eleven current and former mutual funds managed by Ameriprise (the "Funds").[1]  Each Fund is a registered investment company under the ICA, 15 U.S.C. § 80a-1 *et seq*., and Ameriprise entities serve as investment adviser and distributor to the Funds pursuant to separate agreements with each Fund.  *See* Am. Comp. ¶¶ 39-40.[2]  At least one of the plaintiffs was allegedly a shareholder in each Fund during the relevant period – June 10, 2003 to June 9, 2004.[3]

### 2.    The Investment Company Act's Regulatory Structure for Mutual Fund Governance

The ICA creates a regulatory structure for mutual fund governance designed to safeguard the interests of fund shareholders.  Section 15(a) of the ICA requires that fund investment advisers serve pursuant to written management contracts approved by a

---

[1]   Following this Court's ruling on the motion to dismiss, in which the Court limited plaintiffs' discovery, *see* Op. at 8, 10, Magistrate Judge Mayeron ordered plaintiffs to select two funds on which they were to be focus in the first phase of discovery.  *See* Pretrial Sch. Order at 1 (May 3, 2005).  Plaintiffs selected the New Dimensions Fund and the Large Cap Equity Fund*, see* Ex. A to Declaration of Chanel R. Dalal ("Dalal Decl."), and have included a third fund, Blue Chip Advantage, in their expert analyses.  In this Motion, Ameriprise seeks summary judgment on the remaining claims as to all Funds raised in the Complaint, as the record of the fee negotiation process and its results is fully developed.  A further round of discovery focused on facts specific to the other Funds mentioned in the Complaint will not yield any additional facts relevant to this Motion.

[2]   RiverSource Investments LLC currently is the investment adviser to the Funds, and Ameriprise Financial Services, Inc. currently is the distributor.

[3]   In its ruling on the parties' objections to Magistrate Judge Nelson's discovery order, this Court held that damages are limited to the one-year period before the filing of the Complaint.  *See* Mem. Op. & Order at 3-4 (July 27, 2006).

majority of the fund's shareholders, which must thereafter be approved annually by the fund's board of directors or a majority of shareholders. *See* 15 U.S.C. §§ 80a-15(a), 80a-2(a)(12). Section 15(c) requires that approval of the management contract by the fund directors be accomplished by a majority of disinterested directors, and it requires fund directors to request and evaluate such information from the adviser as may be reasonably necessary to evaluate the terms of the proposed contract. *See id.* § 80a-15(c). As for the composition of the board approving the contracts, Section 10(a) of the ICA provides that no more than 60 percent of the fund's board of directors can be comprised of "interested persons" of the fund, as defined by Section 2(a)(19). *See id.* §§ 80a-2(a)(19), 80a-10(a).

### 3.   <u>Ameriprise's Investment Management and 12b-1 Distribution Fees</u>

For its investment management services, Ameriprise receives a fee from each Fund, calculated as a percentage of that Fund's net assets at the end of the preceding month. *See* Dalal Decl. Ex. B at B3-4,B18,B30,B35,B38,B43. The fee schedule is set forth as part of the management contract and is thus negotiated and approved each year by the directors as required by the ICA provisions described above. *See id.*; Dalal Decl. Ex. C. The fee schedule for each Fund features "breakpoints," *i.e.*, asset levels at which the fees decline. *See* Dalal Decl. Ex. B at B3,B18,B30,B35,B38,B43. The following table summarizes the investment management fee schedule for the three Funds that were the focus of plaintiffs' discovery efforts and expert reports, as negotiated and approved by the directors:

| Blue Chip Advantage Fund | New Dimensions Fund | Large Cap Equity Fund |
|---|---|---|
| First $250 million under mgmt: 0.540% | First $1 billion under mgmt: 0.600% | First $1 billion under mgmt: 0.600% |
| Next $250 million under mgmt: 0.515% | | |
| Next $250 million under mgmt: 0.490% | | |
| Next $250 million under mgmt: 0.465% | | |
| Next $1 billion under mgmt: 0.440% | Next $1 billion under mgmt: 0.575% | Next $1 billion under mgmt: 0.575% |
| Next $1 billion under mgmt: 0.410% | Next $1 billion under mgmt: 0.550% | Next $1 billion under mgmt: 0.550% |
| Next $3 billion under mgmt: 0.380% | Next $3 billion under mgmt: 0.525% | Next $3 billion under mgmt: 0.525% |
| Assets over $6 billion: 0.350% | Next $6 billion under mgmt: 0.500% | Next $6 billion under mgmt: 0.500% |
| | Next $12 billion under mgmt: 0.490% | Next $12 billion under mgmt: 0.490% |
| | Assets over $24 billion: 0.480% | Assets over $24 billion: 0.480% |

*See id.*  In addition, pursuant to Section 12(b) of the Investment Company Act, the Funds are also charged a 12b-1 fee for distribution and shareholder servicing.  *See, e.g.*, *id.* at B5-6,B32-33,B40-41 (reporting a 0.25% or 25 basis-point fee for Class A shares).  The applicable fees are fully disclosed to shareholders in the Funds' statements of additional information, and shareholders may redeem their shares at any time should they prefer to invest in a fund with lower fees.  *See, e.g.*, *id.* at B2-6,B30-33,B38-41.

4.      **The Annual Negotiation and Approval of The Investment Management Contract and Fees**

The fees paid by the RiverSource Funds to Ameriprise are negotiated annually by the Funds' board of directors.  The composition of the RiverSource board far exceeds the ICA's requirement that 40 percent of directors be independent of the adviser, as 9 of 12 (or 75%) of the RiverSource directors were statutorily "disinterested" during the relevant

period.[4]  *See* Dalal Decl. Ex. B at B10-11,B25-26.  The annual process of negotiating and approving Ameriprise's fees pursuant to Section 15(c) of the ICA spans several months and involves multiple meetings between Ameriprise and the directors.  *See generally* Dalal Decl. Ex. C; Ex. D.  Much of the directors' information-gathering and analysis is completed by a Contracts Committee of the board, which then makes a recommendation to the full board for consideration.  The Contracts Committee met seven times over the course of twelve months in 2003, and three times over the course of the six months in 2004 prior to the filing of the Complaint on June 9, 2004.  *See* Dalal Decl. Ex. D at D20-30,D39-56.  The directors were advised throughout this process by independent counsel.  *See generally* Dalal Decl. Ex. C; Ex. D.  The board also retained other independent third-party consultants to assist them during the contract renewal process.  In 2002, the board hired KPMG to help evaluate the information provided to them by Ameriprise.  *See* Dalal Decl. Ex. D at D2,D6,D8.

Each year, Ameriprise provides to the directors at their request information on various topics:  the services provided by Ameriprise to the Funds in exchange for the fees; the Ameriprise personnel providing those services; the investment performance of the Funds; the profitability of the contracts to Ameriprise, including detailed information

---

[4] This percentage of independent board members also met the SEC's threshold as set forth in its exemptive rules.  In 2001, the SEC amended its exemptive rules to require that a majority of board members be independent.  SEC, Exemptive Rule Amendments of 2004:  The Independent Chair Condition, http://www.sec.gov/news/studies/indchair.pdf, at 12 (April 2005).  In 2004, the SEC again amended its exemptive rules to require that 75% of board members be independent, effective January 16, 2006.  *See id*. at 52; *see also* SEC Final Rule:  Investment Company Governance, Release No. IC-26520, http://www.sec.gov/rules/final/ic-26520.htm (Sept. 7, 2004).

about Ameriprise's expenses; certain transactions between the Funds and entities affiliated with Ameriprise (*e.g.*, Ameriprise's affiliated broker); benefits accruing to Ameriprise in addition to fees (*e.g.*, use of "soft dollars" to offset research service costs); and compliance information, including information about the best execution of portfolio transactions for each Fund, allocation of purchase and sale transactions among broker-dealers and compliance with the Funds' investment restrictions.  *See generally* Dalal Decl. Ex. C; Ex. D; Ex. E.  These materials are often referred to as "15(c) materials," because Section 15(c) of the ICA mandates the provision of such materials as part of the fee negotiation process.  Additionally, the chair of the Contracts Committee and board counsel review the 15(c) materials prior to the board's annual renewal discussion, and draft memoranda to Ameriprise requesting supplementation, clarification or changes to the reports provided in the 15(c) materials.  *See, e.g.*, Dalal Decl. Ex. F.

The directors also commission a third-party industry consultant, Lipper, Inc., ("Lipper") to provide certain requested data.  The so-called "Lipper materials" include comparisons of the RiverSource Funds' fees to those of a pool of the Funds' competitors.  *See, e.g.*, Dalal Decl. Ex. G at G1-10; Ex. E at E11-19,E96-102,E106; Ex. D at D53.  The independent directors have also undertaken a detailed analysis of the process by which Lipper selects the comparables for each Fund.  *See* Dalal Decl. Ex. H; Ex. D at D27,D39.

In the fee negotiations, Ameriprise and the directors adopted a "pricing philosophy," which provides a context and guidelines for setting the Funds' fees by focusing on performance measurement and pricing structure on a comparative basis.  *See* Dalal Decl. Ex. E at E76-79,E103-105; Ex. D at D47.  In addition to performance and

pricing concerns, the pricing philosophy incorporates considerations related to Ameriprise's distribution of the Funds, economies of scale, and Ameriprise's profitability – many of the issues addressed in the 15(c) materials. *See* Dalal Decl. Ex. E at E76-79,E103-105. Using this pricing philosophy, the board negotiates fees for the RiverSource Funds that are deliberately set at or below the median level charged to comparable funds in the industry. *See id.*; Dalal Decl. Ex. D at D49,D53.

In fact, during the relevant period, each Fund was charged investment management fees *below* the median of funds in their peer group, as defined by Lipper. For 2002 and 2003, Lipper reported the following:

| Fund | % Fees *Below* the Median of Peer Group Funds in 2002 | % Fees *Below* the Median of Peer Group Funds in 2003 |
|---|---|---|
| New Dimensions | 0.021% | 0.121% |
| Blue Chip Advantage | 0.049% | 0.071% |
| Large Cap Equity | 0.100% | 0.686% |

*See* Dalal Decl. Ex. E at E18-19,E106. Notably, the Funds' fees were set below the median *excluding* the impacts of the performance incentive adjustments, discussed *infra*.

Ameriprise also serves as investment adviser to a variety of non-mutual fund clients, including accounts of institutional investors such as pension funds. *See* Dalal Decl. Ex. E at E80-95,E160-171. Ameriprise provides a spectrum of investment management services to these various non-mutual fund accounts, and the fees charged to these accounts for the investment management services provided to them are generally different from the fees charged to the Funds. *See id.* At the request of the directors,

Ameriprise created a report that describes which of the services provided by Ameriprise to the Funds are *not* provided to Ameriprise's non-mutual fund clients.  *See* Dalal Decl. Ex. E at E80-95.   As described to the directors, these additional services involve compliance requirements, including the preparation and distribution of prospectuses and other disclosures; oversight of third-party service providers, including the transfer agent and other intermediaries; director support, including director education and the preparation of quarterly materials for board meetings; and cash management.  *See* Dalal Decl. Ex. E at E84-85,E27-43,E119-135.

### 5.   **Ameriprise's Performance Record**

The Funds have generated investment returns generally above the median of their peer universes, as defined by Lipper.  Significantly, the investment performance figures are reported *net of the advisers' fees* – meaning that any differences among the fee levels within the peer groups are taken into account in the performance comparisons.  Looking at each Fund's performance during the then-portfolio manager's tenure (through December 31, 2003), the New Dimensions Fund ranked within the top quartile of funds within its peer universe; the Blue Chip Advantage Fund ranked within the second quartile of funds within its peer universe; and the Large Cap Equity Fund ranked with the first quartile of funds within its peer universe.  *See* Dalal Decl. Ex. E at E65.

While performance has generally been strong, the Funds occasionally have performed below the median in certain years.  During those years, the management fees for these Funds were reduced according to the Performance Incentive Adjustment matrix ("PIA").  The PIA is designed to further align the incentives of management with the

performance results realized by shareholders by rewarding Ameriprise for performance better than the Lipper index of comparable funds, and for penalizing Ameriprise for under-performance. *See* Dalal Decl. Ex. E at E67. For example, in 2002, the Blue Chip Advantage Fund's management fee was adjusted downward by 4.60% as a result of the PIA, *see* Dalal Decl. Ex. E at E4; and in 2003, the New Dimensions Fund's management fee was adjusted downward by 0.07% as a result of the PIA, *see id.* at E68.[5] The PIA impacts are fully disclosed to shareholders. *See* Dalal Decl. Ex. B at B4,B31,B39.

## ARGUMENT

**I.     PLAINTIFFS MUST ADDUCE EVIDENCE THAT THE FEES CHARGED TO THE FUNDS WERE "SO DISPROPORTIONATELY LARGE" THAT THEY BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES RENDERED AND COULD NOT HAVE BEEN THE PRODUCT OF ARM'S-LENGTH BARGAINING."**

### A.     Ameriprise Is Entitled To Summary Judgment If Plaintiffs Fail To Adduce Evidence Sufficient To Allow The Trier Of Fact – The Court In This Case – To Find For Plaintiffs Under Section 36(b)

Summary judgment is mandated whenever "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 711 (8th Cir. 2004). It is the responsibility of the party opposing the summary judgment motion to set forth "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)); *Anderson v.*

---

[5] By the same token, when a Fund's performance is above median in certain years, management fees are adjusted upward. *See, e.g.*, Dalal Decl. Ex. E at E4,E68 (adjusting New Dimension's fee upward by 5.61% in 2002 and adjusting Blue Chip Advantage's fee and Large Cap Equity's fee upward by 0.07% and 0.08%, respectively, in 2003).

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *accord Planned Parenthood of Minn./S.D. v. Rounds*, 372 F.3d 969, 972 (8th Cir. 2004).  In so doing, the nonmovant cannot simply proffer evidence that is "merely colorable, or is not significantly probative," *Anderson*, 477 U.S. at 249 (citations omitted), nor argue "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000).  The nonmovant also cannot raise "[f]actual disputes that are irrelevant or unnecessary."  *Anderson*, 477 U.S. at 248.  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*; *see also Fenney v. Dakota, Minn. & E. R.R.*, 327 F.3d 707, 712 (8th Cir. 2003).

> **B.      The Test Under Section 36(b) Is Not Whether A Challenged Fee Was "Reasonable," But Instead Whether It Was "So Disproportionately Large That It Bears No Reasonable Relationship To The Services Rendered And Could Not Have Been The Product Of Arm's-Length Bargaining."**

The statutory provision at issue in plaintiffs' Complaint is found in Section 36(b) of the ICA, which provides:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  Section 36(b)(1) further provides that "the plaintiff shall have the burden of proving a breach of fiduciary duty."

- 13 -

Courts addressing Section 36(b) claims uniformly apply the standard first articulated by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Management, Inc.*: "the adviser-manager must charge a fee that is *so disproportionately large* that it bears *no reasonable relationship* to the services rendered and *could not have been* the product of arm's-length bargaining." 694 F.2d at 928 (emphasis added).  Every court directly addressing such a claim has applied this standard.[6]  Plaintiffs pled this standard in their original Complaint, *see* Corr. Compl. ¶ 38 (Apr. 22, 2005), and this Court articulated the standard in its decision on Ameriprise's motion to dismiss.  Op. at 4.

In enacting Section 36(b), Congress was explicit that "the court is not authorized 'to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees.'"  *Gartenberg*, 694 F.2d at 928 (quoting S. Rep. No. 91-184 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897 ("Senate Report")).  As the Seventh Circuit has held, Section 36(b) was *not* passed "to fundamentally revise the system" of the investment company industry.  *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 (7th Cir. 2002) (citing *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682 (3d Cir. 2002); H.R.

---

[6]  *See, e.g.*, *Migdal v. Rowe Price-Fleming, Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001); *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989); *Jones*, 2007 WL 627640, at *6; *Pfieffer v. Bjurman, Barry & Assocs.*, No. 03-Civ.-9741-DLC, 2004 WL 1903075, at *4 (S.D.N.Y. Aug. 26, 2004); *Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*, No. 03-Civ.-5710(RO), 2004 WL 1065533, at *1 (S.D.N.Y. May 12, 2004); *Benak v. Alliance Capital Mgmt. L.P.*, No. Civ. A. 01-5734, 2004 WL 1459249, at *6 (D.N.J. Feb. 9, 2004); *Miller v. Mitchell Hutchins Asset Mgmt., Inc.*, No. 01-CV-00192DRH, 2003 WL 24260305, at *2 (S.D. Ill. Mar. 6, 2003); *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002); *Levy v. Alliance Capital Mgmt. LP*, No. 97-Civ.-4672(DC), 1998 WL 744005, at *2 (S.D.N.Y. Oct. 26, 1998); *King v. Douglass*, 973 F. Supp. 707, 722 (S.D. Tex. 1996); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 972 (S.D.N.Y. 1987).

Rep. No. 91-1382 (1970) ("[T]he enactment of [Section 36(b)] was not 'intended to provide a basis . . . to undertake a general revision of the practices or structures of the investment company industry.'")); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1045 (S.D.N.Y. 1981), *aff'd* 694 F.2d 923 (2d Cir. 1982) (according to the Senate Report, "'Th[is] section is not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary'"). Instead, "Congress enacted § 36(b) to provide a narrow federal remedy that 'is significantly more circumscribed than common law fiduciary duty doctrines.'" *Green*, 295 F.3d at 743 (citation omitted). Given such congressional intent, the court in *Green v. Nuveen Advisory Corp.*, No. 97-C-5255, 2001 WL 1035652 (N.D. Ill. Sept. 10, 2001), held that the board of directors' "undisputed approval militates strongly against the contention that the advisors have breached their fiduciary duty to the funds or their shareholders." *Id.* at *6 (quoting *Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318, 332 (D.N.J. 2001)).

Nor did Congress intend "[t]hat management fees should be tested on whether they are 'reasonable.'" *Gartenberg*, 528 F. Supp. at 1046; *accord id.* at 1047 ("[I]n order to provide relief under Section 36(b), it is not enough for this Court to find that a better bargain was possible."). Accordingly, the question before the Court is not whether the directors arrived at "reasonable" fees or cut the best deal possible, but rather "whether the fee schedule represents a charge *within the range* of what would have been negotiated at arm's-length in the light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928 (emphasis added); *accord In re Nuveen Fund Litig.*, No. 94-C-360, 1996 WL 328006

(N.D. Ill. June 11, 1996); *see also Jones*, 2007 WL 627640, at *8-9 ("Whether [the directors] were able to negotiate the best possible arrangement does not factor into our analysis; the only question we need consider is whether they could have agreed to the fee schedule in the advisory contracts after engaging in good-faith bargaining. . . . Section 36(b) does not create a duty that advisors receive the lowest possible fee amount of compensation for the services they provide. Whether the Funds could have gotten more for their money from [the adviser] is irrelevant. What matters is whether there is a fundamental disconnect between what the Funds paid and what the services were worth."); *Schuyt*, 663 F. Supp. at 972 ("The Senate Report also indicates that the investment adviser is entitled to make a profit."). In asserting claims under Section 36(b), plaintiffs have assumed a very high burden of proof – one they cannot meet here for purposes of avoiding summary judgment.

## II. PLAINTIFFS HAVE FAILED TO ADDUCE EVIDENCE SUFFICIENT FOR THE COURT TO FIND THAT THE FUNDS PAID EXCESSIVE INVESTMENT MANAGEMENT FEES IN VIOLATION OF SECTION 36(B)

### A. The Undisputed Record Of Ameriprise's Fees And The Negotiation Of Those Fees Defeats Plaintiffs' Claims Under Section 36(b)

Plaintiffs' claims for excessive fees under Section 36(b) fail as a matter of law. The record in this case, including the expert reports, does not admit a genuine factual dispute as to the ultimate question under Section 36(b) – whether the fees are "so disproportionately large" that they bear "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928; *accord Jones*, 2007 WL 627640, at *7 ("In considering this motion [for

summary judgment], we must examine whether there is a triable issue of fact on the question of whether the fees charged to the Funds were so disproportionately large that they could not have been the result of arm's-length bargaining between [the adviser] and the board.").

As set forth above in the Statement of Facts, there is no dispute regarding the following key facts:  (i) Ameriprise's fee schedules included breakpoints that diminished the fee levels as assets grew; (ii) the PIAs reduced fees if performance was below industry averages; (iii) the independent directors approved the fees annually; and (iv) the detailed information provided to the directors – including information from third-party analyst Lipper – compared the Funds' net investment performance and fees to those of similar funds in their respective peer groups on a true apples-to-apples basis, and showed that Ameriprise's fees were below the median level charged to comparable funds in the industry.  *See supra* at 6-12.  Nothing in this undisputed record permits the required inference that the fees were grossly unreasonable or not fairly negotiated.

Plaintiffs' five expert reports virtually ignore these facts and the governing standard.  Whereas Section 36(b) requires plaintiffs to prove some gross "disproportion" between the fees and the services rendered for those fees, plaintiffs nowhere undertake such an analysis.  Plaintiffs do not purport to measure the value of the services rendered by Ameriprise in absolute or relative terms, or to compare the value of those services to the fees paid for them.  Indeed, an obvious apples-to-apples comparison in this regard is a juxtaposition of the Funds' fees and net investment performance (which accounts for any differences in fees) to those of similar mutual funds investing in the same asset classes –

the very information provided in the Lipper materials commissioned by the RiverSource independent directors each year.  Plaintiffs raise no challenge to the accuracy or validity of the voluminous and detailed data provided by Lipper or to the accuracy or validity of the independent directors' detailed analysis of the process by which Lipper selected the comparables for each Fund.  Nor do plaintiffs attempt to explain how independent directors' insistence on PIAs – which specifically tie Ameriprise's fees to its performance results – reflects something other than a robust process.

Such proffers fail to articulate a genuine issue of triable fact on the material question:  whether the fees resulting from the negotiations between Ameriprise and directors were *so un*reasonable that they evince no hint of a good faith negotiation.  Because plaintiffs cannot show a genuine material issue of triable fact on this question, summary judgment is warranted. *See Jones*, 2007 WL 627640, at *9 (granting summary judgment where plaintiffs failed to "set forth an issue of fact that, if resolved in their favor, could lead to a finding that [the adviser] had breached its § 36(b) duty" due to a "fundamental disconnect between what the Funds paid and what the services were worth").

### B. Comparison Of Mutual Fund Fees To Non-Mutual Fund Fees Is Irrelevant As A Matter Of Law, And Plaintiffs Have Shown No Factual Predicate Of Comparability

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  Any comparisons plaintiffs make between the fees Ameriprise received from the Funds and

the fees it charges its non-mutual fund clients – such as pension funds – are legally irrelevant to plaintiffs' Section 36(b) claim under well-established authority.  And the record reflects no competent evidence demonstrating a factual predicate for plaintiffs' assertion that Ameriprise is charging these other clients different fees for the same services.

When the *Gartenberg* court recognized "comparative fee structures" as a factor courts may consider in determining whether a fee is grossly disproportionate, it limited the categories of comparisons that would be useful to such an analysis.  Soundly rejecting any comparisons to non-mutual fund clients, the court held:

> Appellants' argument that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market funds must also be rejected.  The nature and extent of the services required by each type of fund differ sharply.

*Gartenberg*, 694 F.2d at 930 n.3; *accord Gartenberg*, 528 F. Supp. at 1048.  Among other reasons, the district court noted that this conclusion was consistent with the intent of Congress that mutual fund fees be evaluated in light of "industry practice" and "industry level of management fees."  *Id.* at 1046.

Since *Gartenberg*, courts have consistently held that the relevant benchmark for measuring fees charged is *other comparable mutual funds* – here, actively-managed equity mutual funds of similar sizes pursuing similar investment objectives – and *not non-mutual fund accounts*.  In fact, in a virtually identical Section 36(b) case brought by the same plaintiffs' lawyers and involving the same type of funds, *Baker v. American Century Investment Mgmt., Inc.*, No. 04-4039-CV-C-ODS (W.D. Mo. July 17, 2006), the

- 19 -

court precluded the presentation of any evidence relating to the defendants' management

of non-mutual fund accounts.  In so ruling, the court held that "such evidence is irrelevant

to Plaintiffs' claims involving mutual fund fees under Section 36(b) of the Investment

Company Act."  Dalal Decl. Ex. I; *accord Strougo*, 188 F. Supp. 2d at 384 (in challenge

to fees of equity-based retail mutual funds, court held that "relevant comparison must be

to other mutual funds, not to non-mutual fund institutional clients").[7]

Instead, as numerous courts have recognized, the one relevant comparison is

between the investment management fees paid by the RiverSource Funds and the fees

paid by comparable funds providing similar services – the very information considered

by the RiverSource directors in the comparative analysis they commissioned from Lipper.

*See supra* at 9-10; Dalal Decl. Ex. I; *Kalish*, 742 F. Supp. at 1237 ("[A] mutual fund

---

[7] *See also Batra v. Investors Research Corp.*, 144 F.R.D. 97, 98-99 (D. Mo. 1992) (allowing plaintiffs to discover information on non-mutual fund fees, but noting that such information would not be permitted "at trial" since "advisory fees from dissimilar clients such as pension funds are not relevant for comparative purposes"); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990) (in challenge to fees of fixed income fund, court gave "no weight to plaintiffs' comparisons of the Fund's profitability with a wide range of different sorts of companies"); *Schuyt*, 663 F. Supp. at 963 n.4, 974 n.38 (rejecting attempt by plaintiffs' expert to "compare the fees charged by the Adviser to the Fund to fees charged by the Adviser to its private counsel accounts [a type of institutional account]"); *Bromson v. Lehman Mgmt. Co.*, No. 84-Civ.-7795 (JFK), 1986 WL 165, at *2-3 & n.1 (S.D.N.Y. Mar. 13, 1986) ("[j]ust as a comparison of money market funds to pension funds entailed . . . a comparison of apples to oranges [in *Gartenberg*], so would comparison of individual accounts add a comparison of pears to the recipe").  *Cf. In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04-Civ-4885(SWK), 2006 WL 1520222 (S.D.N.Y. May 31, 2006) (refusing leave to amend complaint with new Section 36(b) claim based in part on "fee discrepancies for institutional and retail clients," noting that an independent report disclosed that "the fee differential reflects, among other things, different services provided to such clients, and different liabilities assumed").

adviser-manager must be compared with members of an appropriate universe: adviser-managers of similar funds."); *Schuyt*, 663 F. Supp. at 980 n.53 (in comparing defendants' money-market fund fee with the money-market fund fee in *Gartenberg*, court held that "the appropriate analysis is a comparison at equivalent size levels"); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 496-97 (S.D.N.Y. 1988).   As discussed above, consideration of the correct comparison establishes that the fees Ameriprise charged the Funds were not remotely excessive or unreasonable.  *See supra* at 17.

Even if a comparison of mutual fund fees to non-mutual fund account fees could be relevant as a matter of law, plaintiffs here have failed to establish a factual predicate to make such a comparison useful – that is, that the services are comparable.  Plaintiffs cannot dispute the fact that Ameriprise provided the directors with detailed information regarding the *differences* in the services between the mutual funds and other clients, justifying the fee differential.  *See supra* at 10-11.  Instead, plaintiffs' experts dismiss the information in these reports, and assert by *ipse dixit* that institutional and retail mutual fund products are "essentially identical" without providing evidence that the *services* for those products are in fact identical; without providing any quantitative cost analyses for the differences in services; and without considering whether the institutional accounts they rely on are profitable.

In any event, as the *Jones* court found in granting summary judgment, "[e]ven assuming for the mere sake of comparison that the services [the adviser's] institutional clients received were indistinguishable from those the Funds received, the amounts paid by different parties establish a range of prices that investors were willing to pay.  The

range extended from a low-end figure below what institutional clients were paying and a high-end figure beyond the fees that other mutual fund clients paid.  [The adviser's] fees fell within this range, thus preventing a conclusion that the amount of fees indicates that self-dealing was afoot."  *Jones*, 2007 WL 627640, at *8.  So too here.

**C.**     **Plaintiffs' Evidence Relating To The So-Called "*Gartenberg* Factors" Raises No Genuine Issue Of Material Fact Under Section 36(b) As To The Fees Being The Product Of Arm's-Length Bargaining**

Beyond the comparison of Fund fees to non-fund fees, plaintiffs point to evidence relating to the so-called "*Gartenberg* factors," a non-exclusive list of factors that courts can consider as an aid in determining if an allegedly excessive fee exceeds the relevant standard – *i.e.*, that it is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  The *Gartenberg* court provided the following list of such factors:  (a) the nature and quality of services provided to fund shareholders; (b) comparative fee structures; (c) economies of scale; (d) fall-out benefits; (e) the profitability of the fund to the adviser-manager; and (f) the independence and conscientiousness of the directors. *See Gartenberg*, 694 F.2d at 929-30.  These "factors" do not *establish* the standard, they simply supply a rubric for measuring whether the standard is met.

Nothing in plaintiffs' *Gartenberg* factor evidence creates an issue of material fact under the governing standard.  The Statement of Facts above summarizes the undisputed record regarding the robust annual fee negotiation process between Ameriprise and the RiverSource independent directors, the wide-ranging information provided to the directors by Ameriprise and third-party consultants in this process, and the resulting

negotiated fee levels that decline as assets grow. *See supra* at 6-12. Plaintiffs can point to nothing approaching a fundamental flaw or failing in this process or in the resulting level of the fees relative to other funds – in short, nothing that could support an inference of "bad faith" or gross disproportion between the fees and the services rendered. *See Jones*, 2007 WL 627640, at *9 (granting summary judgment against plaintiffs who told "an elaborate story of what they believe should have transpired between the Funds and [the adviser] in order to produce a deal that would ultimately be more advantageous to the Plaintiffs than the arrangement that was reached. . . [r]ather than [demonstrating that the flaws plaintiffs find in what transpired would have made a legally significant difference]"). Each *Gartenberg* factor is considered in turn below.

>   **1.    In Attacking The Independent Directors' Diligence, Plaintiffs Ignore The Factual Record Of The Broad Array Of Information They Considered And The Fee Concessions They Negotiated On The Shareholders' Behalf**

Plaintiffs' primary challenge to the contract approval process is their assessment of how the directors should have considered the information presented to them. But plaintiffs have adduced no evidence to suggest that the directors were not independent and qualified to serve as the Funds' board members. They also do not challenge that the directors met regularly and played an active role in the negotiation process, or that the board consulted independent counsel and other third-party consultants as necessary to inform their understanding of contract negotiations. *See* Dalal Decl. Ex. J at J2-J3; Ex. K at K4-5.

Plaintiffs also do not contest that Ameriprise provided to the board in the 15(c) materials a wide range of information covering all the *Gartenberg* factors, in addition to information beyond those factors.  Nor do plaintiffs contest that the chair of the Contracts Committees and board counsel reviewed the 15(c) materials prior to their annual discussion, drafted memoranda to Ameriprise requesting supplementation, clarification or changes to the reports provided in the 15(c) materials, and regularly requested additional information from Ameriprise.  *See supra* at 9.  Nor do plaintiffs contest that Ameriprise always promptly responded to the directors' requests for additional information.  *See* Dalal Decl. Ex. J at J3; Ex. K at K5-6. Instead, plaintiffs' experts suggest only that among the broad array of information considered by the directors, the directors placed comparatively too much weight on fees charged to peer mutual funds and too little on fees charged to non-mutual fund accounts.  However, plaintiffs are unable to say how the different pieces of information should have been weighed under any relevant standard. *See* Dalal Decl. Ex. K at K7-8.

These challenges are not substantive attacks on the diligence of the board.[8]  They only amount to feeble attempts to "Monday morning quarterback" the decision-making process of the directors and are insufficient to create a genuine issue of material fact. Notably, plaintiffs have not suggested how the negotiation process would have been different had the board considered more or different information.  *See, e.g.*, Dalal Decl. Ex. K at K2-3.  Given plaintiffs' lack of any substantive evidence challenging the

---

[8]  Indeed, the diligence of the board's representation of shareholders' interests was recently recognized by a fund industry journal, which named the board's chair, Arne Carlson, as its 2006 "Trustee of the Year."  Dalal Decl. Ex. L.

adequacy of the negotiation process, there can be no genuine issue of material fact suggesting that this process could not have been an arm's-length one.

> **2.      Plaintiffs Do Not Challenge The Voluminous Data Reviewed By The Independent Directors Regarding The "Nature And Quality Of Services" Ameriprise Provided To The Funds**

With respect to the "nature and quality of services" factor, it is undisputed that the independent directors were provided with voluminous data reflecting what the shareholders receive in return for their fees – including reports of the Funds' net investment performance relative to benchmarks and other funds, detailed descriptions of the services provided by Ameriprise to the Funds and the shareholders, the Ameriprise personnel providing those services, detailed information about Ameriprise's expenses, certain transactions between the Funds and entities affiliated with Ameriprise (*e.g.*, Ameriprise's affiliated broker), benefits accruing to Ameriprise in addition to fees (*e.g.*, use of "soft dollars" to offset the cost of research services), and compliance information, including information about the best execution of portfolio transactions for each Fund, allocation of purchase and sale transactions among broker-dealers and compliance with the Funds' investment restrictions. *See supra* at 8-9. Plaintiffs adduce no evidence to call into question the accuracy or thoroughness of this information – which is compiled at the request of the directors by Ameriprise and third-party industry consultants. The breadth and depth of these materials do not provide plaintiffs with any disputed issue of material fact suggesting that the board's process could not have been an arm's-length one.

3.      **Plaintiffs' "Comparative Fee Structure" Analyses Focus On An Irrelevant Comparison Between Mutual Fund Fees And Non-Mutual Fund Fees, And They Ignore The Data Considered By The Directors Comparing The RiverSource Funds To Comparable Mutual Funds**

As discussed at length above, plaintiffs' evidence on the "comparative fee structures" factor focuses on how the Funds' fees compare to fees paid by non-mutual fund clients. *See* Dalal Decl. Ex. M at M2; Ex. N at N3; Ex. O at O2-4; Ex. P at P2. Not only is plaintiffs' comparison legally irrelevant, it ignores the undisputed fact that the RiverSource directors receive extensive data comparing the Funds' fees to a *relevant* peer group – competitor mutual funds of a similar size that pursue the same investment objectives through active management. *See supra* at 9-10. Plaintiffs can point to no disputed issue of material fact regarding this data to suggest that the fees are so disproportionately excessive that they could not have been the product of arm's-length negotiation.

4.      **Plaintiffs' "Economies Of Scale" Experts Take No Account Of The Effect Of Ameriprise's Breakpoints, Which Concededly Pass Along Economies Of Scale To Shareholders**

It is undisputed that the Funds have "breakpoints" that cause the fees to drop as the Funds grow in size. *See supra* at 6-7; *see also Green*, 295 F.3d at 741 n.6 ("To account for economies of scale, the percentage of the daily net asset value that [the adviser] receives decreases as that value increases."). Yet Plaintiffs and their experts do not explain why these decreasing fees fail to adequately pass along to shareholders any "economies of scale" supposedly being achieved by Ameriprise in running the Funds. Indeed, plaintiffs' putative experts on economies of scale *concede* that breakpoints in the

Fund fee schedules have the effect of passing along at least some economies of scale to the shareholders. *See, e.g.*, Dalal Decl. Ex. Q at Q3-4. Plaintiffs' finance expert admits that he has done no quantitative analysis of the Funds' breakpoints to analyze the amount of economies of scale that are passed on to shareholders. *See id.* at Q5-6. While plaintiffs' mathematics expert contends that the amount of economies of scale passed to shareholders is not "meaningful," he does not analyze why the amount of economies of scale passed on to shareholders is "meaningless," or what amount – in his opinion – would be appropriate. *See* Dalal Decl. Ex. R at R2-3. Thus, there is no basis to conclude from plaintiffs' expert reports or testimony that the fees charged by Ameriprise are "so disproportionate" under the relevant standard.

### 5.    Any "Fall-Out Benefits" Were Fully Disclosed To The Directors

So-called "fall-out benefits" are benefits incidental to fees that accrue to the benefit of the adviser as a result of the advisory relationship. Ameriprise provides the independent directors with a report expressly addressing the fall-out benefits it believes it enjoys as a result of the advisory relationship. *See* Dalal Decl. Ex. E at E45-48,E137-140. One example is so-called "soft dollar" arrangements, which are also the subject of a regular report from Ameriprise to the directors. *See, e.g.*, Dalal Decl. Ex. S. Plaintiffs do not adduce any evidence to suggest that the independent directors did not consider these reports and take them into account when negotiating fees with Ameriprise. Again, plaintiffs can point to no disputed issue of material fact regarding this reporting to suggest that the board's process could not have been an arm's-length one.

6.     **Plaintiffs' Challenge To The Directors' Profitability Report Does Not Describe Or Quantify The *Effect* Of Any Supposed Failings In The Report**

Ameriprise provides detailed reports on its profitability to the independent directors.   Plaintiffs' accounting expert asserts that Ameriprise's cost allocation methodology underlying these reports is "flawed," Dalal Decl. Ex. P at P4, but he makes no attempt to describe or quantify the *effect* of this accounting treatment on the board's analysis of fees.[9]   The accountant claims that Ameriprise "did not take full advantage of costing principles aimed at accurately reflecting the profitability of the Funds," *id.* – namely, his preferred methodology known as an "activity-base costing" ("ABC") system. He recognizes, however, that Ameriprise uses a "hybrid" accounting methodology, which incorporates both activity-based costing and asset-based accounting principles.   *See* Dalal Decl. Ex. T at T4.   Moreover, the expert does not present any factual or quantitative analysis to show whether Ameriprise's asset-based accounting methodology actually is deficient in any way.   *See* Dalal Decl. Ex. P at P4-7.   In fact, he even concedes that an ABC system is not necessarily more accurate than a cost allocation based on assets under management.   *See* Dalal Decl. Ex. T at T2-3.   Plaintiffs thus adduce no evidence suggesting the degree of actual *impact* these supposed accounting failures have on the information provided to the directors or on the fee negotiations.   Simply asserting that

---

[9]  *See* Dalal Decl. Ex. T at T5-6 ("Q: Did you attempt to quantify the effect of Ameriprise's cost allocation system on the level of profitability reported to the board?  A: No. . . . Q:  Do you have an opinion on how much the cost allocation system at Ameriprise affected the profitability figures that were reported to the board?  A:  No.").

there was more or different information plaintiffs believe the directors should have had does not allow an inference of a bad faith or tainted negotiation process.

\* \* \*

At bottom, after two years of fact and expert discovery, plaintiffs still have provided no reason of substance for the Court to question the soundness of the fee negotiation and approval process undertaken by the directors or to conclude that the resulting fee schedules are not "within the range" of what would be negotiated at arm's-length. Given plaintiffs' heavy burden in proving an excessive fee claim, they cannot demonstrate a triable issue of material fact.

## III.   PLAINTIFFS' CHALLENGE TO AMERIPRISE'S 12B-1 DISTRIBUTION FEES ARE NOT ACTIONABLE UNDER SECTION 36(B)

### A.   Plaintiffs Do Not Attempt To Establish That Ameriprise's 12b-1 Distribution Fees Are Excessive Under Section 36(b) As Alleged In The Complaint, But Rather Challenge The Validity Of The Fees In Their Entirety

Section 12(b) of the ICA permits mutual fund distributors to charge the Funds so-called "12b-1 fees" for distribution and shareholder servicing. *See* SEC, Mutual Fund Fees and Expenses, www.sec.gov/answers/mffees.htm, at 5 (Mar. 1, 2006). In its ruling on the motion to dismiss, this Court warned that it had "considerable concerns about" whether "Plaintiffs are attacking only the Funds' distribution fee rate or if Plaintiffs are attacking the ability of the mutual fund industry to charge existing shareholders these fees *in toto*." Op. at 9. After two years of discovery, plaintiffs still have not focused on Ameriprise's actual 12b-1 fee rates and the actual services covered. Instead, plaintiffs' experts categorically declare that the 12b-1 system does not bestow any benefits on

shareholders. *See, e.g.*, Dalal Decl. Ex. N at N2 ("Business and financial publications have for years been decrying the justification for 12b-1 fees."); Ex. P at P3 (calculating damages from excessive 12b-1 fees as *total* disgorgement of fees).

Not only does this argument ignore the evidence showing that the board has considered the benefits of the 12b-1 program, *see, e.g.*, Dalal Decl. Ex. D at D12, and has received quarterly reports from Ameriprise on 12b-1 fees, *see, e.g.*, Dalal Decl. Ex. U, it ignores the fact that Congress expressly allowed the use of fund assets to pay certain fees for the sale of new shares, among other things.  By focusing solely on what benefits accrue to shareholders from such sales, plaintiffs merely question the wisdom of Congress' original decision.  This approach is exactly what the Court feared: using this Court to "challenge the basic nature of the distribution fee system," Op. at 10 – a claim that, as this Court recognized, is an issue "appropriately left to the legislative branch." Op. at 9.

> **B.**     **Plaintiffs Provide No Analysis Of The 12b-1 Distribution Fees Under Relevant Section 36(b) Standards, As They Ignore The Record Evidence Of The Different Services Actually Paid For By The 12b-1 Fees**

As this Court has held, in order for plaintiffs to prove that Ameriprise charged excessive 12b-1 fees in violation of Section 36(b), they must establish that the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  Op. at 8 (quoting *Gartenberg*, 694 F.2d at 928).  Only *one* of plaintiffs' experts even attempts to address the actual 12b-1 fees charged by Ameriprise, by trying to "compar[e] the level of the 12b-

1 fee [which he asserts is used to pay for distribution and marketing of fund shares] with potential savings from economies of scale in other fees [such as investment management fees]."   Dalal Decl. Ex. O at O5.   Yet this "comparison" ignores the evidence showing that *up to 85%* (or 21.25 basis points) of the 25 basis-point 12b-1 fee for Class A shares covers shareholder servicing to existing shareholders, *not* the marketing of fund shares to new shareholders.   *See* Dalal Decl. Ex. E at E44,E136,E158.   With just one faulty look at Ameriprise's actual 12b-1 fees, and without any attempts at a comparison of the 12b-1 fees charged and the services rendered for those fees, plaintiffs have not raised any genuine issue of material fact regarding their claim of excessive 12b-1 distribution fees.

## CONCLUSION

For the foregoing reasons, Ameriprise respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,


By:  s/Robert L. Schnell, Jr.
Robert L. Schnell, Jr. #97329
FAEGRE & BENSON LLP
90 South Seventh Street
Minneapolis, MN  55402
612-766-7225

John D. Donovan, Jr.
Robert A. Skinner
Chanel R. Dalal
ROPES & GRAY, LLP
One International Place
Boston, MA  02110
617-951-7000

Dated: March 13, 2007