# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| John E. Gallus; D. Elaine Gallus; Alexandria Ione Faller for use and benefit of a/k/a Alexandria Ione Griffin; AXP New Dimensions Fund; AXP Strategy Aggressive Fund; AXP Mutual Fund; AXP Precious Metals Fund; AXP Equity Select Fund; AXP Small Cap Advantage Fund; AXP Partners Small Cap Value Fund; AXP Mid Cap Value Fund; AXP Small Company Index Fund; AXP High Yield Bond Fund; and AXP Managed Allocation Fund successor by merger to AXP Blue Chip Advantage Fund, | Civil No. 04-4498 (DWF/SRN) |

Plaintiffs,

v.

Ameriprise Financial, Inc., (f/k/a
American Express Financial Corporation),
RiverSource Investments LLC, and
Ameriprise Financial Services, Inc. (f/k/a
American Express Financial Advisors Inc.),

Defendants.

**AMENDED MEMORANDUM
OPINION AND ORDER**

---

Audrey B. Rauchway, Esq., Becky Ferrell-Anton, Esq., Guy M. Burns, Esq., and
Jonathan S. Coleman, Esq., Johnson Pope Bokor Ruppell & Burns, LLP; Erin M. Riley,
Esq., Gretchen Freeman Cappio, Esq., Laura R. Gerber, Esq., Lynn Lincoln Sarko, Esq.,
Michael D. Woerner, Esq., and Tana Lin, Esq., Keller Rohrback LLP; James C. Bradley,
Esq., Michael J. Brickman, Esq., Nina H. Fields, Esq., Richardson Patrick Westbrook &
Brickman; Karl L. Cambronne, Esq., Chestnut & Cambronne; counsel for Plaintiffs.

Chanel R. Dalal, Esq., John D. Donovan, Jr., Esq., Robert A. Skinner, Esq., Ropes &
Gray LLP; Robert L. Schnell, Jr., Esq., Faegre & Benson LLP; counsel for Defendants.

Thomas B. Hatch, Esq., Robins Kaplan Miller & Ciresi LLP, counsel for Movant
RiverSource Funds and its Independent Directors.

---

On July 6, 2007, the Court docketed an Order granting Defendant's Motion for

Summary Judgment and dismissing with prejudice the Amended Complaint[1] found at

docket number 78.  (*See* Doc. No. 200.)  The Court now vacates that Order and enters this

Amended Memorandum Opinion and Order, which is exactly the same as the July 6, 2007

Order found at docket number 200 except that this Order dismisses with prejudice the

most recently filed Amended Complaint found at docket number 177.[2]

## INTRODUCTION

This matter is before the Court pursuant to a Motion for Summary Judgment

brought by Defendants American Express Financial Corporation, RiverSource

Investments LLC, and American Express Financial Advisors Inc. (collectively,

"Defendants").  For the reasons set forth below, the Court grants Defendants' motion.

## BACKGROUND

Plaintiffs own an unspecified number of shares of eleven mutual funds in a family

of funds known as the American Express Funds.[3]  At least one of the Plaintiffs was a

---

[1]     Although the title of this Complaint is "Corrected Complaint Under Investment Company Act of 1940," the Court construes this Complaint as an Amended Complaint.

[2]     For the purposes of this motion, the differences between the Amended Complaint found at docket number 177 and the Amended Complaint found at docket number 78 are immaterial.

[3]     The "American Express Funds" or "the Funds" are the AXP New Dimensions Fund, the AXP Mutual Fund, the AXP Precious Metals Fund, the AXP Equity Select Fund, the AXP Small Cap Advantage Fund, the AXP Partners Small Cap Value Fund, the AXP Mid Cap Value Fund, the AXP Small Company Index Fund, the AXP High Yield

(Footnote Continued on Next Page)

shareholder in each Fund during the applicable damage period—June 10, 2003, to June 9, 2004.[4]  Defendants serve as the investment adviser and distributor of the American Express Funds.  Each Fund pays the Defendants a fee for their services pursuant to a fee schedule.  The Funds' board of directors (the "Board") negotiates the contracts containing the fee schedules on an annual basis.

Pursuant to these contracts, each Fund pays a management fee, based on a percentage of the Fund's net assets at the end of the preceding month, for the advisory and administrative services performed by the investment adviser.  In addition, the fee covers certain administrative expenses.  Each Fund also pays a distribution fee, based on a percentage of the Fund's net assets, for the costs of marketing and distributing fund shares.

The Board and Defendants meet several times during the annual process of negotiating and approving Defendants' fees.  A Contracts Committee, comprised of Board members, reviews current contracts and makes recommendations to the entire Board as part of the process.  The Contracts Committee met seven times during 2003 and three times during the six months in 2004 prior to the filing of the Complaint on

---

(Footnote Continued From Previous Page)
Bond Fund, the AXP Managed Allocation Fund, and the AXP Blue Chip Advantage Fund.  Each Fund is a registered investment company under the Investment Company Act ("ICA"), 15 U.S.C. § 80a-1, *et seq*.

[4]     In an Order dated July 27, 2006, this Court held that damages are limited to the one-year period before the filing of the Complaint pursuant to 15 U.S.C. § 80a-35(b)(3).
(Footnote Continued on Next Page)

June 9, 2004.  Additionally, the Board sought the advice of independent counsel during the fee-negotiation process.  The Board also retained independent third-party consultants, KPMG, LLP ("KPMG"), to assist them during this process.

As part of the fee-negotiation process each year and pursuant to section 15(c) of the ICA, Defendants provide the Board with information regarding the services provided to the Funds; the personnel providing those services; the investment performance of the Funds; the profitability of the contracts to Defendants, including detailed information about Defendants' expenses; certain transactions between the Funds and entities affiliated with Defendants; benefits accruing to Defendants in addition to fees; and compliance information (collectively, the "15(c) materials").  The chair of the Contracts Committee and Board counsel review the 15(c) materials prior to the Board's annual renewal discussion, and draft memoranda to Defendants requesting supplementation, clarification or changes to the reports provided in the 15(c) materials.

In addition to reviewing the 15(c) materials, the Board in this case commissioned a third-party industry consultant, Lipper, Inc. ("Lipper"), to provide certain requested data for the Board's review.  In particular, Lipper provided written materials on the comparison of the Funds' fees to those of a pool of the Funds' competitors.  The Board was involved in the process by which Lipper selected the pool of Funds' competitors.

---

(Footnote Continued From Previous Page)
(*See* Mem. Op. & Order at 3–4, Doc. No. 163).

During the fee-negotiation process, the Board adopted a "pricing philosophy" for setting the Funds' fees that focused on the Funds' performance and pricing structure on a comparative basis to the Funds' relevant competitors.  Specifically, the Board aspired to negotiate fees for the Funds that were at the median level of fees charged to comparable funds in the industry.  The Board was willing to pay fees above the median when the Funds' performance was good, but sought to pay fees below the median when performance was poor.  Arne Carlson, Chairman of the Funds' Board, testified that "[i]t's an externally driven process.  The overall business model is that our performance shall be at or above the median."  (Decl. of Becky Ferrell-Anton ("Ferrell-Anton Decl."), Ex. D ("Carlson Dep.") at 128.)  The pricing philosophy also incorporated considerations related to Defendants' distribution of the Funds, economies of scale, and profitability.  The Lipper report showed that during the relevant period, each Fund was charged investment-management fees at or below the median of funds in their peer group.

The Board also requested that Defendants create a report that describes the similarities and differences between the fees charged and services provided to Defendants' non-mutual fund clients, including accounts of institutional investors ("institutional accounts") such as pension funds and the Funds.  The report generally shows that the fees that institutional accounts pay are lower than those paid by the Funds.  The report describes those additional services that Defendants provide to the Funds that Defendants do not provide to Defendants' institutional accounts.  These additional services include additional compliance requirements, such as preparing and distributing

prospectuses and other disclosures; oversight of third-party service providers, including

the transfer agent and other intermediaries; director support, including director education

and the preparation of quarterly materials for board meetings; and cash management.

The Board approved fee schedules for each Fund that feature "breakpoints," that

is, asset levels at which the fees decline.  The following tables display the fee schedules

approved by the Board for the two Funds that were the subject of Plaintiffs' discovery

efforts in this case.  The tables show the percentage charged as a fee for the amount of the

Fund's assets.

| Blue Chip Advantage Fund |
| --- |
| 0.540% of the first $250 million |
| 0.515% of the next $250 million |
| 0.490% of the next $205 million |
| 0.465% of the next $250 million |
| 0.440% of the next $1 billion |
| 0.410% of the next $1 billion |
| 0.380% of the next $3 billion |
| 0.350% of assets over $6 billion |

| Large Cap Equity Fund & New Dimensions Fund |
| --- |
| 0.600% of the first $1 billion |
| 0.575% of the next $1 billion |
| 0.550% of the next $1 billion |
| 0.525% of the next $3 billion |
| 0.500% of the next $6 billion |
| 0.490% of the next $12 billion |
| 0.480% of assets over $24 billion |

The Funds have generated investment returns generally above the median of their

peer funds, as defined by Lipper.  Specifically, the Lipper Report indicates that during the

then-portfolio manager's tenure (through December 31, 2003), the New Dimensions Fund

ranked within the first quartile of funds within its peer universe; the Blue Chip Advantage

Fund ranked within the second quartile of funds within its peer universe; and the Large

Cap Equity Fund ranked within the first quartile of funds within its peer universe. The

contracts in this case also contained a Performance Incentive Adjustment matrix ("PIA"), which rewarded Defendants for performance better than the Lipper index of comparable funds, and penalized Defendants for under-performance.

On June 9, 2004, Plaintiffs filed this lawsuit on behalf of the Funds pursuant to sections 12(b) and 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C.A. §§ 80a-12(b), 80a-35(b), alleging that the fees charged under the Funds' management and distribution agreements are excessive.  The Complaint contains four counts.  In Counts I and II of Plaintiffs' Complaint, Plaintiffs allege that the advisory fees charged by Defendants are excessive.  In Count III, Plaintiffs allege that Defendants have breached their fiduciary duties under section 36(b) by collecting excessive distribution fees and by using the distribution fees as a method to obtain additional compensation for their advisory services.  In Count IV, Plaintiffs allege that Defendants have failed to comply with the requirements of section 12(b).

Defendants subsequently brought a Motion to Dismiss all claims.  In an Order dated March 7, 2005 (the "March 7, 2005 Order"), the Court granted Defendants' motion with respect to Count IV, but denied Defendants' motion with respect to Counts I through III.  The parties then conducted discovery.[5]  Defendants now bring this Motion for

---

[5]     In the March 7, 2005 Order, the Court held that Plaintiffs' Complaint survived the motion to dismiss by "only the narrowest of margins" and expressed doubt regarding the basis and veracity regarding certain allegations in the Complaint.  (March 7, 2005 Order, Doc. No. 73.)  Although the Court allowed Counts I through III to survive, the Court limited the scope of discovery based on the Court's view of the Complaint.  Specifically,

(Footnote Continued on Next Page)

Summary Judgment on the remaining claims.  In response to Defendants' motion,

Plaintiffs rely on five expert reports.

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court

must view the evidence and the inferences, which may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*,

---

(Footnote Continued From Previous Page)
the Court directed Magistrate Judge Janie S. Mayeron to determine the parameters of the
limited discovery process with the assistance of the parties.  Magistrate Judge Mayeron
ordered Plaintiffs to select two funds on which they were to focus the first phase of
discovery.  (*See* Pretrial Sch. Order at 1 (May 3, 2005).  Plaintiffs selected the New
Dimensions Fund and the Large Cap Equity Fund (as successor by merger to the Blue
Chip Advantage Fund).  Following the Court's March 7, 2005 Order, Plaintiffs filed a
Corrected Amended Complaint, which eliminated many of the allegations in the
Complaint regarding their excessive-fee claims.

92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.      The ICA

Congress passed the ICA in order to protect investors' interests.  15 U.S.C. § 80a-1, *et seq*.  Pursuant to the ICA, fund investment advisers serve pursuant to written management contracts approved by a majority of the fund's shareholders, such contracts must thereafter be approved annually by the fund's board of directors or a majority of shareholders.  15 U.S.C. §§ 80a-15(a), 80a-2(a)(12).  The board negotiates the compensation to be paid to the advisers on behalf of the shareholders and in their best interests.  *Id.* at § 80a-15(c).  The board is required to request and evaluate such information from the adviser as may be reasonably necessary to evaluate the terms of the proposed contract and the adviser must supply such requested information.  *Id.*  No more than sixty percent of the fund's board of directors can be comprised of "interested persons" of the fund, as defined by section 2(a)(19).[6]  *Id.* at §§ 80a-2(a)(19), 80a-10(a).

## III.     Counts I and II

---

[6]      In this case, nine of the twelve board members (or 75%) were "disinterested"

(Footnote Continued on Next Page)

9

Defendants request that the Court grant summary judgment on Plaintiffs' claims that Defendants charged excessive advisory fees in violation of its obligations under section 36(b) of the ICA.  Section 36(b) of the ICA imposes a fiduciary duty on mutual fund investment advisers in connection with their receipt of fees from the funds they manage.  15 U.S.C. § 80a-35(b).  The statute provides, in relevant part,

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  The statute also provides that the funds' shareholders have a right to bring a derivative action against the adviser for alleged breaches of that fiduciary duty in connection with the receipt of compensation.  *Id.*  Further, section 36(b)(1) provides that "the plaintiff shall have the burden of proving a breach of fiduciary duty."

The seminal case on section 36(b) is *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982).  In *Gartenberg*, the Second Circuit held that in order to violate section 36(b), an "advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  *Id.* at 928.  To make this determination, a court must consider all pertinent facts, including:  (1) the nature and quality of the services provided by the adviser to the shareholders; (2) the profitability of the mutual

---

(Footnote Continued From Previous Page)
during the relevant period, thereby satisfying this requirement of the ICA.

fund to the adviser; (3) "fall-out" benefits;[7] (4) the economies of scale realized by the adviser; (5) comparative fee structures with similar funds; and (5) the independence and conscientiousness of the independent trustees.  *Id.* at 928–31.  Defendants assert that there is no genuine issue of material fact based on the evidence relating to the *Gartenberg* factors regarding whether the fees could not have been the product of arm's-length bargaining under section 36(b).  In response, Plaintiffs contend that application of the *Gartenberg* factors shows that the advisory fees were excessive.  The Court will address the parties' arguments regarding the *Gartenberg* factors.[8]

### A.    Nature and Quality of the Services

Defendants contend that Plaintiffs do not challenge the data reviewed by the Board regarding the nature and quality of services Defendants provided to the Funds. Specifically, Defendants assert that the Board was provided with data reflecting the amount the shareholders receive in return for their fees, including reports of the Funds' net investment performance relative to benchmarks and other funds.  Defendants also assert that the Board was provided with detailed descriptions of the services provided by Defendants to the Funds and the shareholders, the personnel providing those services, and

---

[7]    "Fall-out" benefits are those benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund.  *See Levy v. Alliance Capital Mgmt. L.P.*, No. 97 Civ. 4672(DC), 1998 WL 744005, *2 (S.D.N.Y. Oct. 26, 1998).

[8]    Although Plaintiffs assert that *Gartenberg* does not set forth the appropriate test in this case, as the Court stated in its March 7, 2005 Order, the Court will analyze Plaintiffs' section 36(b) claims under the standard set forth in *Gartenberg*.  (*See* March 7, 2005
(Footnote Continued on Next Page)

detailed information about Defendants' expenses.  Further, Defendants contend that the

Board received information regarding certain transactions between the Funds and entities

affiliated with Defendants, benefits accruing to Defendants in addition to fees, and

compliance information, including information about the best execution of portfolio

transactions for each Fund, allocation of purchase and sale transactions among broker-

dealers, and compliance with the Funds' investment restrictions.

In response, Plaintiffs assert that Defendants put their own financial interests ahead

of their clients' interest and that performance of the Funds was poor during the damages

period.  In particular, Plaintiffs suggest that Defendants and their affiliates have a long

record of violating the law relating to their mutual fund activities that has resulted in

almost $80 million in fines during the damages period for breaching their fiduciary duties

to clients.  Plaintiffs also allege that their expert, Steve Pomerantz, will testify that the

performance of the Funds was poor during the applicable damages period.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that there

are no genuine issues of material fact regarding whether the fee was so disproportionately

large that it bears no reasonable relationship to the services rendered and could not have

been the product of arm's-length bargaining.  Here, the regulatory settlements that

Plaintiffs identify focus on activities that are not connected to Defendants' conduct as

investment adviser to the Funds.  Plaintiffs fail to establish a link between the practices at

---

(Footnote Continued From Previous Page)
Order at 5, Doc. No. 73.)

issue in the regulatory settlements and the value of services paid for by the challenged

fees.  Further, Plaintiffs' characterization of the undisputed performance figures as "poor"

does not create a genuine issue of material fact.  Plaintiffs do not allege that the

performance figures were incorrect or that Defendants improperly reported them.

Furthermore, Plaintiffs do not address the fact that the Funds' fees were subject to PIAs

that reduced fees if performance was in fact "poor."  Accordingly, Plaintiffs' claims

cannot survive summary judgment based on this *Gartenberg* factor.

### B.    Profitability of the Mutual Fund to the Adviser

Defendants assert that Plaintiffs' challenge to the directors' profitability report

does not describe or quantify the effect of any supposed failings in the report.  In

response, Plaintiffs contend that the profitability reports that Defendants provided to the

directors were misleading.  In particular, Plaintiffs point to their expert Bruce Dubinsky,

who opines that the allocation methodology Defendants used to determine profitability

was unreliable and that the board was not provided with sufficient data to enable it to

properly evaluate the true financial profitability of the Funds.  Plaintiffs also contend that

Dubinsky will testify that the lack of adequate detail in Defendants' costing system makes

quantifying the effect of Defendants' flawed costing methodology nearly impossible.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that there

are no genuine issues of material fact regarding whether the fee was so disproportionately

large that it bears no reasonable relationship to the services rendered and could not have

been the product of arm's-length bargaining.  Plaintiffs do not dispute that Defendants

provided detailed reports on its profitability to the Board.  Instead, Plaintiffs' expert takes issue with how the information was presented to the Board by criticizing the cost allocation methodology used.  Although Plaintiffs suggest that the Board should have had different information than what the Board was provided, Plaintiffs do not point to any authority detailing requirements for the presentation of profitability data. Furthermore, Plaintiffs fail to show how any such failings in the data create a genuine issue of material fact regarding whether the board negotiates the fees at arm's length.  Accordingly, Plaintiffs' claims cannot survive summary judgment based on the profitability factor.

### C.        "Fall-Out" Benefits

Defendants assert that any fall-out benefits were fully disclosed to the Board. Defendants point out that Defendants provided the Board with a report that addressed the fall-out benefits it believed it enjoyed as a result of the advisory relationship.  In particular, Defendants note that it identified so-called "soft-dollar" arrangements in a report to the Board.  In response, Plaintiffs assert that Defendants receive an enormous fall-out benefit in being able to resell the services that Defendants have already provided to the Funds to institutional clients and that the Board never took this benefit into account.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that no genuine issue of material fact exists regarding the disclosure and consideration of fall-out benefits that would suggest that the Board's fee-negotiation process could not have been an arm's-length one.  Here, Plaintiffs do not dispute that the Board considered the reports

14

that Defendants provided to them that expressly addressed the fall-out benefits when

negotiating fees with Defendants.  Instead, Plaintiffs assert that the profitability or cost

data with respect to institutional business constitutes a fall-out benefit.  This assertion

does not create a genuine issue of material fact under the standard and, therefore,

Plaintiffs' claims cannot survive summary judgment based on fall-out benefits.

### D.    Economies of Scale

Defendants assert that it is undisputed that the Funds have "breakpoints" that cause

the fees to drop as the Funds grow in size and that Plaintiffs' economies-of-scale experts

take no account of the effect of these breakpoints.  Plaintiffs, on the other hand, assert that

Defendants realized enormous economies of scale in connection with their

asset-management business but contend that the breakpoints in Defendants' advisory fee

schedules did not appropriately share economies of scale with the Funds' shareholders.

Plaintiffs point to their experts, Pomerantz and Edward O'Neal, who conclude that

Defendants realize significant economies of scale.  In addition, Plaintiffs point to

Pomerantz's calculation that during the relevant damages period, Defendants realized

$74 million in cost savings due to economies of scale for the New Dimensions Fund, but

shared only $12.7 million of those savings with the Fund shareholders through

breakpoints, thereby retaining the remaining $61.3 million.  Finally, Plaintiffs contend

that Defendants shared significantly more economies of scale with its institutional clients.

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that

no genuine issue of material fact exists regarding whether the fee schedules could not

have been negotiated at arm's length.  Plaintiffs do not dispute that breakpoints in the

Funds' fee schedules served to share some economies of scale.  Instead, Plaintiffs' argue

that the breakpoints did not appropriately share economies of scale.  But Plaintiffs do not

establish why the existing breakpoints so inadequately shared the cost savings, such that

the fee schedules could not have been the product of arm's-length bargaining.  Plaintiffs'

experts do not identify what amount of cost savings would have been appropriate, or why

the amounts shared fall outside the range that could have been negotiated at arm's length.

Accordingly, Plaintiffs' claims cannot survive summary judgment based on the

economies-of-scale factor.

###     E.      Comparative Fee Structure with Similar Funds

Defendants contend that Plaintiffs' comparative-fee-structure analysis focuses on

an irrelevant comparison between mutual fund fees and non-mutual fund fees.  Further,

Defendants contend that the record reflects no competent evidence demonstrating a

factual predicate for Plaintiffs' assertion that Defendants are charging other clients

different fees for the same services.  Additionally, Defendants contend that Plaintiffs

ignore the data considered by the Board comparing the Funds to other comparable mutual

funds.

Plaintiffs, on the other hand, contend that the comparison of non-mutual fund,

institutional-client fees to mutual-fund fees is legally relevant in section 36(b) cases.

Further, Plaintiffs allege that Defendants' retail mutual funds and institutional accounts

were receiving comparable services.  Plaintiffs also contend that Defendants provided

some limited information to their Board members on institutional fees for the first time in
March 2004, but that that this information was not available to the Board when they
approved the advisory fees at issue in this case.

Regarding the comparative-fee-structures factor, the *Gartenberg* court rejected
plaintiffs' assertion that "the lower fees charged by investment advisers to large pension
funds should be used as a criterion for determining fair advisory fees for money market
funds[.]" *Gartenberg*, 694 F.2d at 930 n.3. That court further explained that the nature
and extent of the services required by each type of fund was different. *Id.* Since
*Gartenberg*, courts have held that other mutual funds provide the relevant comparison for
measuring fees—not non-mutual fund institutional clients. *See, i.e., Strougo v. Bea
Assocs.*, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002).

Here, even if comparing mutual fund fees to non-mutual fund fees is relevant,
Plaintiffs have not demonstrated that the services provided to the different types of funds
are comparable. Instead, the evidence shows that Defendants provided the Board with a
report showing that the services provided to the Funds were different than those provided
to the institutional clients. Moreover, a district court in Illinois recently stated that
"[e]ven assuming for the mere sake of comparison that the services [the adviser's]
institutional clients received were indistinguishable from those the Funds received, the
amounts paid by different parties establish a range of prices that investors were willing to
pay." *Jones v. Harris Assocs., L.P.,* No. 04-C-8305, 2007 WL 627640, at *8 (N.D. Ill.
Feb. 27, 2007). Thus, the fact that Defendants did not compare the Funds' fees to those

of its institutional clients does not create a genuine issue of material fact regarding

whether the fees could not have been negotiated as a result of arm's-length bargaining.

Furthermore, the Board received data comparing the Funds' fees to a relevant peer

group—competitor mutual funds of a similar size that pursue the same investment

objectives through active management.  Plaintiffs do not challenge the accuracy or

validity of the Lipper data or the accuracy or validity of the Board's analysis of the

process by which Lipper selected the comparable peer funds for each Fund.  Considering

this data, Plaintiffs have not identified a genuine issue of material fact as to whether the

fees are so disproportionately excessive that they could not have been the product of

arm's-length negotiation.  Accordingly, Plaintiffs' claims cannot survive summary

judgment based on this factor.

### F.      Independence and Conscientiousness of the Independent Trustees

Defendants assert that Plaintiffs have not adduced evidence to suggest that the

Board members were not independent and qualified to serve as the Funds' Board

members.  Defendants contend that Plaintiffs do not challenge that the Board met

regularly and played an active role in the negotiation process, or that the Board consulted

independent counsel and other third-party consultants as necessary to inform their

understanding of the contract negotiations.  Additionally, Defendants contend that

Plaintiffs do not contest that Defendants provided to the Board a wide range of

information covering all the *Gartenberg* factors in the 15(c) materials.  Defendants also

contend that Plaintiffs do not contest that the chair of the Contracts Committee and Board

18

counsel reviewed the 15(c) materials prior to their annual discussion; drafted memoranda to Defendants requesting supplementation, clarification, or changes to the reports provided in the 15(c) materials; and regularly requested additional information from Defendants.

In response, Plaintiffs contend that the Board followed a flawed process in establishing the advisory fees charged to the funds. Specifically, Plaintiffs allege that, in practice, the Board focused exclusively on comparing the Funds' fees and performance to those of other retail mutual funds, and did not take into account the other *Gartenberg* factors. Additionally, Plaintiffs contend that the Board members could not properly consider all the *Gartenberg* factors because Defendants failed to provide them with sufficient and reliable information.

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that no genuine issue of material fact exists as to whether this process was not an arm's-length one. Plaintiffs do not challenge the board members' independence. Plaintiffs do not dispute that the Board met regularly, played an active role in the contract negotiation process, and sought the advice of independent counsel and consultants. The evidence does not support Plaintiffs' assertion that the Board admits that it exclusively focuses on fees charged to peer mutual funds when setting the fees. While the Board may have placed greater emphasis on fees charged to peer mutual funds than Plaintiffs would have liked, such evidence does not create a genuine issue of material fact that the process was not an arm's-length one. Additionally, while Plaintiffs contend that the information

19

Defendants provided the Board was misleading, Plaintiffs fail to describe how these alleged deficiencies affected the results of the Board's fee-negotiation process. Plaintiffs' attacks do not establish that the care and conscientiousness of the Board was lacking and ultimately fail to create a genuine issue of material fact regarding whether the fees could not have been the result of arm's-length bargaining.

In conclusion, after weighing all of the *Gartenberg* factors, the Court finds that Plaintiffs have failed to establish a genuine issue of material fact regarding whether the fees charged were so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. Here, the Board sets Defendants' fees at the median amount charged to comparable funds in the industry, the fees include breakpoints that share economies of scale with shareholders as the Funds grow, and the fees are subject to performance-incentive adjustments that further decrease the fees if a Fund's performance does not exceed an agreed benchmark. Plaintiffs' primary argument that Defendants' fees are excessive is that non-mutual fund institutional accounts pay Defendants lower fees than the Funds. But as stated above, this argument lacks merit and fails to create a genuine issue of material fact.

While the evidence in this case may show that the Board could have negotiated lower fees, whether the fees could have been lower is not the question the Court is required to address under the applicable standard. *See Gartenberg*, 528 F. Supp. at 1047 ("[I]n order to provide relief under Section 36(b), it is not enough for this Court to find

that a better bargain was possible.")  Because the evidence relating to the *Gartenberg*

factors raises no genuine issue of material fact under section 36(b) that the fees could not

have been the product of arm's-length bargaining, Defendants are entitled to summary

judgment on Counts I and II.[9]  *See Jones*, 2007 WL 627640, at *9 (holding that the

plaintiffs failed to "set forth an issue of fact that, if resolved in their favor, could lead to a

finding that [the adviser] had breached its § 36(b) duty.")

## IV.    Count III

In Count III of the Complaint, Plaintiffs allege that Defendants charged excessive

section 12(b) distribution fees in violation of their obligations under section 36(b) of the

ICA.[10]  As with their excessive advisory-fees claim, Plaintiffs must prove that the fee "is

---

[9]      Defendants seek summary judgment on all of the Funds, asserting that the record of the fee-negotiation process and its results is fully developed.  Plaintiffs, on the other hand, contend that Defendants' request for summary judgment on all claims is inappropriate because Plaintiffs were only provided discovery on two of the Funds and only allowed to depose two of the disinterested directors of the Funds.  Therefore, Plaintiffs assert that summary judgment is inappropriate under Federal Rule of Civil Procedure 56(f) because Plaintiffs have not completed adequate discovery.

The Court finds that Defendants are entitled to summary judgment on all of the Funds.  Because the record of the fee-negotiation process is complete, additional discovery will not add anything new to the record.  Here, the discovery materials that Defendants provided were not redacted or limited to be fund-specific.  Furthermore, the Court directed Defendants "to file a motion for reconsideration after the initial discovery has been completed" so that the Court could reconsider dismissing the case. (March 7, 2005 Order at 8, Doc. No. 73.)  Accordingly, Defendants' summary judgment motion is not unanticipated at this juncture.

[10]      In the March 7, 2005 Order, the Court stated that it had "considerable concerns" about whether "Plaintiffs are attacking only the Funds' distribution fee rate or if Plaintiffs
(Footnote Continued on Next Page)

so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928.

Defendants contend that Plaintiffs' challenge to Defendants' 12b-1 distribution fees are not actionable under section 36(b).  In particular, Defendants contend that Plaintiffs do not attempt to establish that Defendants' 12b-1 distribution fees are excessive under section 36(b) as alleged in the Complaint, but rather challenge the validity of such fees in general.  Additionally, Defendants contend that Plaintiffs provided no analysis of the 12b-1 distribution fees under relevant section 36(b) standards because they ignore the evidence of the different services actually paid for by the 12b-1 fees.  In particular, Defendants point out that Plaintiffs' expert's comparison of the level of the 12b-1 fee with potential savings from economies of scale in other fees such as investment-management fees ignores the evidence showing that up to 85% (or 21.25 basis points) of the 25 basis-point 12b-1 fee for Class A shares covers shareholder servicing to existing shareholders, not the marketing of fund shares to new shareholders.

In response, Plaintiffs assert that Defendants breached their fiduciary duty under section 36(b) with regard to the distribution fees by failing to provide the directors with

---

(Footnote Continued From Previous Page)
are attacking the ability of the mutual fund industry to charge existing shareholders these fees *in toto*."  (March 7, 2005 Order, Doc. No. 73.)  The Court therefore held that Plaintiffs should only be granted a limited form of discovery that focused on the distribution fees actually paid by the Funds in this case.  (*Id.*)

all necessary information required by Rule 12b-1.  Specifically, Plaintiffs contend that

Defendants have never provided the Board with a cost-benefit analysis showing the costs

of the 12b-1 Plans in comparison to their potential benefits.  Plaintiffs also contend that in

exchange for the 12b-1 fees, the shareholders received no material benefit.  Instead,

Plaintiffs contend that any rewards realized went solely to Defendants.

Here, Plaintiffs ignore the evidence showing that approximately 85% of

Defendants' 12b-1 distribution fees were paid for services to existing shareholders and

not to marketing the Funds to new shareholders.  Thus, Plaintiffs' claim that existing

shareholders received absolutely "no material benefit" from these services is without

merit.  Furthermore, the evidence shows that the Board has, in fact, considered the

benefits of the full set of services provided pursuant to Defendants' 12b-1 distribution

fees.  Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that

Plaintiffs have not established a genuine issue of material fact regarding whether the

12b-1 fee is so disproportionate to the full set of services Defendants provided to the

shareholders that it could not have been the product of arm's-length bargaining.

Accordingly, Defendants are entitled to summary judgment on Count III of Plaintiffs'

Complaint.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that**:**

1.      Defendants' Motion for Summary Judgment (Doc. No. 178) is **GRANTED**.

2.      Plaintiffs' Amended Complaint (Doc. No. 177) is **DISMISSED WITH**

**PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  July 10, 2007              s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   Judge of United States District Court