# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2945
_____

| | |
|---|---|
| John E. Gallus; Alexandria Ione Faller, also known as Alexandria Ione Griffin; Diana J. Anderson, for the use and benefit of the RiverSource Balanced Fund, formerly known as AXP Mutual Fund; RiverSource Precious Metals Fund, formerly known as AXP Precious Metals Fund; RiverSource Mid Cap Growth Fund, formerly known as AXP Equity Select Fund; RiverSource Small Cap Advantage Fund, formerly known as AXP Small Cap Advantage Fund; River Source Small Cap Value Fund, formerly known as AXP Partners Small Cap Value Fund; RiverSource Mid Cap Value Fund, formerly known as AXP Mid Cap Value Fund; RiverSource Small Company Index Fund, formerly known as AXP Small Company Index Fund; RiverSource High Yield Bond Fund, formerly known as AXP High Yield Bond Fund; RiverSource Large Cap Equity Fund, formerly known as AXP Large Cap Equity Fund, Successor by merger to RiverSource New Dimensions Fund and AXP Blue Chip Advantage Fund,<br><br>       Appellants,<br><br>v. | Appeal from the United States District Court for the District of Minnesota. |

|                                                          |   |
|---------------------------------------------------------|---|
| Ameriprise Financial, Inc., formerly                     | * |
| known as American Express Financial                      | * |
| Corporation; RiverSource Investments,                    | * |
| LLC; Ameriprise Financial Services,                      | * |
| Inc., formerly known as American                         | * |
| Express Financial Advisors, Inc.,                        | * |
|                                                          | * |
|    Appellees.                                            | * |

_____

Submitted: April 17, 2008
Filed: April 8, 2009
_____

Before WOLLMAN, BEAM, and RILEY, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

This appeal requires us to examine a question that has created a split among our sister circuits: the scope of the fiduciary duty imposed on advisers of mutual funds by § 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35(b). Because we conclude that the district court construed too narrowly the extent of the defendants' duty under § 36(b) and gave insufficient weight to contested issues of material fact, we reverse and remand for further proceedings.

The plaintiffs are shareholders of eleven mutual funds ("the Funds") that are registered investment companies under the ICA. The Funds are managed and distributed by affiliates of the defendants (collectively, "Ameriprise"). The plaintiffs filed this lawsuit on June 9, 2004, alleging that Ameriprise had breached its fiduciary duty under § 36(b) of the ICA. The district court determined that the statutory damages period was restricted to the year preceding the filing date. After allowing limited discovery, the court granted Ameriprise's motion for summary judgment on

-2-

all of the plaintiffs' claims. The court based its decision on an analysis of the factors set out in Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir. 1982). On appeal, the plaintiffs argue that the district court improperly interpreted § 36(b) and overlooked important questions of material fact.

We review *de novo* the district court's grant of summary judgment. Ferguson v. United States, 484 F.3d 1068, 1072 (8th Cir. 2007). "Summary judgment is proper if the 'record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law.'" Id. (quoting Keller v. United States, 46 F.3d 851, 853 (8th Cir. 1995)).

I.

The fees paid to Ameriprise for advising the Funds are negotiated each year by the Funds' board of directors (the "Board"), whose primary responsibility is to represent the plaintiffs and other shareholders during the fee negotiation. According to the plaintiffs, Ameriprise breached its statutory fiduciary duty by misleading the Board during the negotiation and demanding excessive fees. The gravamen of the plaintiffs' argument can be distilled into three claims: (1) the fee negotiation was inherently flawed because it was based not on Ameriprise's costs and profits but on external factors—namely the fee agreements of similar mutual funds in the market; (2) Ameriprise provided comparable advisory services to institutional, non-fiduciary clients at substantially lower fees than it charged the plaintiffs, to whom it owed a fiduciary duty; and (3) Ameriprise misled the Board about its arrangements with non-fiduciary clients to prevent the Board from questioning the higher fees demanded by Ameriprise.

The record reflects that the negotiation between the Board and Ameriprise focused on the advisory fees charged by peer mutual funds. Ameriprise entered the

negotiation with a pricing philosophy wherein it attempted to establish fees that were "in the middle of the pack of funds with a similar size, objective and distribution model." See J.A. 255. The Board acquiesced in this goal of tethering fees to the industry median. According to Arne Carlson, the chairman of the Board, the negotiation was "an externally driven process." Id. at 529. Notwithstanding this outward focus, it is undisputed that the Board had access to a wide variety of information, including reports on the services provided to the Funds, the personnel providing those services, the investment performance of the Funds, and the profit Ameriprise derived from the Funds. Additionally, the Board requested data from a third-party industry consultant, Lipper, Inc. The Lipper data provided a comparison between Ameriprise's fees and the fees charged by a pool of other mutual funds. Both parties agree that the result of the negotiation was a fee arrangement that, broadly speaking, was comparable to the rates paid by shareholders of other mutual funds throughout the industry.

In addition to its mutual fund clients, however, Ameriprise sells its investment advice to institutional, non-fiduciary clients such as pension funds. There is significant dispute over both the relevance of any comparison between these two types of clients and the insights that such a comparison would yield. At first glance, the most striking difference between Ameriprise's mutual fund clients and its institutional clients is that the former pay an advisory fee that is substantially more—perhaps up to twice as much higher—than the latter.[1] The record is replete with expert testimony regarding the existence and reasonableness of the discrepancy.

Professor Charles Murdock testified on behalf of the plaintiffs that the advisory service provided to the mutual funds was similar, if not identical, to the service Ameriprise provided to its institutional clients. Id. at 1485. Murdock explained, for

---

[1] The difference in fees mostly results from larger fee breaks for institutional accounts as the amount of assets under management increases in size.

-4-

example, that the Growth Spectrum III institutional account on which the plaintiffs conducted discovery was a "patterned portfolio" to the New Dimensions mutual fund—meaning that the two accounts had identical investment objectives and very similar stock holdings. The record indicates that Growth Spectrum III and New Dimensions were managed by the same individual, with the same decision to buy or sell stock shares frequently governing both accounts. Id. at 519-20. Murdock further explained that equalizing the fee structures of the two accounts would reduce the fees paid by mutual fund shareholders from $87.5 million to roughly $35 million, and he argued that the fee difference could not be substantively justified. Id. at 1489. Expert testimony for Ameriprise, however, indicated that the difference in fee was warranted by additional services provided for mutual funds, such as compliance with legal and regulatory requirements, shareholder communication, and more frequent board support. Id. at 1427. Ameriprise also pointed out that fee discrepancies between mutual funds and institutional accounts were common throughout the industry.

At some point during the fee negotiation, the Board became aware of the comparatively lower fees Ameriprise charged its institutional clients and requested a report explaining the similarities and differences between the two types of accounts. Even before the Board's request, there is some indication that Ameriprise knew that a fee discrepancy between institutional accounts and mutual funds might concern the Board. In response to a Wall Street Journal article that discussed the industry-wide disparity in fees, an internal email noted that "this could come up in a Board meeting" and suggested that "we should have a reply, though it may or may not be convincing." Id. at 616.

To address the Board's concerns, Ameriprise produced a report entitled the San Diego Office Review, which compared the fee structures of mutual funds and institutional accounts. The veracity and completeness of that report is an important part of this dispute. The plaintiffs' experts claim that the report omitted or obfuscated information to make the fee discrepancy seem smaller and more justifiable than it

really was.  According to one of the plaintiffs' experts, "the Board did not notice the distortions, relied on the misrepresentations, and erroneously concluded exactly what the Investment Advisor mislead [sic] them into concluding: that the fees for the [mutual fund] and institutional accounts were 'in line.'"  Id. at 1492.  The plaintiffs suggest that the Board might not have ratified the fee agreement had it been given accurate information.  Although Ameriprise objects to the plaintiffs' characterization of the report as inaccurate and misleading, its main argument is that the contents of the report were irrelevant.  According to Ameriprise, "[a]n inadequate [negotiation] that produces an objectively reasonable fee self-evidently cannot form the basis for liability [under § 36(b)]."  In effect, Ameriprise contends that an adviser cannot be liable for a breach of fiduciary duty as long as its fees are roughly in line with industry norms.

## II.

Several unique features of the mutual fund industry have made it the focus of congressional regulation.  See Burks v. Lasker, 441 U.S. 471, 480-81 (1979).  Although mutual funds are technically owned by the individual shareholders who invest in the funds, most mutual funds are created, organized, and managed by external investment advisers—an arrangement that gives the adviser a significant amount of control over the fund it serves.  Id. at 481. Investment advisers are compensated for their administrative service and investment advice through agreements that they negotiate with their respective funds.  In the nascent stages of a fund's development, the adviser often has the ability to influence who will sit on the fund's board of directors, though this power is limited by federal securities regulations on director independence.  See William A. Birdthistle, Compensating Power: An Analysis of Rents and Rewards in the Mutual Fund Industry, 80 Tul. L. Rev. 1401, 1422 (2006); Burks, 441 U.S. at 482-83 (explaining the responsibilities of disinterested directors).

Experts have extensively debated the extent to which these industry characteristics interfere with robust competition and drive up fees. Some studies have concluded that inherent conflicts of interest and a lack of meaningful competition between mutual funds have led to systematic overpricing of investment advice. <u>See</u>, <u>e.g.</u>, Birdthistle, <u>supra</u>; John P. Freeman, Stewart L. Brown & Steve Pomerantz, <u>Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Duty Test</u>, 61 Okla. L. Rev. 83 (2008); John P. Freeman & Stewart L. Brown, <u>Mutual Fund Advisory Fees: The Cost of Conflicts of Interest</u>, 26 Iowa J. Corp. L. 609 (2001); Donald C. Langevoort, <u>Private Litigation to Enforce Fiduciary Duties in Mutual Funds: Derivative Suits, Disinterested Directors and the Ideology of Investor Sovereignty</u>, 83 Wash. U. L.Q. 1017 (2005); Lyman Johnson, <u>A Fresh Look at Director "Independence": Mutual Fund Fee Litigation and Gartenberg at Twenty-Five</u>, 61 Vand. L. Rev. 497 (2008); <u>see also</u> Lucian Bebchuk & Jesse Fried, <u>Pay Without Performance: The Unfulfilled Promise of Executive Compensation</u> ix (2004) ("The absence of effective arm's-length dealing under today's system of corporate governance . . . has been the primary source of problematic compensation arrangements.").

The central component of this argument is that arm's-length bargaining does not occur between an adviser and a mutual fund because the fund cannot sever its relationship with the adviser. Critics claim that because this dynamic pervades the mutual fund industry, there is little competitive pressure to lower fees. This phenomenon may be exacerbated by the fact that the typical fee structure—which is established as a percentage of net asset value—will allow an adviser's compensation to skyrocket if the fee is not adjusted downward as a fund grows larger.

In response to these types of concerns, Congress adopted the ICA of 1940. <u>See</u> <u>Daily Income Fund, Inc. v. Fox</u>, 464 U.S. 523, 536-40 (1983) (explaining the history of the ICA). The ICA was amended in 1970 to add several new provisions, including § 36(b), which states, in relevant part:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser . . . . With respect to any such action the following provisions shall apply:
>
> (1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
>
> (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances. 15 U.S.C. § 80a-35(b).

In Gartenberg, the Second Circuit analyzed § 36(b) and created the framework that has served as the starting point for interpreting a fund adviser's fiduciary duty. The plaintiffs in Gartenberg argued that, because of their fund's exponential growth, the adviser's fee had become so disproportionately large that it constituted a breach of fiduciary duty. After reviewing what the court called the "tortuous legislative history" of § 36(b), the Second Circuit concluded that the purpose of the provision was to mitigate the competitive deficiencies of the mutual fund industry. See Gartenberg, 694 F.2d at 928-29. Accordingly, the court held that the relevant test for a fee is whether it "represents a charge within the range of what would have been negotiated at arm's-length in light of all the surrounding circumstances." Id. at 928. The court then listed a number of non-exclusive factors that were germane to the

analysis: (1) the nature and quality of the services provided by the adviser; (2) the profitability of the mutual fund to the adviser; (3) the extent to which "fall-out" benefits inured to the adviser; (4) the economies of scale realized by the adviser; (5) the fee structures of comparable funds; and (6) the independence and conscientiousness of the board of directors. Id. at 928-31. In addition, the court offered some economic observations to assist the evaluation. For instance, the court noted that reliance on other fees throughout the industry will not satisfy § 36(b) because of the competitive defects of the mutual fund market. See id. at 929. The court ultimately concluded that the adviser's fee was not "so excessive or unfair as to amount to a breach of fiduciary duty within the meaning of § 36(b)." Id. at 930.

A number of courts have indicated approval of the Gartenberg framework in cases challenging adviser's fees under § 36(b). See, e.g., Krantz v. Prudential Invs. Fund Mgmt. L.L.C., 305 F.3d 140 (3rd Cir. 2002) (following a Fourth Circuit analysis that was based on Gartenberg); Migdal v. Rowe Price-Fleming Int'l, 248 F.3d 321 (4th Cir. 2001); Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100 (D. Mass. 2006); Sins v. Janus Capital Mgmt., L.L.C., 2006 WL 3746130 (D. Colo. 2006); In re Dreyfus Mut. Funds Fee Litig., 428 F. Supp. 2d 342 (D. Pa. 2005); Zucker v. Aim Advisors, Inc. 371 F. Supp. 2d 845 (S.D. Tex. 2005); Strigliabotti v. Franklin Res., Inc., 2005 WL 645529 (N.D. Cal. 2005).

The Seventh Circuit eschewed the Gartenberg approach in Jones v. Harris Associates, 527 F.3d 627 (7th Cir. 2008). Jones rejected the proposition that courts should evaluate the reasonableness of an adviser's fee, holding that "[a] fiduciary must make full disclosure and play no tricks but is not subject to a cap on compensation." Id. at 632. The court based its conclusion on two fundamental premises: the plain meaning of the word "fiduciary" and a rejection of the economic assumptions inherent in Gartenberg. According to the court, the plain meaning of "fiduciary" is a requirement of "candor in negotiation, and honesty in performance" and nothing in the obscure legislative history of § 36(b) alters that conclusion. Id. at 632-33. Furthermore, the court declared that the observations in Gartenberg about the lack of

competitiveness in the mutual fund industry were flawed. Mutual funds, according to the court, "come much closer to the model of atomistic competition than do most other markets." Id. at 634. The court based this observation on the fact that there are thousands of mutual funds, and even if investors cannot control the fees set by any particular fund, they can assert indirect pressure on an adviser's compensation by choosing funds with lower fees. See id. at 632; see also John C. Coates & R. Glenn Hubbard, Competition in the Mutual Fund Industry: Evidence and Implications for Policy, 33 Iowa J. Corp. L. 151, 211 (2007) (arguing that there is robust competition within the mutual fund industry, though concluding that "Gartenberg's three principal holdings are sensible from legal and economic perspectives").

The Jones opinion drew notable criticism within the court itself. Four judges joined Judge Richard Posner in a dissent from denial of rehearing en banc. See Jones v. Harris Associates, 537 F.3d 728, 729 (7th Cir. 2008) (Posner, J., dissenting from denial of rehearing en banc). Citing numerous academic studies, as well as financial-press articles, id. at 729-32, the dissent took issue with what it considered a tendentious economic analysis that was overly favorable to the mutual fund industry. See id. at 733. Additionally, the dissent chided the panel opinion for improperly rejecting a "comparison of the fees that [the defendant] charges independent funds with the much higher fees that it charges the funds it controls." Id. at 732. Overall, the dissent expressed the view that Gartenberg should not be abandoned and that judicial oversight of investment advisers should not be relaxed.

The Supreme Court has granted certiorari in Jones, No. 08-586, 2009 WL 578699 (U.S. Mar. 9, 2009), leading some observers to suggest that the Court may establish a standard of review that may result in lower management fees. See Sam Mamudi, "Decision Could Set Standard on Fees," Wall St. J., March 19, 2009, at C9.

III.

Our review of the cases, legislative history, and academic work surrounding § 36(b) leads us to conclude that the Gartenberg factors provide a useful framework for resolving claims of excessive fees, notwithstanding the substantial changes in the mutual fund industry that have occurred in the intervening years. Fund advisers do not have a fiduciary duty in merely an abstract sense. Rather, the duty is imposed "with respect to the receipt of compensation." As the Seventh Circuit acknowledged in Jones, a fee itself may be so large that it provides prima facie evidence that a breach of fiduciary duty has occurred. See Jones, 527 F.3d at 632.

At the same time, however, we think that Jones highlights a flaw in the way many courts have applied Gartenberg  The Gartenberg case demonstrates one way in which a fund adviser can breach its fiduciary duty; but it is not the only way. As did the Seventh Circuit, we read the plain language of § 36(b) to impose on advisers a duty to be honest and transparent throughout the negotiation process.[2]  This conclusion is consistent with Gartenberg, in which the Second Circuit was addressing only the question of whether the fee *itself* was so high that it violated § 36(b).[3]  The size of the adviser's fee is of course one of the factors to be considered in reviewing a § 36(b) challenge to a fee structure. But the standard that the Second Circuit enunciated should not be construed to create a safe harbor of exorbitance, for under such a view an adviser's fiduciary duty would be diluted to a simple and easily satisfiable requirement not to charge a fee that is egregiously out of line with industry

---

[2]The Third Circuit appears to have also adopted a broader, conduct-sensitive approach to § 36(b). See Green v. Fund Asset Mgmt., 286 F.3d 682 (3rd Cir. 2002).

[3]Indeed, Gartenberg does not address, much less overrule, Galfand v.Chestnutt Corp., 545 F.2d 807 (2d Cir. 1976), an earlier case in which the Second Circuit concluded that an adviser violated its fiduciary duty under § 36(b) by "acquiring from the mutual fund, without full disclosure to the [board of directors], a patently one-sided revision of the advisory contract." Id. at 809.

norms.  To apply Gartenberg in this fashion across the entire mutual fund market would be to eviscerate § 36(b).[4]

We believe that the proper approach to § 36(b) is one that looks to both the adviser's conduct during negotiation and the end result.  Cf. In re Mutual Funds Investment Litigation, 590 F. Supp. 2d 741, 760 (D. Md. 2008) ("To the extent that a portion of the fees paid to the investment adviser defendants was 'disproportionate, excessive, or unearned' . . . because it was based upon the existence of [improprieties] not disclosed when the fees were negotiated, plaintiffs . . . may recover that portion of the fees.").  Unscrupulous behavior with respect to either can constitute a breach of fiduciary duty.  It bears mention, of course, that Congress allocated the burden of proof to plaintiffs, both with respect to establishing the existence of a breach of fiduciary duty, see 15 U.S.C. § 80a-35(b)(1), as well as demonstrating the existence of cognizable financial harm resulting from that breach.  Id. § 80a-35(b)(3).

## IV.

We conclude that the district court erred in holding that no § 36(b) violation occurred simply because Ameriprise's fee passed muster under the Gartenberg standard.  Although the district court properly applied the Gartenberg factors for the limited purpose of determining whether the fee itself constituted a breach of fiduciary duty, it erred in rejecting a comparison between the fees charged to Ameriprise's institutional clients and its mutual fund clients.  In part, the court based its decision on dicta from Gartenberg that refused to compare the adviser's fees for fundamentally different investment vehicles—money market mutual funds and equity pension funds.

---

[4]This may explain why no plaintiff has ever obtained a judgment in an action brought under that provision.  See Johnson, supra, at 519 (noting that no investor has obtained a verdict against an investment adviser in the twenty-five years since Gartenberg).

-12-

See Gartenberg, 694 F.2d at 930 n.3. It does not follow, however, that a comparison will be irrelevant when there is greater similarity between the funds being compared. See Freeman & Brown, supra, at 645 ("The [Gartenberg] court's ruling on admissibility would have no force in an apples-to-apples suit where equity pension fund fee levels are compared to fee levels for an equity mutual fund."); see also Jones, 537 F.3d at 731 (Posner, J., dissenting from denial of rehearing en banc) ("A particular concern in this case is the adviser's charging its captive funds more than twice what it charges independent funds."). Indeed, the argument for comparing mutual fund advisory fees with the fees charged to institutional accounts is particularly strong in this case because the investment advice may have been essentially the same for both accounts.

We are also unpersuaded by the assertion that the fee disparity simply reflects what different investors are willing to pay. The purpose of an inquiry into the fees paid by institutional, non-fiduciary clients is to determine what the investment advice is worth. Advisers will argue that a comparison with institutional clients is inapt or that the discrepancy is substantively justified. As the district court noted, this is exactly what Ameriprise attempted to do with its San Diego Office Review. There was, however, conflicting expert testimony on the accuracy and veracity of that report. Given the relevance of this evidence, the district court should have explored the disputed issues of material fact concerning the similarities and differences between mutual funds and institutional accounts.

Likewise, the district court should not have engaged in so limited a scope of review. Ameriprise's conduct must be evaluated independent from the result of the negotiation. The district court concluded that Ameriprise did not breach its fiduciary duty in one way (by setting a fee that was exorbitant relative to that of other advisers), but it should have also considered other possible violations of § 36(b). Specifically, the court should have determined whether Ameriprise purposefully omitted, disguised, or obfuscated information that it presented to the Board about the fee discrepancy

between different types of clients. The record indicates that there are material questions of fact on this issue.

We remain mindful that § 36(b) does not allow a court "to substitute its business judgment for that of a mutual fund's board of directors in the area of management fees." Gartenberg, 694 F.2d at 928 (quoting S. Rep. No. 91-184 (1970), as reprinted in 1970 U.S.C.C.A.N. 4902-03). Candid, transparent negotiation does not require discussion of every issue that a plaintiff might find relevant; and it does not require the adoption of a particular negotiation strategy.

Here, the plaintiffs made much of the fact that the negotiation focused on the advisory fees charged throughout the industry, arguing that this external focus was a per se breach of Ameriprise's fiduciary duty. But while tethering fees to an industry median will not provide sure-fire protection from § 36(b) liability, a negotiation strategy similar to that employed in this case is not necessarily suspect. An effort to meet or surpass the value offered by one's primary competitors is a common business strategy, and there is no reason to assume it indicates bad faith.

V.

Finally, we address the question whether the statutory damage period ends with the filing of a § 36(b) lawsuit or continues throughout the litigation. Ameriprise contends that the plaintiffs cannot recover damages incurred after the filing date, but we disagree. The statute provides that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3). It further states that damages "shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payments received . . . ." Id.

Ameriprise argues that this language creates two temporal restrictions on § 36(b) damages. The first limitation is obvious: a plaintiff may not recover damages

suffered more than one year before the lawsuit was filed. Beyond this, however, Ameriprise argues that the filing date provides an ending point, so that damages suffered *after* a plaintiff files suit are similarly unrecoverable. The district court adopted this view, which is consistent with brief dicta in Daily Income Fund, Inc., 464 U.S. at 526 n.2. Ameriprise claims that this reading is also consistent with the structure of the ICA because investment advisory contracts must be approved annually. See 15 U.S.C. § § 80a-15(a)(2), (b)(1).

The plain language of the statute, however, does not support this interpretation. As the United States District Court for the District of Massachusetts concluded in a thorough and carefully reasoned opinion, a straightforward reading of the damage limitation yields only a retrospective limitation. See Dumond v. Massachusetts Fin. Servs. Co., 2007 WL 602589 (D. Mass. 2007). Of course, the annual recurrence of fee negotiation makes it less likely that the same conduct will cause damage over successive years. But where the plaintiffs have continued to suffer damage during the litigation, both the language of the statute and the interests of judicial economy suggest that redress should be available in a single action.

### VI.

The judgment is reversed, and the case is remanded to the district court for further proceedings not inconsistent with the views set forth in this opinion.

_____