UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN GALLUS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    Civil Action No. 0:04-cv-4498 |
| | ) |
| AMERIPRISE FINANCIAL, INC, | )    Honorable Donovan W. Frank |
| f/k/a AMERICAN EXPRESS | )  Magistrate Judge Susan Richard Nelson |
| FINANCIAL CORPORATION; | ) |
| RIVERSOURCE INVESTMENTS | ) |
| LLC; and AMERIPRISE FINANCIAL | ) |
| SERVICES, INC, f/k/a AMERICAN | ) |
| EXPRESS FINANCIAL ADVISORS | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' BRIEF REGARDING THE IMPACT OF *JONES V. HARRIS ASSOCIATES L.P.*, 130 S.CT. 1418 (2010) ON THESE PROCEEDINGS**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

OVERVIEW OF PLAINTIFFS' POSITION .................................................... 1

SUMMARY OF FACTUAL BACKGROUND............................................... 4

    I.  PLAINTIFFS PRESENTED EVIDENCE THAT THE FEE-SETTING
        PROCESS WAS DEFICIENT. ....................................................... 5

    II. PLAINTIFFS PRESENTED EVIDENCE THAT AMERIPRISE
        CHARGED THE FUNDS TWICE AS MUCH AS IT CHARGED
        NON-FIDUCIARY CLIENTS FOR THE SAME SERVICES. ...................... 7

STANDARD OF REVIEW .......................................................................... 9

ARGUMENT.............................................................................................. 9

    I.  THE SUPREME COURT'S *JONES* DECISION REQUIRES A HIGHLY
        FACT-SPECIFIC REVIEW OF THE FEE-SETTING PROCESS AND
        THE SUBSTANTIVE OUTCOME................................................... 9

        A. *Jones* Clarified the Meaning of § 36(b)'s Fiduciary Duty.......... 9

        B. *Jones* Necessitates a Threshold Review of the Fee-Setting Process
           and Instructs That a Process That Is Not "Robust" Is Entitled to
           Little, If Any, Judicial Deference. ........................................... 11

        C. *Jones* Clarified the Scope and Meaning of *Gartenberg* with Respect
           to the Consideration of Comparative Fees. ............................... 12

    II. THE EIGHTH CIRCUIT'S OPINION IS CONSISTENT WITH *JONES*
        AND SHOULD BE FOLLOWED BY THIS COURT ON REMAND ......... 13

    III. SUMMARY JUDGMENT IS INAPPROPRIATE UNDER *JONES*
        BECAUSE THERE ARE MULTIPLE FACTUAL DISPUTES
        CONCERNING THE ADEQUACY OF THE FEE- SETTING
        PROCESS AND THE LEVEL OF THE FEES THEMSELVES................. 14

        A. The Fee-Setting Process Was Deficient, Requires Greater Scrutiny,
           and Is Entitled to Little, If Any, Deference. ............................... 15

i

1.  The fee-setting process was deficient because it focused exclusively on fees charged to similarly captive funds by similarly conflicted advisers................................................................ 16

2.  The fee-setting process was deficient because Ameriprise withheld material information............................................................. 17

B.  Plaintiffs' Evidence Demonstrates That the Fees Are Far Higher Than What an Arm's-Length Transaction Would Have Produced. ................... 21

1.  Ameriprise charged significantly lower fees to its non-fiduciary clients for virtually identical services................................................... 21

2.  Material issues of fact remain with respect to Plaintiffs' additional evidence regarding the *Gartenberg* factors, including evidence of substantive excessiveness, rendering summary judgment inappropriate. ..................................................................... 24

IV. THE DAMAGES PERIOD UNDER § 36(b) DOES NOT CLOSE AFTER ONE YEAR....................................................................................... 26

CONCLUSION ............................................................................................................. 27

## TABLE OF AUTHORITIES

Cases

*Burks v. Lasker*, 441 U.S. 471 (1979) ................................................................... 11, 17

*Curran v. Principal Management Corp., LLC*,
    2010 U.S. Dist. LEXIS 83730 (S.D. Iowa June 8, 2010) ..................................... 13

*Dumond v. Mass. Fin. Servs. Co.*,
    No. 04-cv-11458, 2007 U.S. Dist. LEXIS 12304
    (D. Mass. Feb. 22, 2007) .............................................................................. 26, 27

*Ferguson v. United States*, 484 F.3d 1068 (8th Cir. 2007) .............................................. 9

*Galfand v. Chestnutt Corp.*, 545 F.2d 807 (2d Cir. 1976)............................................. 19

*Gallus v. Ameriprise Financial, Inc.*,
    561 F.3d 816 (8th Cir. 2009) ........................................................................ *passim*
    370 F.Supp.2d 862 (D. Minn. 2005) ..................................................................... 5

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
    694 F.2d 923 (2d Cir. 1982) ......................................................................... *passim*

*Glover v. McDonnell Douglas Corp.*, 12 F.3d 845 (8th Cir. 1994) .................... 2, 14, 27

*Hunt v. Invesco Funds Group, Inc.*,
    No. 04-02555, 2006 U.S. Dist. LEXIS 42064 (S.D. Tex. Jun. 22, 2006) ........... 26

*Jones v Harris Associates L.P.*,
    537 F.3d 728 (2008) ........................................................................................ 12
    559 U.S. ___, 130 S.Ct. 1418 (2010)  .......................................................... *passim*

*O'Connor v. Donaldson*, 422 U.S. 563 (1975)............................................................. 14

*Pepper v. Litton*, 308 U.S. 295 (1939) ..................................................................... *passim*

*United States v. Betcher*, 534 F.3d 820 (8th Cir. 2008) ................................................ 14

<u>Statutes and Rules</u>

Fed.R.Civ.P. 56(c) ........................................................................................................ 9

17 C.F.R. § 270.12b-1(d).............................................................................................. 19

17 C.F.R. § 270.12b-1(e).............................................................................................. 26

Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq*:

§ 15(c), 15 U.S.C. § 80a-15(c) ..................................................................................... 19

§ 36(b), 15 U.S.C. § 80a-35(b) .............................................................................. *passim*

§ 47(b), 15 U.S.C. § 80a-46(b) ................................................................................... 10

## INTRODUCTION

As requested by the Court, Plaintiffs submit this brief to address the impact of the Supreme Court's decision in *Jones v. Harris Associates L.P.,* 559 U.S. __, 130 S.Ct. 1418 (2010), on these proceedings.[1]  As discussed *infra*, the Court should set a schedule for completion of discovery that encompasses the appropriate damages period and set a date for a trial on the merits.

## OVERVIEW OF PLAINTIFFS' POSITION

The Supreme Court ordered that this Court's summary judgment opinion be re-examined in light of *Jones,* which held that the meaning of "fiduciary duty" in § 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35(b), is "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." 130 S.Ct. at 1427 (citations omitted).  In *Jones,* the Court also ruled that "all the circumstances" include the factors enunciated in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982), with two significant clarifications—(1) that a court must conduct a careful threshold review of the process by which a mutual fund's fees were set to determine whether that process was "robust," and (2) that a court must consider a comparison of the fees charged by the adviser to the mutual fund with the fees charged by the adviser to its independent clients when appropriate. *See Jones*, 130 S.Ct. at 1427-30.  The Eighth Circuit's review of the fees at issue closely resembles the

---

[1]  The sole issue presented in *Jones* was, for purposes of an excessive-advisory-fees claim, what must a mutual fund shareholder "prove in order to show that a mutual fund investment adviser breached the 'fiduciary duty with respect to the receipt of compensation for services' that is imposed by §36(b)." 130 S.Ct. at 1422.

approach laid out in *Jones* and should be followed.  *See Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th Cir. 2009).[2]

In *Jones*, the Supreme Court made clear that "a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance." 130 S.Ct. at 1429.  To fulfill this obligation, the court must, as a threshold matter, analyze the *process* by which fees were approved in order to determine the measure of deference that process ought to be afforded.  If the fee-setting process was "robust," more deference may be appropriate, but where "the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome."  *Id.* at 1429-30.  In this case, the "negotiation" process was deficient for two primary reasons: (1) Defendants withheld from the board candid and accurate information, including the fees charged and services rendered to institutional accounts that were substantially similar to the mutual funds; and (2) Defendants and the board employed an "externally" driven fee review that was based entirely on a comparison to fees charged to other mutual funds.

Just as *Jones* prescribes, the Eighth Circuit reviewed the robustness and integrity of the review process and determined that there are material issues of fact concerning the adequacy of that process.  First, the court questioned the sufficiency of the review process by finding, *inter alia*, that there was conflicting testimony on the "accuracy and veracity"

---

[2]  The vacated *Gallus* decision may still serve as guidance.  *See e.g.*, *Glover v. McDonnell Douglas Corp.*, 12 F.3d 845, 848 n.3 (8th Cir. 1994) (although a vacated opinion is not precedential, parties and the district court can look to it to resolve matters on remand); *see also infra* note 10.

of information Ameriprise provided to the Funds' directors and concluded the district

court should have evaluated Ameriprise's conduct "independent from the result of the

negotiation." *Gallus*, 561 F.3d at 824.  In addition, the Eighth Circuit found that factors

other than Ameriprise's fees vis-à-vis those charged to other mutual funds by other

advisers should have been evaluated, *id.*, a finding bolstered by the Supreme Court's

admonition that reliance on the fees charged to other mutual funds is "problematic."

*Jones*, 130 S.Ct. at 1429.

Given the deficiencies in the fee-setting process, the substantive results of the

process must be subjected to a "rigorous" court review under *Jones*.  And because there

are numerous issues of disputed fact, a rigorous review requires that this Court grant a

trial in which full evidence can be presented and a rigorous review can be made.  In this

regard, the Eighth Circuit found that there were material issues of fact regarding two

important questions:  (1) the similarities and differences between the Funds and their

institutional counterparts given that such a comparison is "particularly strong in this case

because the investment advice may have been essentially the same for both accounts;"

and (2) whether "Ameriprise purposefully omitted, disguised, or obfuscated information

that it presented to the [b]oard about the fee discrepancy between different types of

clients." *Gallus*, 561 F.3d at 824.  Given the nearly identical nature of the institutional

accounts in this case, the tens of millions of dollars of additional fees Ameriprise charged

the Funds cannot survive a "rigorous" review at the summary judgment stage (or,

Plaintiffs submit, at trial).  Because the Eighth Circuit has already completed a *Jones*-

style analysis and found that a trial is warranted, this Court should vacate its summary

3

judgment ruling, *see* Dkt. 202, direct the completion of discovery, and allow a trial to proceed.

With regard to the applicable damages period under ICA § 36(b), although not addressed in *Jones*, the Eighth Circuit unequivocally held in *Gallus* that a "straightforward reading of the damage limitation yields only a retrospective limitation." 561 F.3d at 825.  This Court should therefore vacate its prior ruling, *see* Dkt. 163, and hold that the damages period contemplated by § 36(b)(3) does not close after one year.

## SUMMARY OF FACTUAL BACKGROUND[3]

Plaintiffs are shareholders of eleven RiverSource Funds.[4]  Plaintiffs sued the Funds' investment advisers and distributors (collectively, "Ameriprise") under ICA § 36(b), which imposes upon advisers/distributors a fiduciary duty with respect to the receipt of compensation.  Plaintiffs allege that the fees charged under the advisory and distribution agreements with the Funds were excessive and that the process pursuant to which those fees were approved was woefully deficient, in part because Ameriprise misled the Funds' board.  Plaintiffs maintain that Ameriprise orchestrated and manipulated the process by which the board approved the advisory fees to knowingly receive compensation from the Funds that far exceeded levels that would have resulted from an arm's-length transaction and, further, that Ameriprise received distribution fees from the Funds despite knowing that there was no reasonable likelihood that those

---

[3]  The factual background of this dispute has been extensively briefed for the Court in the parties' respective summary judgment papers, and elsewhere.  *See e.g.,* Mem. of Law in Supp. of Pls.' Opp'n. to Defs.' Mot. for Summ. J. ("Pls.' Opp'n.") (Dkt. 190).

[4]  The fund family was previously known as the American Express Funds.

expenditures would benefit the Funds and their current shareholders.  *See* Am. Compl. ¶¶ 5-19, 44-78; 20-28 & 79-82 (Dkt. No. 177).

## I.   PLAINTIFFS PRESENTED EVIDENCE THAT THE FEE-SETTING PROCESS WAS DEFICIENT.

With only limited discovery,[5] Plaintiffs presented evidence that the process by which the fees were approved was deficient and that the fees charged to the Funds exceeded those that a true arm's-length negotiation between fully informed and independent parties would have produced.  Those facts included:

- Ameriprise's fee rates were not actually negotiated by the Defendants and the Fund's board but, rather, were pegged to rates charged to similar mutual funds by other (similarly conflicted) advisers.  The goal of this "externally driven" process was to ensure that advisory fees were in the middle of the pack of mutual funds with similar size, objective, and distribution model. *See* American Express Funds Pricing Philosophy, at AEF028503, Declaration of Becky Ferrell-Anton, attached to Pls.' Opp'n. ("Ferrell-Anton Decl.")[6] Ex. P; Carlson Dep. at 128:1-6, Ferrell-Anton Decl. Ex. D. *See also* Meyer Dep. at 114:14-17, 101:17-20, 114:19-25, 226:11-14, 226:18-20, Ferrell-Anton Decl. Ex. F; Truscott Dep. at 62:6-23, Ferrell-Anton Decl. Ex. G; Lewis Dep. at 28:25-29:6; 236:9-12, Ferrell-Anton Decl. Ex. E.  Both the *Jones* and *Gartenberg* courts have held that this type

---

[5]  In its order denying in part and granting in part Ameriprise's motion to dismiss, the Court found that discovery should be limited and staged.  *See* 370 F.Supp.2d 862 (D. Minn. 2005).  Plaintiffs were ordered to select two subject Funds for the first stage of discovery and were permitted to depose only two of the Funds' disinterested directors. *See* Dkt. No. 81.  Plaintiffs elected to focus on the RiverSource New Dimensions Fund and the RiverSource Large Cap Equity Fund and to depose directors Arne Carlson and Stephen Lewis, Jr.

[6]  The cited declarations and exhibits were filed in support of Plaintiffs' opposition to Defendant's motion for summary judgment.  All non-confidential exhibits and declarations can be found at Docket Number 185.  Confidential exhibits supporting Plaintiffs' opposition were filed under seal.  *See* Dkt. No. 188.  Plaintiffs have not re-filed the exhibits cited herein; however, should the Court wish to receive a courtesy copy of these exhibits, Plaintiffs of course will provide one.

of comparison is of little value in the fee review process.  *See infra* pp. 12-13.

- Ameriprise provided the board with misleading and deceptive information concerning the fees it charged non-mutual fund clients and the nature of the services provided to those non-mutual fund clients. *See* Pls.' Opp'n. at 31-35 (Dkt. No. 190) (discussing the inaccuracies and gross misrepresentations contained in the San Diego Office Review).

- Ameriprise provided the board with a deceptive and unreliable account of its profitability by using cost allocation methodologies that understated Ameriprise's profitability associated with larger funds and that masked the enormous economies of scale that Ameriprise enjoyed but did not share with the Funds.  *See* Declaration of Bruce Dubinsky ¶¶ 8-10, 12, Att. 6 to Pls.' Opp'n. ("Dubinsky Decl.") (Dkt. 185); Dubinsky Decl. Ex. 1 at 10-11. Further, Ameriprise suppressed its reported profitability by improperly accounting for the costs of developing and launching new funds as expenses of existing funds.  Dubinsky Decl. ¶ 11.

- Although Ameriprise acknowledged that economies of scale exist in its investment advisory business, it failed to provide, and the Fund's board failed to consider, information concerning economies of scale.  *See* Lewis Dep. at 407:24-408:11, Ferrell-Anton Decl. Ex. E; *see also* Pls.' Opp'n. at 5 (Dkt. 190).

- Ameriprise retained significant scale economies for itself.  For instance, in one year alone, Ameriprise realized $74 million in cost savings due to economies of scale in managing the New Dimensions Fund but shared only $12.7 million of those savings with the Fund and its shareholders. Declaration of Steve Pomerantz ¶ 26, Att. 4 to Pls.' Opp'n ("Pomerantz Decl.") (Dkt. 185).  Likewise, the advisory fees charged to the New Dimensions Fund declined only 20% from the first dollar managed up to the 24 billionth dollar managed, but advisory fees charged to similar institutional accounts declined between 70% and 75% over the relevant range of assets.  Declaration of Edward S. O'Neal ¶ 16, Att. 5 to Pls.' Opp'n ("O'Neal Decl.") (Dkt. 185).

- Ameriprise routinely put its own financial interests above those of the Funds, engaging in flagrant regulatory violations that resulted in fines of $80 million by the SEC and other regulatory agencies.  These activities, which were directly related to Ameriprise's role as adviser and distributor to the Funds, included permitting inappropriate market timing activities that harmed the Funds and their shareholders, failing to adequately disclose

conflicts of interest, and participating in unlawful directed brokerage and revenue sharing.  *See* Pls.' Opp'n. at 8 (Dkt. No. 190); Ferrell-Anton Decl. Exs. W-DD.

- As a result of Ameriprise's regulatory violations, Morningstar, an independent investment research provider, gave Ameriprise a rating of "very poor" with respect to regulatory issues and an overall stewardship grade of "F" for the New Dimensions Fund.  *See* Ferrell-Anton Decl. Ex. EE.

- In contravention of regulatory requirements, Ameriprise failed to provide, and the Funds' board failed to consider, any quantification of the purported benefits to the Funds and their current shareholders of the Rule 12b-1 distribution fees they were charged.  *See* Lewis Dep. at 404:21-405:21, Ferrell-Anton Decl. Ex. E.  Rather, the decision to continue the Funds' 12b-1 plans, and the distribution fees paid pursuant thereto, was made for no reason other than that such fees were standard in the industry and were deemed competitively necessary by Ameriprise.  *See* Carlson Dep. at 251:14-25, Ferrell-Anton Decl. Ex. D; Lewis Dep. at 156:20-157:23, Ferrell-Anton Decl. Ex. E.

- The Rule 12b-1 fees were not reasonably likely to (and did not in fact) benefit current Funds and shareholders.  *See* O'Neal Decl. ¶ 19; Pls.' Opp'n. at 41-44 (Dkt. No. 190) (summarizing evidence).

## II.   PLAINTIFFS PRESENTED EVIDENCE THAT AMERIPRISE CHARGED THE FUNDS TWICE AS MUCH AS IT CHARGED NON-FIDUCIARY CLIENTS FOR THE SAME SERVICES.

Plaintiffs also adduced powerful evidence that, for "virtually identical" services, Ameriprise charged the shareholders to whom it owed a fiduciary duty as much as double the fee rate it charged its non-fiduciary clients who bargained at arm's length for their fees.  *See* Pomerantz Decl. ¶¶ 10, 12; O'Neal Decl. ¶ 17.  Plaintiffs' evidence demonstrates that the services provided to the Funds are directly comparable to the services provided to the institutional accounts.  For example, Ameriprise managed a group of institutional accounts known as Growth Spectrum III (GSIII), which were

patterned on the New Dimensions Fund.  *See* Ferrell-Anton Decl. Ex. N.  GSIII and the

New Dimensions Fund received virtually the same, if not identical, services from

Ameriprise.  Their top ten holdings were very similar, *see* AEFE000319780, Ferrell-

Anton Decl. Ex. T; they had virtually identical investment returns in 2001, 2002, and

2003, *see* Pomerantz Decl. ¶ 12; and as of December 31, 2003, they had identical

investment performance, *see* AEFE000027423, Ferrell-Anton Decl. Ex. M.  Gordon

Fines, the portfolio manager for both the New Dimensions Fund and its clone, GSIII,

confirmed that the two accounts were managed "in a very, very like fashion" and that he

made the same buy or sell decisions for both.  *See* Fines Dep. at 86:3-9, 88:2-5, 90:3-7,

Ferrell-Anton Decl. Ex. B.

   Plaintiffs also presented evidence that Ameriprise's purported justification for the

Funds' much higher fees, including cash flows and client services, do not result in

additional or greater services being provided to the Funds.  In fact, the portfolio managers

for the New Dimensions and Large Cap Equity Funds testified that they did not spend a

significant amount of time on issues related to cash management in the mutual funds.  *See*

Fines Dep. at 175:23-176:4, Ferrell-Anton Decl. Ex. B; Ewing Dep. at 36:10-38:13,

Ferrell-Anton Decl. Ex. C.  Likewise, most, if not all, of the "additional" services

Ameriprise claims to provide to the Funds are provided pursuant to separate contracts and

are paid for by the Funds with additional fees.  *See* Declaration of Charles Murdock ¶ 15,

Att. 2 to Pls.' Summ. J. Opp'n. ("Murdock Decl.") (Dkt. 185).  Even assuming *arguendo*

that additional services are provided to the Funds, those services are counterbalanced (if

not outweighed) by the additional accounting and recordkeeping services that Ameriprise

is obligated to provide to the institutional accounts.  Pomerantz Decl. ¶ 14.  Nevertheless,

for providing equivalent (if not *fewer*) services, Ameriprise charged the New Dimensions

Fund *alone* as much as $60 million more *per year* than it charged its independent, non-

mutual fund clients.  *See* Murdock Decl. ¶ 20.

### STANDARD OF REVIEW

Summary judgment is only proper if there are no disputed issues of material fact,

and the Court must view the evidence and inferences that may reasonably be drawn from

the evidence in favor of Plaintiffs, the non-moving party.  Fed.R.Civ.P. 56(c); *Ferguson

v. United States*, 484 F.3d 1068, 1072 (8th Cir. 2007).  The Eighth Circuit already has

found there to be material issues of fact in this case—a decision that is further supported

by *Jones.*

### ARGUMENT

**I.     THE SUPREME COURT'S *JONES* DECISION REQUIRES A HIGHLY
FACT-SPECIFIC REVIEW OF THE FEE-SETTING PROCESS AND THE
SUBSTANTIVE OUTCOME.**

**A.     *Jones* Clarified the Meaning of § 36(b)'s Fiduciary Duty.**

In *Jones*, the Supreme Court clarified that the meaning of the phrase "fiduciary

duty" in § 36(b) is expressed in its "analogous" decision, *Pepper v. Litton*, 308 U.S. 295

(1939):

> Their [corporate fiduciaries'] dealings with the corporation
> are subjected to rigorous scrutiny and where any of their
> contracts or engagements with the corporation is challenged
> the burden is on the director or stockholder not only to prove
> the good faith of the transaction but also to show its inherent
> fairness from the viewpoint of the corporation and those
> interested therein…. *The essence of the test is whether or not*

9

> *under all the circumstances the transaction carries the*
> *earmarks of an arm's length bargain.* If it does not, equity
> will set it aside.

130 S.Ct. at 1427 (citing *Pepper*, 308 U.S. at 306-307) (italics in original).[7] Thus, *Jones*

confirmed that "fiduciary duty" requires *both* good faith in the negotiation process and a

fair outcome. A breach of that duty is determined by examining whether "*under all the*

*circumstances the transaction carries the earmarks of an arm's length bargain*."

    After noting one statutory alteration of the *Pepper* fiduciary standard—i.e., that

ICA §36(b) transfers the burden of proof from the fiduciary to the party claiming a

breach—the Supreme Court found that, for purposes of an excessive fee claim,

*Gartenberg*'s "insist[ence] that all relevant circumstances be taken into account" and its

use of "the range of fees that might result from arm's-length bargaining as the benchmark

for reviewing challenged fees" incorporates *Pepper's* fiduciary duty standard, while

taking into account the fact that § 36(b)(1) shifts the burden of proof. *Id.* Under

*Gartenberg*, and now under *Jones*, it is clear that the *Gartenberg* factors must be

considered as an analytical amalgam of "all relevant circumstances"[8] and not in isolation

as standalone evidence of excessiveness.

---

[7] *See also* ICA § 47(b), 15 U.S.C. § 80a-46(b) (allowing mutual fund contracts to be set
aside based on violations of other sections of the ICA).

[8] The relevant surrounding circumstances contemplated by *Gartenberg*, which have been
reduced by numerous courts to a non-exhaustive list of *Gartenberg* "factors," include: (a)
the adviser's costs in providing the service; (b) the extent to which the adviser realizes
economies of scale as the fund grows; (c) "the nature and quality of the services provided
to the fund and shareholders;" (d) "the profitability of the fund to the adviser;" (e) "any
'fall-out financial benefits' … that accrue to the adviser because of its relationship with
the mutual fund;" (f) "comparative fee structure (meaning a comparison of the fees with

**B.**     *Jones* **Necessitates a Threshold Review of the Fee-Setting Process and Instructs That a Process That Is Not "Robust" Is Entitled to Little, If Any, Judicial Deference.**

In evaluating an excessive fee claim, *Jones* requires that the reviewing court "must take into account both procedure and substance." *See Jones,* 130 S.Ct. at 1429 (citations omitted). To determine the measure of deference to which the board's approval is entitled, a court's evaluation necessarily begins with an analysis of the *process* by which the challenged fees were approved before turning to an analysis of the substantive outcome. For "where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome" and engage in "greater scrutiny … because the withheld information may have hampered the board's ability to function as 'an independent check upon the management.'" *Id.* at 1430 (quoting *Burks v. Lasker*, 441 U.S. 471, 484 (1979)).

On the other hand, even if the fund board's review process was sufficiently "robust," the fee may still be "excessive" if the evidence demonstrates that it "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.* at 1429-30 (quoting *Gartenberg*, 694 F.2d at 928). In other words, only a robust board review warrants application of *Gartenberg's* "so disproportionately large" standard.

---

those paid by similar funds);" and (g) "the independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation." *Jones*, 130 S.Ct. at 1425-26, n.5 (citing *Gartenberg*, 694 F.2d at 929-932).

11

**C.**     ***Jones* Clarified the Scope and Meaning of *Gartenberg* with Respect to the Consideration of Comparative Fees.**

*Jones* also resolved important questions regarding the meaning and scope of

*Gartenberg* with respect to "comparative fees."  First, the Supreme Court rejected the

argument that a comparison between the fees charged mutual funds and those charged an

adviser's other clients is per se inapt.  *Id.* at 1428.  While the Court observed that the ICA

"does not *necessarily* ensure fee parity," *id.* at 1429 (emphasis added), it held that "courts

may give such comparisons the weight that they merit in light of the similarities and

differences between the services that the clients in question require."  *Id.* at 1428.

Second, the Supreme Court cautioned lower courts "not [to] rely too heavily on

comparisons with fees charged to mutual funds by other advisers."  *Id.* at 1429.  The

Court explained that such comparisons "are problematic because [the fees charged to

other similar funds], like those challenged, may not be the product of negotiations

conducted at arm's length."  *Id.* (citing *Jones v. Harris Assocs. L.P.,* 537 F.3d 728, 731-

32 (2008) (Posner, J., dissenting from denial of rehearing en banc)); *see also id.*

("'Competition between . . . funds for shareholder business does not support an inference

that competition must therefore also exist between [investment advisers] for fund

business.  The former may be vigorous even though the latter is virtually non-existent.'")

(quoting *Gartenberg*, 694 F.2d at 929).

As discussed below, in this case, the fee-setting process relied *exclusively* on a

comparison to other funds' fees through an "externally driven" process.  However, the

Supreme Court has now elucidated that such an approach is "problematic." *Jones,* 130

S.Ct. at 1429.

## II.   THE EIGHTH CIRCUIT'S OPINION IS CONSISTENT WITH *JONES* AND SHOULD BE FOLLOWED BY THIS COURT ON REMAND.

The Eighth Circuit engaged in a review of Ameriprise's fees that closely mirrored,

and is entirely consistent with, the approach approved by *Jones*.[9]  Like *Jones*, the Eighth

Circuit concluded "that the *Gartenberg* factors provide a useful framework for resolving

claims of excessive fees."  *Gallus,* 561 F.3d at 822; *see also Jones,* 130 S.Ct. at 1427

(citing with approval *Gartenberg's* requirement that all relevant circumstances be taken

into account).  And also like *Jones*, the Eighth Circuit found that "the proper approach to

§36(b) is one that looks to both the adviser's conduct during negotiation and the end

result." *Gallus,* 561 F.3d at 823; *see also Jones,* 130 S.Ct. at 1429 ("evaluation … must

take into account both procedure and substance.").  Employing a review that was both

process- and outcome-focused as required by *Jones* and *Gartenberg*, the Eighth Circuit

concluded that the grant of summary judgment for Ameriprise was erroneous in several

respects and made *factual* findings that render this case unsuitable for summary

judgment.  While the *Gallus* opinion was vacated, it does not conflict with *Jones* and

---

[9]  Indeed, the only post-*Jones* case to consider both *Gallus* and *Jones* concluded that the legal analysis of the Eighth Circuit and the Supreme Court was "substantially similar." *See Curran v. Principal Management Corp., LLC,* 2010 U.S. Dist. LEXIS 83730, at *13 n.4 (S.D. Iowa June 8, 2010) (denying, in part, a motion to dismiss ICA § 36(b) claims).

13

provides guidance as to how the Eighth Circuit would view Ameriprise's receipt of the advisory and distribution fees at issue in the event of another appeal.[10]

## III.   SUMMARY JUDGMENT IS INAPPROPRIATE UNDER *JONES* BECAUSE THERE ARE MULTIPLE FACTUAL DISPUTES CONCERNING THE ADEQUACY OF THE FEE-SETTING PROCESS AND THE LEVEL OF THE FEES THEMSELVES.

Under *Jones* (and *Gallus*), numerous material issues of fact remain regarding the adequacy of the fee-setting *process,* as well as the *substantive* result of that process, none of which can be disposed of on summary judgment.  First, this Court must treat as material Plaintiffs' evidence that the process by which the fees were approved was profoundly flawed and must decline to give deference to the board's approval of the fees, particularly in light of Ameriprise's deceit, non-disclosures, and obfuscation of pertinent information.  *See Jones,* 130 S.Ct. at 1429-30 (requiring courts to review fee-setting process and discount deference to board where the process lacked robustness); *Gallus,* 561 F.3d at 824 (finding this Court should have evaluated Ameriprise's conduct independent of the end result, including whether "Ameriprise purposefully omitted, disguised, or obfuscated information that it presented to the [b]oard").  Second, the Court cannot, in essence, treat as dispositive the fact that Ameriprise had set "a fee that was

---

[10]  While the Eighth Circuit's *Gallus* opinion was vacated, it was not reversed.  Although a vacated decision does not constitute binding precedent, *see O'Connor v. Donaldson*, 422 U.S. 563, 577 (1975), the Eighth Circuit has ruled that its vacated opinions may still serve as guidance for district courts following a remand.  *See e.g.*, *Glover v. McDonnell Douglas Corp.*, 12 F.3d 845, 848 n.3 (8th Cir. 1994) (though a vacated opinion lacks precedential value, "the parties and the district court are invited to rely on our prior opinion as it relates to [certain] issues for purposes of resolving matters on remand"); *see also United States v. Betcher*, 534 F.3d 820, 824 n.3 (8th Cir. 2008) (a discussion of legal issues in the vacated case was still deemed "nonetheless persuasive").

[not] exorbitant relative to that of other advisers," *Gallus,* 561 F.3d at 824, a comparison

that *Jones* and *Gartenberg* found problematic.  *See Jones,* 130 S.Ct. at 1429

(comparisons to similarly conflicted mutual funds' fees are "problematic"); *Gartenberg*,

694 F.2d at 929 (same).  Third, the Court must consider "a comparison between the fees

charged to Ameriprise's institutional clients and its mutual fund clients" given that this

comparison "is particularly strong in this case." *Gallus*, 561 F.3d at 823, 824; *see also*

*Jones*, 130 S.Ct. at 1429 n.8 (indicating that, where plaintiffs have shown a large

disparity in fees that cannot be explained by a difference in services, trial is appropriate).

Finally, the Court must also rigorously scrutinize, and give sufficient weight to,

Plaintiffs' evidence that Ameriprise's fees exceeded those that would have resulted from

a true arm's-length negotiation.  *See Gallus*, 561 F.3d at 818 (finding insufficient weight

given to contested issues of material fact).  In doing so, the Court must consider the

relevant "surrounding circumstances" together, rather than isolating each factor for *per se*

evidence of excessiveness.  *See Jones*, 130 S.Ct. at 1427 (citing with approval

*Gartenberg's* requirement that "all relevant circumstances be taken into account").

### A.     The Fee-Setting Process Was Deficient, Requires Greater Scrutiny, and Is Entitled to Little, If Any, Deference.

*Jones* instructs that, where a board's review process is not robust or when an

adviser fails to disclose material information to a board, the court must engage in a

rigorous review of the process's outcome.  Here, the process consisted of little more than

a rubber-stamp approval of Ameriprise's fees based on their proximity to the fees

charged to other mutual funds and was both infected with misleading and deceptive

15

information designed to justify Ameriprise's high fees and lacking in pertinent data

needed for true arm's-length negotiations.  This evidence that the board's review process

was deficient creates genuine issues of material fact with respect to the threshold

consideration of whether, under *Jones,* the fee agreements were the product of a process

to which this Court should give any deference.

> 1.    *The fee-setting process was deficient because it focused exclusively on fees charged to similarly captive funds by similarly conflicted advisers.*

The singular focus of Ameriprise's "pricing philosophy" was to set advisory fees

for the Funds that were "'in the middle of the pack of funds with a similar size, objective

and distribution model.'" *Gallus*, 561 F.3d at 818.  Hardly a "robust" negotiation, the fee-

setting process was "externally driven" based on Ameriprise's competitors—a fact

confirmed by both the Funds' directors and Ameriprise executives.  *See* Carlson Dep.

128:1-6, Ferrell-Anton Decl. Ex. D; Lewis Dep. 236:9-12, Ferrell-Anton Decl. Ex. E;

Meyer Dep. 114:14-17, 226:12-14, 226:18-20, Ferrell-Anton Decl. Ex. F.  Regarding the

"process," the Eighth Circuit found, as a factual matter, that the "negotiation" "focused

on the advisory fees charged by peer mutual funds" and that the "Board acquiesced in

this goal of tethering fees to the industry median" even though it had access to internal

information about the mutual fund services provided, personnel, performance, and

profits.  *Gallus,* 561 F.3d at 818.[11]

---

[11]  Plaintiffs also presented evidence that, as with the advisory fees, the 12b-1 distribution fees were competitively set and were not "negotiated" in light of an evaluation of the nine factors the SEC has found should inform a board's analysis of such fees.  *See* Carlson

By focusing on fees charged to similarly captive mutual funds to the exclusion of all else, the Funds' board ignored important factors and engaged in exactly the analysis that *Jones* and *Gartenberg* found problematic.  *See Jones*, 130 S.Ct. at 1429 (citing *Gartenberg*, 694 F.2d at 929).  Indeed, if *Jones* stands for anything, it is that the range of fees that could be negotiated at arm's length *does not* ipso facto include fees paid by other mutual funds.  And yet this inapt comparison is the lynchpin of the "negotiations" and fee-setting process.  As the Eighth Circuit recognized, a process primarily focused on other mutual funds' fees could "create a safe harbor of exorbitance" and "dilute[]" an adviser's fiduciary duty "to a simple and easily satisfiable requirement not to charge a fee that is egregiously out of line with industry norms. To apply *Gartenberg* in this fashion across the entire mutual fund market would be to eviscerate § 36(b)." *Gallus*, 561 F.3d at 823.

> 2.   *The fee-setting process was deficient because Ameriprise withheld material information.*

The Funds' board was not fully informed and, therefore, was unable to protect the interests of the Funds and their shareholders during the fee-setting process.  *See Jones*, 130 S.Ct. at 1427 ("[S]crutiny of investment adviser compensation by a fully informed mutual fund board is the 'cornerstone of the … effort to control conflicts of interest within mutual funds.'") (quoting *Burks,* 441 U.S. at 482).  By employing an "externally driven" process that relied solely on competitors' fees, Defendants sidestepped, and the

---

Dep. at 251:14-25, Ferrell-Anton Decl. Ex. D; Lewis Dep. at 156:20-157:23, 405:5-8, Ferrell-Anton Decl. Ex. E.

board ignored, facts necessary to conduct a true arm's-length negotiation, such as Ameriprise's costs and profitability in managing the Funds. *See* Declaration of Manning Warren, ¶¶ 8-9, Att. 3 to Pls.' Opp'n. (Dkt. 185). Indeed, Plaintiffs presented evidence establishing that the "negotiation" process did not encompass a meaningful consideration of Ameriprise's internal costs, profitability, or savings from economies of scale in setting fees as it was required to do. *See* Meyer Dep. at 114:14-17, Ferrell-Anton Decl. Ex. F ("Neither savings nor incremental costs are considered when we set fund prices. Competitors are considered. That's the primary consideration."); *id.* at 226:12-14, 18-20 ("95% of the discussion relates to… the competitive set, and what other people are charging…I can't even recall any discussions that try to connect that back to profitability."); *id.* at 114:19-25 (when asked directly if any other consideration goes into setting fees, Meyer replied, "No, there really isn't. I mean our agreement is to have fund fees that are at or below the median."); *see also* Lewis Dep. at 407:24-408:11, Ferrell-Anton Decl. Ex. E.

Under *Jones*, "an adviser's … noncompliance with its disclosure obligations is a factor that must be considered in calibrating the degree of deference that is due a board's decision to approve an adviser's fees." 130 S.Ct. at 1430. Accordingly, the Court must also consider other evidence that the process was not robust because Ameriprise failed to provide information necessary for the Board to be "fully informed,"[12] including the following facts:

---

[12] The ICA "requires advisers to furnish all information 'reasonably … necessary to evaluate the terms' of the adviser's contract." *Jones*, 130 S.Ct. at 1428 (quoting 15

- Ameriprise never provided, and the board never requested, an economies-of-scale analysis that could be used to negotiate a fair division of profits from economies of scale through "breakpoints" reflective of the costs and profitability of each Fund.  Instead, the Funds' breakpoints were established comparatively based on other conflicted mutual funds.  *See* Lewis Dep. at 407:24-408:11, Ferrell-Anton Decl. Ex. E.

- Ameriprise did not provide the board with information concerning its costs and profitability from the institutional accounts.  *See* Lewis Dep. at 251:20-252:13, Ferrell-Anton Decl. Ex. E.  And when "negotiating" the Funds' fees, the board failed to consider the huge fall-out benefit to Ameriprise of having portfolio managers and research teams already in place as a result of the Funds that Ameriprise could "clone" and resell to institutional clients.  *See id.* at 252:15-253:3.

- Ameriprise failed to furnish the Funds' directors with information "necessary to an informed determination of whether [a 12b-1] plan should be implemented or continued," including a quantification of the purported benefits to current Funds and shareholders of the 12b-1 fees.  *See* Lewis Dep. at 404:21-405:21, Ferrell-Anton Decl. Ex. E.

Perhaps more telling of the defects in the fee-setting process than the foregoing evidence is the fact that Ameriprise supplied the board with inherently deceptive and misleading information to justify its high fees.[13]  As the Eighth Circuit instructs, this

---

U.S.C. § 80a-15(c)).  Similarly, Ameriprise was obligated to furnish the Funds' directors with information "necessary to an informed determination of whether [the 12b-1] plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d).

[13]  Under *Pepper*, and therefore under *Jones*, a "simpl[e] . . . violation of rules of fair play and good conscience" is "sufficient" to establish a breach of fiduciary duty.  *Pepper*, 308 U.S. at 310-11; *see also id.* at 311 (a fiduciary may not "utilize his inside information and his strategic position for his own preferment"); *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 809 (2d Cir. 1976) (holding that an adviser violated its fiduciary duty under § 36(b) by "acquiring from the mutual fund, without full disclosure to the [board of directors], a patently one-sided revision of the advisory contract").  Plaintiffs submit that, in view of Ameriprise's knowing "negotiation" of its own high fees with a board to which it knowingly provided misleading information to justify its level of fees, no rational fact finder could conclude that Ameriprise's fees were negotiated in a "good faith … transaction."  *Jones*, 130 S.Ct. at 1427 (quoting *Pepper*, 308 U.S. at 306).

Court must determine "whether Ameriprise purposefully omitted, disguised, or obfuscated information that it presented to the Board" and must evaluate this evidence of Ameriprise's conduct in the negotiation process "independent from the result of the negotiation." *Gallus*, 561 F.3d at 824.

Plaintiffs presented evidence that Ameriprise misled the board regarding the fees it was actually charging its non-mutual fund clients for "cloned" products and regarding the nature and scope of the services it provided to the non-fiduciary clients.[14]  Apparently concerned that the justification for the significant fee disparity between the Funds and Ameriprise's non-fiduciary, institutional clients "might not be convincing" to the board, Ameriprise created the "San Diego Office Review"—a report which omitted or obfuscated information to make the fee discrepancy seem smaller and more justifiable than it really was.  The Eighth Circuit found that there was "conflicting expert testimony on the accuracy and veracity" of the San Diego Office Review and concluded that "[t]he veracity and completeness of th[is] report is an important part of this dispute," especially because the fees charged to institutional clients is a proxy for what the Funds' "investment advice is worth."  561 F.3d at 819, 824.

Plaintiffs also brought forward evidence that the profitability data Ameriprise provided to the board was improper, misleading, and inaccurate.  *See* Dubinsky Decl. ¶¶

---

[14] *See* Pls.' Opp'n. at 33-35 (Dkt. No. 190) (summarizing evidence that Ameriprise significantly understated to the board the fees charged to its non-mutual fund clients for advising "cloned" funds); Pomerantz Decl. at ¶¶ 10-15 (summarizing the relevant evidence and explaining that, if anything the funds received advisory services that were less costly to provide than those provided to the non-fiduciary clients).

8-13. Specifically, Ameriprise used a cost allocation methodology that understated its profitability from higher-asset funds, enabled Ameriprise to obscure its true costs and mask its enormous economies of scale, and improperly included costs associated with developing and launching new funds. *See id.*; Pomerantz Decl. ¶ 23. Construed in a light most favorable to Plaintiffs, this evidence demonstrates that Ameriprise lacked integrity during the fee-setting process.

Given the board's exclusive reliance on other mutual funds in setting the Funds' fees, and in view of Ameriprise's failure to provide, and the board's failure to consider, accurate information concerning the fees charged to Ameriprise's institutional accounts, economies of scale, profitability, and the benefits, if any, of the 12b-1 fees paid by the Funds and their shareholders, there are material issues of fact concerning whether the fee-setting process is entitled to any deference.

**B.     Plaintiffs' Evidence Demonstrates That the Fees Are Far Higher Than What an Arm's-Length Transaction Would Have Produced.**

The deficiencies in the fee-setting process described above require that this Court take a "rigorous" look at the outcome to determine whether it "carries the earmarks of an arm's length bargain." *Jones*, 130 S.Ct. at 1427 (quoting *Pepper* at 306-307). Here, the outcome was a fee that was double what Ameriprise charged its non-fiduciary clients with whom it bargains at arm's-length.

*1.     Ameriprise charged significantly lower fees to its non-fiduciary clients for virtually identical services.*

"The purpose of an inquiry into the fees paid by institutional, non-fiduciary clients is to determine what the investment advice is worth." *Gallus,* 561 F.3d at 824. In this

21

case, Plaintiffs' evidence of the fee disparity between the Funds and Ameriprise's non-fiduciary institutional accounts creates a trial-worthy issue with respect to the substantive excessiveness of the advisory fees.  As the Eighth Circuit concluded, this Court should consider "a comparison between the fees charged to Ameriprise's institutional clients and its mutual funds."  *Id.* at 823.

The Supreme Court now has provided clear guidance that comparisons between the fees charged to institutional accounts should be given "the weight that they merit in light of the similarities and differences between the services that the clients in question require," *Jones*, 130 S.Ct. at 1428—a highly fact-intensive inquiry that does not lend itself to resolution as a matter of law.  While the Supreme Court commented in a footnote that "comparisons with fees charged to institutional clients … will not 'doom any fund to trial,'" *id.* at 1429 n.8 (citations and brackets omitted), it made clear that a triable issue is raised when a plaintiff shows a large fee disparity "that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's length range."  *Id.*

Here, consistent with *Jones*, Plaintiffs have shown, and the Eighth Circuit has found as a factual matter, that "the argument for comparing mutual fund advisory fees with the fees charged to institutional accounts is particularly strong in this case because the investment advice may have been essentially the same for both accounts." *Gallus*, 561 F.3d at 824.  Indeed, Plaintiffs' evidence establishes that the comparison between the fees charged to the mutual funds and those charged to the non-fiduciary, institutional clients is directly comparable:  the funds pay separately pursuant to separate agreements

for services that are not provided to non-mutual funds clients and, if anything, Ameriprise

provides *more* services to the institutional accounts.  *See* Murdock Decl. ¶ 15; Pomerantz

Decl. ¶¶ 10-12, 14-15.  Plaintiffs adduced evidence that "the advisory service provided to

the mutual funds was similar, if not identical, to the service Ameriprise provided to the

institutional clients"[15] and that "the fee difference could not be substantively justified."

*Gallus*, 561 F.3d at 819 (referencing testimony of Plaintiffs' expert, Professor Charles

Murdock).  Further, as discussed above, there are issues of fact concerning the "veracity

and completeness" of Ameriprise's attempt to justify the significant fee differential.  *Id.*

at 824.

As the Eighth Circuit recognized, "the most striking difference between

Ameriprise's mutual fund clients and its institutional clients is that the former pay an

advisory fee that is substantially more—perhaps up to twice as much higher—than the

latter." *Id.* at 819.  Plaintiffs' evidence shows that Ameriprise charged the New

Dimensions Fund and its shareholders $60 million *more* in one year than the identically

managed institutional account.  *See* Murdock Decl. at ¶ 20.  "[U]npersuaded by the

assertion that th[is] fee disparity simply reflects what different investors are willing to

pay," the Eighth Circuit charged the district court  "to explore[] the disputed issues of

material fact concerning the similarities and differences between mutual funds and

institutional accounts." *Gallus*, 561 F.3d at 824.   Given the Eighth Circuit's factual

findings concerning the similarity of services and the great disparity in fees between the

---

[15] *See supra* pp. 7-9 (setting forth evidence demonstrating that the services are
comparable).

Funds and the institutional accounts, Plaintiffs' evidence clearly raises a triable issue under *Jones.*

>        2.      *Material issues of fact remain with respect to Plaintiffs' additional evidence regarding the Gartenberg factors, including evidence of substantive excessiveness, rendering summary judgment inappropriate.*

In its summary judgment analysis, this Court reviewed each of the *Gartenberg* factors, acknowledged that there are disputed issues of fact regarding each, and ultimately concluded that the evidence as to each factor did not *per se* establish that Ameriprise's fees were too high as a substantive economic matter. *See* Mem. Op. at 11-20 (Dkt. 202). But this approach is inconsistent with *Jones,* which requires an analysis of "all the surrounding circumstances" taken as a whole and not merely a review of each of the *Gartenberg* factors in isolation. Moreover, it is now clear under *Jones* that, given the fatal flaws in the fee-setting process, this Court cannot defer to the board's decision but, rather, must engage in a rigorous review. The Court must treat as material Plaintiffs' other evidence that Ameriprise's fees exceed those that a true arm's-length transaction would have produced in light of all the "surrounding circumstances."

For example, Plaintiffs adduced evidence that in a one-year period, Ameriprise realized $74 million in cost savings due to economies of scale from the New Dimensions Fund but that it shared only $12.7 million of those savings with the Fund and its shareholders. *See* Pomerantz Decl. ¶ 26. Plaintiffs also adduced evidence that fee schedules applicable to the institutional accounts shared significantly more economies of scale with those clients than Ameriprise shared with the Funds. *See* O'Neal Decl. ¶¶ 16-

17.  This tremendous disparity in economies-of-scale savings between the Funds and the institutional clients, who engage in true arm's-length negotiations with Ameriprise, is further evidence that the Funds' advisory fees are substantively excessive.

Plaintiffs also presented expert testimony that the 12b-1 fees were not reasonably likely to *ever* benefit the Funds and their shareholders. Although the 12b-1 fees were intended to generate economies of scale that would, in turn, be shared with the Funds and their shareholders through lower advisory fee levels, Plaintiffs' experts testified that Defendants' selling activities have only benefited Ameriprise because cost economies associated with higher levels of assets have been retained and not passed on to the Funds. *See* Pomerantz Decl. ¶¶ 24-26.  In fact, given current breakpoint levels in the advisory fees, shareholders will never recoup the 12b-1 fees paid by the Funds regardless of how large assets become.  *See* O'Neal Decl. ¶ 19.[16]  Nevertheless, in contravention of applicable regulatory requirements, the Board approved, and Ameriprise knowingly received, the 12b-1 fees year after year even though there was no reasonable likelihood that those fees would *ever* benefit the Funds and their current shareholders.  *See* 17

_____

[16]  This Court granted summary judgment on Plaintiffs' excessive-distribution-fees claim in part based on its conclusion that 85% of the 12b-1 fees covers shareholder servicing to existing shareholders.  *See* Mem. Op. at 22-23.  But the evidence that supposedly supports this conclusion does not establish that these fees only subsidize the retail financial advisers' work for *current* shareholders rather than their search for new shareholders.  Indeed, to the contrary, a number of recent studies that conclude that Rule 12b-1 plans do not benefit funds or their shareholders.  *See* Lori Walsh, Financial Economist, Office of Economic Analysis, U.S. Securities and Exchange Commission, *The Costs and Benefits to Fund Shareholders of 12b-1Plans: An Examination of Fund Flows, Expenses and Returns*, at 2-6 & nn.2 & 7 (2004); Daniel B. Bergstresser, John M.R. Chalmers & Peter Tufano, *Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry* (October 1, 2007) (available at http://ssrn.com/abstract=616981).

C.F.R. § 270.12b-1(e) (requiring a finding that the 12b-1 Plans are reasonably likely to benefit the funds and their shareholders).  At a minimum, this evidence creates disputed issues of material fact regarding whether Ameriprise breached its fiduciary with respect to its receipt of the 12b-1 fees.

## IV.   THE DAMAGES PERIOD UNDER § 36(b) DOES NOT CLOSE AFTER ONE YEAR.

The Court should also vacate its July 27, 2006, order and hold that the damages available to the Plaintiffs are not limited to the one-year period prior to the filing of the lawsuit.  In *Gallus*, the Eighth Circuit squarely considered and rejected the argument that the damages limitation of § 36(b)(3) "closes" after one year.  *Gallus*, 561 F.3d at 825. *See also Dumond v. Mass. Fin. Servs. Co.,* No. 04-cv-11458, 2007 U.S. Dist. LEXIS 12304 (D. Mass. Feb. 22, 2007) (after a comprehensive analysis, concluding that a straightforward reading of the damage limitation period in the ICA yields only a retrospective, and not a prospective, limitation); *Hunt v. Invesco Funds Group, Inc.*, No. 04-02555, 2006 U.S. Dist. LEXIS 42064, at *4-5 (S.D. Tex. Jun. 22, 2006) (the ICA does not limit damages *following* the filing of a §36(b) action).

While the ICA's one-year damage lookback is calculated from the date a complaint is filed, the statute does *not* provide that damages stop accruing or that filing ends the damage period.  Rather, as the Eighth Circuit has found, damages continue up through and including the time of trial.  *Gallus,* 561 F.3d at 825.  This result is logical as injured plaintiffs do not suffer merely one calendar year of damages where the harm is continuing.  It is also entirely consistent with the general principle that continuing

damages are to be determined at trial and do not end the date a lawsuit is filed. *See Dumond*, 2006 U.S. Dist. LEXIS 12304, at *6-7 ("damages caused by a defendant's liability-producing conduct ordinarily may be proved through the time of trial and judgment.").

Although *Gallus* was vacated in light of *Jones*, the damages period issue was not addressed in *Jones,* and therefore, *Gallus* should be relied upon and followed on remand. *See e.g., Glover,* 12 F.3d at 848 n.3; *see also supra* note 10 (discussing the fact that vacated opinions should serve as guidance on remand).

## CONCLUSION

For the reasons stated above, this Court should vacate its prior order granting summary judgment for Ameriprise, *see* Dkt. No. 202, and allow this case to proceed to trial after the completion of the remaining discovery. This Court should also vacate its order regarding the damages period under § 36(b), *see* Dkt. No. 163, and hold that the damages available to Plaintiffs in this case are not limited to the one-year period prior to the filing of the complaint.

Dated:  September 1, 2010          Respectfully submitted,

                                   **CHESTNUT & CAMBRONNE, P.A.**


               By:      /s/ Karl L. Cambronne
                       Karl L. Cambronne (MN Bar# 14321)
                       3700 Campbell Mithun Tower
                       222 South Ninth Street
                       Minneapolis, MN 55402
                       Ph:  (612) 339-7300
                       Fax: (612) 336-2940
                       E-mail: kcambronne@chestnutcambronne.com

                       Michael J. Brickman, *Pro Hac Vice*
                       James C. Bradley, *Pro Hac Vice*
                       Nina H. Fields, *Pro Hac Vice*
                       RICHARDSON, PATRICK
                         WESTBROOK & BRICKMAN, LLC
                       1017 Chuck Dawley Blvd. (29464)
                       Post Office Box 1007
                       Mount Pleasant, SC 29465
                       Ph: (843) 727-6500
                       Fax:  (843) 881-6183
                       E-mail:  mbrickman@rpwb.com
                                jbradley@rpwb.com
                                nfields@rpwb.com

                       Guy M. Burns, *Pro Hac Vice*
                       Jonathan S. Coleman, *Pro Hac Vice*
                       JOHNSON, POPE, BOKOR,
                         RUPPEL & BURNS, LLP
                       403 E. Madison St., Suite 400
                       Tampa, FL  33602
                       Ph:  (813) 225-2500
                       Fax: (813) 223-7118
                       E-mail: guyb@jpfirm.com
                                jonathanc@jpfirm.com

Michael D. Woerner, *Pro Hac Vice*
Lynn Lincoln Sarko, *Pro Hac Vice*
Tana Lin, *Pro Hac Vice*
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Ph: (206) 623-1900
Fax: (206) 623-3384
E-mail: mwoerner@kellerrohrback.com
           lsarko@kellerrohrback.com
           tlin@kellerrohrback.com

*Attorneys for Plaintiffs*